UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LOCAL 2507, UNIFORMED EMTs, PARAMEDICS &
FIRE INSPECTORS, Individually and on behalf of its
current and former members; LOCAL 3621, EMS
OFFICERS UNION, Individually and on behalf of its
current and former members; NYC EMS SUPERIOR
OFFICERS ASSOCIATION, Individually and on behalf
of its current and former members; TONYA BOYD,
CHRISTELL CADET, MARK CARRASQUILLO,
LIZETTE CLARO, BEVERLY COBB, ALI COUTARD,
SENCIA DATILUS, LAITRICE EDWARDS, ALICIA
ELKADI, RONALD FLOYD, KAHLIA GRAHAM,
RICHARD GUZMAN, MAGGIE HOPE, JASMIN
HOWARD, ANGELA JONES, RAVIVARMAN
KAILAYANATHAN, MELANIE MORENO-
KETCHUM, JENELLE PIERRE, SIMONE QUASHIE,
JASON SAFFON, ALLISON SHAUGHNESSY,
LAURA TORRES, ANDRE VALDEZ, LANCE
WINFIELD, RONALD WOLFE, MARYLOU
AURRICHIO on behalf of themselves and all other
similarly-situated individuals,

Case No. 22-cv-10336 (AT) (GWG)
[rel. 20-cv-3389]

                                    Plaintiffs,

              -against-

CITY OF NEW YORK on behalf of the Fire Department
of the City of New York,

                                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF CERTIFICATION OF A
CLASS AND SUBCLASSES, APPOINTMENT OF CLASS COUNSEL, AND
EXCLUSION OF THE REPORT AND TESTIMONY OF DR. MICHAEL CAMPION**

---

THE KURLAND GROUP
*Attorneys for Plaintiffs*
85 Broad Street, 28th Floor
New York, New York 10004
(212) 253-6911

**TABLE OF CONTENTS**

**I. INTRODUCTION**_____1

**II. FACTS**_____5

**A.    The Representative Plaintiffs, Proposed Class and Subclasses**_____5

**B.    Defendant's Policies and Practices That Discriminate Against
       EMS First Responders**_____5

       1. Defendant's Failure to Take the Necessary Steps to Determine
          Appropriate Pay for EMS First Responders' Current Job Duties
          in the FDNY_____6

       2. Defendant's Failure to Monitor Occupational Segregation to
          Prevent Discriminatory Employment Practices Against EMS
          First Responders_____9

       3. Defendant's Failure to Recognize EMS as Uniform for Collective
          Bargaining Purposes in Violation of NYC Administrative Code
          §12-307 as Amended by Local Law 19 of 2001_____15

**III. ARGUMENT**_____18

**A.    The Campion Report Should Not be Considered in Deciding
       Whether to Certify the Proposed Class and Subclasses**_____18

       1.  Dr. Campion is Unqualified to Respond to the Findings of
           Dr. Maguire_____19

       2.  The Court Should Not Consider Dr. Campion's Discussion
           of Whether Fire First Responders Are Appropriate Comparators
           to EMS First Responders_____19

       3.  The Court Should Not Consider Dr. Campion's Discussion
           Regarding Whether the Pay Disparities Between Fire First
           Responders and EMS First Responders are Justified_____25

**B.   The Proposed Class and Subclasses Meet The Certification Criteria
       Pursuant To FRCP 23(a)**_____29

       1.  The Class and Subclasses are Sufficiently Numerous and
           Ascertainable_____30

2. There Are Questions of Law and Fact Common to the Class
and Subclasses_____ 31

3. Plaintiffs' Claims Are Typical of the Claims of the Class
and Subclasses_____ 35

4. Plaintiffs and Their Counsel Will Fairly and Adequately
Represent the Class and Subclasses_____ 37

5. The Class and Subclasses Meet the Certification Criteria
Pursuant to FRCP 23(b)(3)_____ 38

IV.    CONCLUSION_____ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Amchem Products, Inc. v. Windsor,
521 U.S. 591 (1997)………………………………………………………………………….29

Amorgianos v. Nat'l R.R. Passenger Corp.,
303 F.3d 256 (2d Cir. 2002)……………………………………………………19-20, 26

AngioDynamics v. C.R. Bard, Inc.,
537 F.Supp.3d 273 (N.D.N.Y. 2021)…………………………………………………19-20, 25

Barone v. Safway Steel Products, Inc.,
2005 WL 2009882 (E.D.N.Y. Aug. 23, 2005)……………………………………………….39

Berkman v. City of New York,
536 F.Supp. 177 (E.D.N.Y. 1982)……………………………………………………...35

Betances v. Fischer,
2021 WL 1534159 (S.D.N.Y. Feb. 23, 2021)…………………………………………21, 26-27

Bocoum v. Daimler Trucks North America, LLC,
2022 WL 902465 (S.D.N.Y. March 28, 2022)…………………………………………..28-29

Bolanos v. Norwegian Cruise Lines Ltd.,
212 F.R.D. 144 (S.D.N.Y. 2002)……………………………………………………………38

Brown v. Daikin Am. Inc.,
756 F.3d 219 (2d Cir. 2014)………………………………………………………...23-24

Caridad v. Metro-North Commuter R.R.,
191 F.3d 283 (2d Cir. 1999)………………………………………………………...32-33

Cayuga Indian Nation of NY v. Pataki,
83 F.Supp.2d 318 (N.D.N.Y. 2000)……………………………………………………24-25

Chalmers v. City of New York,
2022 WL 4330119  (S.D.N.Y. Sept. 19, 2022)………………………………………..21-22

Chen-Oster v. Goldman, Sachs & Co.,
325 F.R.D. 55, 73 (S.D.N.Y. 2018)………………………………………31, 32-33, 35, 36, 38

Chen-Oster v. Goldman, Sachs & Co,
2022 WL 814074  (S.D.N.Y. Mar. 17, 2022)………………………………………...21-22, 24

Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,
    502 F.3d 91 (2d Cir. 2007)…………………………………………………………………...37

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)…………………………………………………………...……18-19, 22, 23

Duling v. Gristede's Operating Corp.,
    267 F.R.D. 86 (S.D.N.Y. March 8, 2010)……………………………………….…………..37

Fin. Guar. Ins. Co. v. Putnam Advisory Co.,
    2020 WL 4251229  (S.D.N.Y. Feb. 19, 2020)………………………………………………23

Forte v. Liquidnet Holdings, Inc.,
    2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015), aff'd 675 F. App'x 21 (2d Cir. 2017)…...24-25

Fonseca v. Dircksen & Talleyrand Inc.,
    2015 WL 5813382 (S.D.N.Y. Sep. 28, 2015)…………………………………………….…33

General Electric Co. v. Joiner,
    522 U.S. 136 (1997)……………………………………………………….…21, 26-27, 28-29

General Telephone Co. of Southwest v. Falcon,
    457 U.S. 147 (1982)………………………………………………………………......…36

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000)…………………………………………………………10, 11, 23-24

Houser v. Pritzker,
    28 F.Supp. 3d 222 (S.D.N.Y. 2014)……………………………………………………36

Hnot v. Willis Group Holdings Ltd.,
    228 F.R.D. 476 (S.D.N.Y. 2005)……………………………………….…………..30, 31

In re Initial Pub. Offerings Secs. Litig.,
    471 F.3d 24 (2d Cir. 2006)……………………………………………………...……29

In re Lyman Good Dietary Supplements Litig.,
    2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019)…………………………...…………18, 22

In re NASDAQ Market–Makers Antitrust Litig.,
    169 F.R.D. 493 (S.D.N.Y. 1996)……………………………………………………36

In re Nassau County Strip Search Cases,
    461 F.3d 219 (2d Cir. 2006)……………………………………………….…………40

In re Omnicom Group, Inc. Sec. Litig.,
    2007 WL 1280640 (S.D.N.Y. Apr. 30, 2007)……………………………………………..39

In re Visa Check / MasterMoney Antitrust Litig.,
       280 F.3d 126 (2d Cir. 2001)……………………………………………………..……39

Katz v. Prof'l Billing Collections, LLC,
       2021 WL 2418387 (S.D.N.Y. June 14, 2021)………………………………………………30

Koss v. Wackenhut Corp.,
       2009 WL 928087 (S.D.N.Y. March 30, 2009)…………………………………...……………38

Local 3621, et al v. City of New York, et al,
       1:18-cv-04476 (LJL)(JW)…………………………………………………………..…..35

Marisol A. v. Giuliani,
       126 F.3d 372 (2d Cir. 1997)…………………………………………………………29, 35, 37

Mayor of City of New York v. Council of City of New York,
       38 A.D.3d 89 (1st Dep't 2006)……………………………………………………………15

Mayor of City of New York v. Council of City of New York,
       9 N.Y.3d 23 (2007)………………………………………………………………………..15

Mendez v. Radec Corp.,
       232 F.R.D. 78 (W.D.N.Y. 2005)……………………………………..……………………39

Nimely v. City of New York,
       414 F.3d 381 (2d Cir. 2005)……………………………………………………………..……19

N.K. v. Abbott Labs.,
       731 Fed. App'x 24 (2d Cir. 2018)……………………………………………………...……18

Noble v. 93 Univ. Place Corp.,
       224 F.R.D. 330 (S.D.N.Y. 2004)………………………………………………………..…..31

Richardson v. City of New York,
       2018 WL 4682224 (S.D.N.Y. Sep. 28, 2018)……………………………...……………31

Robinson v. New York City Transit Auth.,
       2020 WL 5814189 (S.D.N.Y. Sep. 30, 2020)……………………………….…………30

Rodriguez v. Hayes,
       591 F.3d 1105 (9th Cir. 2010)………………………………………………………….……35

Rossini v. Ogilvy & Mather, Inc.,
       798 F.2d 590 (2d Cir. 1986)……………………………………………...……………..36, 38, 39

Torres v. Gristede's Operating Corp.,
       2006 WL 2819730 (S.D.N.Y. Sept. 26, 2006)……………………………...…………..39

Tyson Foods, Inc. v. Bouaphakeo,
    136 S. Ct. 1036 (2016)……………………………………………………………………34

United States v. City of New York,
    717 F.3d 72 (2d Cir. 2013)……………………………………...………………..34, 35

United States v. City of New York,
    683 F. Supp. 2d 225 (E.D.N.Y. 2010)……………………………………...…………..35

United States v. Khan,
    787 F.2d 28 (2d Cir. 1986)……………………………………………………………...…23

United States v. Mulder,
    273 F.3d 91 (2d Cir. 2001)…………………………………………………………...……23

United States v. Romano,
    794 F.3d 317 (2d Cir. 2015)…………………………………………………………………22

United States v. Williams,
    506 F.3d 151 (2d Cir. 2007)……………………………………………………….…………19

Vulcan Soc. v. Civil Serv. Comm'n,
    360 F.Supp. 1265 (S.D.N.Y 1973)………………………………..………………………35

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011)…………………………………………………………...……31, 32

**Rules and Statutes**

Fed. Rule Civ. Proc. Rule 23(a)……………………………………………1, 29, 31, 35, 37, 38

Fed. Rule Civ. Proc. Rule 23(b)……………………………………………………1, 4,  29-30, 38

Fed. Rule Civ. Proc. Rule 23(g)…………………………………………………………..……1

Fed. Rule Civ. Proc. Rule 26(a)(2)(B)…………………………………………………………..18

Fed. Rule Evid. 401…………………………………………………………………………...……23

Fed. Rule Evid. 702…………………………………………………………………...………..1, 18, 19

NYC Administrative Code §12-307……………………………………...……2, 5, 15, 32, 35, 36, 37

Plaintiffs Local 2507, Uniformed EMTs, Paramedics, Fire Inspectors ("Local 2507");

Local 3621, EMS Officers Union ("Local 3621"), NYC EMS Superior Officers Association

("SOA"), Tonya Boyd, Christell Cadet, Mark Carrasquillo, Lizette Claro, Beverly Cobb, Ali

Coutard, Sencia Datilus, Laitrice Edwards, Alicia Elkadi, Ronald Floyd, Kahlia Graham, Richard

Guzman, Maggie Hope, Jasmin Howard, Angela Jones, Ravivarman Kailayanathan, Melanie

Moreno-Ketchum, Jenelle Pierre, Simone Quashie, Jason Saffon, Allison Shaughnessy, Laura

Torres, Andre Valdez, Lance Winfield, Ronald Wolfe, and Marylou Aurrichio (collectively, the

"Plaintiffs") hereby move to designate Tonya Boyd, Lizette Claro, Beverly Cobb, Sencia Datilus,

Laitrice Edwards, Alicia Elkadi, Angela Jones, Melanie Moreno-Ketchum, Jenelle Pierre, Simone

Quashie, and Laura Torres as Representative Plaintiffs (collectively, the "Representative

Plaintiffs") and to (1) certify a Class and Subclasses pursuant to Federal Rules of Civil Procedure

("FRCP") 23(a) and 23(b); (2) appoint Class Counsel pursuant to FRCP 23(g); and (3) exclude the

report and testimony of Dr. Michael Campion pursuant to Federal Rule of Evidence ("FRE") §702.

## I.    **INTRODUCTION**

Plaintiffs bring this action to remedy their longstanding claims of discriminatory

employment practices against the Fire Department of the City of New York ("FDNY"), including

its pattern and practice of segregating its workforce based on sex, gender, and race, and suppressing

the compensation of first responders employed in its Emergency Medical Services ("EMS"),

including suppressing their salary, benefits, and terms and conditions of employment (hereinafter

"Compensation").[1]  Representative Plaintiffs seek to represent a class of FDNY employees, who

"are predominantly non-white and largely female," and who Plaintiffs allege have "been

disparately treated and/or impacted in the compensation, benefits, terms and conditions of their

---

[1] Plaintiffs' initial charges with the Equal Employment Opportunity Commission ("EEOC") were filed contemporaneous with EEOC charges filed in the related matter, Chalmers, et al. v City of New York, 20-cv-03389 (AT). However, the instant action was initiated two (2) years after Chalmers, during which and because the EEOC elected to investigate and issue a Determination in favor of Plaintiffs.

employment because of their sex, gender, and/or race" by Defendant City of New York's Fire Department (hereinafter "Defendant," "FDNY," or the "City"). (**Exhibit 1**, Plaintiffs' Class Action Complaint, ¶¶ 89, 99).

Plaintiffs have shown these disparities are the result of discrimination on the basis of sex, gender, and race and have identified three (3) policies and practices that Defendant maintains which have contributed to this discrimination. (Ex. 2, Landis Report). First, Defendant failed to take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders. (Ex. 2, p. 3 "There is no job-relevant rationale that explains the lower rate of pay for EMS First Responders;" Ex. 5, Deposition of Robert Alexander, p. 38 - "Q. … you can't [set a salary]. A. …Right;" Ex. 4, Deposition of Renee Campion, p. 35 – "OLR do[es]n't set the rates of pay;" Ex. 3, Deposition of Lizette Christoff, p. 45 "[FDNY] do[es] not get to set those pay scales.").

Second, Defendant has failed to exert sufficient oversight to prevent or correct suppressed Compensation in its segregated workforce of predominantly non-white and largely female EMS First Responders within the FDNY despite acknowledging that it has a duty to do so. (Ex. 5, p 35 "Q. Does the FDNY have a duty to investigate [those titles with… disparate demographics to ensure there isn't any kind of discriminatory effect on the workers], or review their salary process to ensure that it is not discriminatory?... A. Yes.").[2]

Third, Defendant has failed, and continues to fail, to recognize EMS as uniform for purposes of collective bargaining in violation of NYC Administrative Code §12-307, as amended by Local Law 19 of 2001. (Exhibits 6-8, Declarations of Oren Barzilay, Kathleen Knuth, and

---

[2] Ex. 3, p. 292 Q. "…[do] you take any steps to monitor those pay practices to ensure they don't adversely impact women or people of color? A. To my knowledge, we do not....," p. 301 "Q. I'm wondering if there were any steps to investigate or to change policies or to take any other remedial efforts in response to [findings of discrimination]…? A. Not that I am aware of or was responsible for." *See also* Ex. 4, pp. 145-146 "Q… you don't know of any policies where the City is required to monitor or analyze rates of pay for titles where there's a large portion of women or people of color to ensure there's no adverse impact in terms of pay practices, correct? A. Yes."

Vincent Variale; *see also* Ex. 4, p. 99 "Q… are EMS first responders uniform? A. Not as regards to collective bargaining.")

In 2021, after conducting a two-year investigation of Plaintiffs' claims, the EEOC issued a Determination finding that Defendant "discriminated against current and former First Responders of the FDNY's EMS, including EMTs, Paramedics, Lieutenants, Captains, Deputy Chiefs, and Division Chiefs/Commanders, based on race and sex, from at least November 8, 2018 to the present with respect to pay, benefits, and terms and conditions of employment." (Ex. 9, EEOC Determination, p. 3). Further, the EEOC found that "any difference in duties between the EMS First Responders and Firefighters fails to explain the pronounced gap in wages and benefits, and [Defendant has] failed to adjust the pay scales of EMS First Responders to keep pace with the changes to their duties since the City merged EMS with the Fire Department in 1996." (Id., p. 2).[3]

Plaintiffs' expert reports provide significant proof in support of class certification. Dr. Ronald S. Landis, an industrial and organizational psychologist, offers a report dated July 7, 2023 ("Landis Report," attached here at **Exhibit 2**), in which he found: (1) Fire First Responders are a proper comparator for EMS First Responders; (2) the jobs of EMS First Responders and Fire First Responders are becoming more similar over time; (3) there are statistically significant differences in the demographic composition as to sex, gender, and race and the Compensation of EMS and Fire First Responders; (4) "there is no job-related rationale to explain the large disparity in the pay between EMS and Fire First Responders," (5) without a proper compensation analysis, "the FDNY cannot credibly assert that it pays EMS First Responders the appropriate pay rates." Dr. Brian Maguire, an epidemiologist with a specialization in occupational safety, offers a report dated July

---

[3] The EMS Bureau is staffed by emergency medical technicians ("EMTs") and their promotional line which is paramedic, lieutenant, captain, deputy chief and division chief/commander ("EMS or EMS First Responders"). (Exs. 6-8, Union Leader Declarations). The Fire Bureau consists of firefighters and their promotional line which is lieutenant, captain, battalion chief and deputy chief ("Fire" or "Fire First Responders," and collectively "FDNY First Responders"). (Exs. 6-8, Union Leader Declarations).

7, 2023 ("Maguire Report," attached here at **Ex. 10**), in which he found that EMS and Fire First Responders face similar occupational risks and hazards.

Defendant's expert, Dr. Michael Campion, offers a report dated August 4, 2023 ("Campion Report," attached here at **Ex. 11**), but does not dispute many of Plaintiffs' experts' findings such as the statistical significance of the disparities in pay and demographics. (Ex. 12, Landis Rebuttal Report; Ex. 13, Maguire Rebuttal Report). The Campion Report is also not based on reliable or sufficient facts and/or data and addresses irrelevant questions, as explained *infra*. These, and other deficiencies of the Campion Report, are described in detail in the Rebuttal Report of Dr. Landis dated November 2, 2023 ("Landis Rebuttal Report," attached here at **Ex. 12**) and the Rebuttal Report of Dr. Maguire dated November 2, 2023 ("Maguire Rebuttal Report," attached here at **Ex. 13**).

The Representative Plaintiffs now ask the Court to certify a proposed class under FRCP 23(b)(3) of "all people employed by the City of New York in the EMS Bureau of the New York City Fire Department in the titles of Emergency Medical Technician, Paramedic, Lieutenant, Captain, Deputy Chief, Division Commander/Chief as of the commencement of this action and at any time during the preceding three-year period" to litigate their disparate treatment claims. The Representative Plaintiffs also ask the Court to certify two proposed subclasses under FRCP 23(b)(3) of "all people employed by the City of New York in the EMS Bureau of the New York City Fire Department in the titles of Emergency Medical Technician, Paramedic, Lieutenant, Captain, Deputy Chief, Division Commander/Chief as of the commencement of this action and at any time during the preceding three-year period who identify as non-white" and "all people employed by the City of New York in the EMS Bureau of the New York City Fire Department in the titles of Emergency Medical Technician, Paramedic, Lieutenant, Captain, Deputy Chief, Division Commander/Chief as of the commencement of this action and at any time during the

preceding three-year period who identify as female[4]" to litigate their disparate treatment and disparate impact claims. The class and subclasses seek damages for past discrimination and injunctive relief to remedy Defendant's discriminatory employment practices in the future.

## II.    FACTS

### A.    The Representative Plaintiffs, Proposed Class and Subclasses

The proposed Representative Plaintiffs are all non-white women who have been employed as EMS First Responders during the three (3) years preceding commencement of this action and therefore are able to serve as representatives of the class as a whole as well as both subclasses. (Ex. 14, Declarations of Representative Plaintiffs). There are approximately 4,500 EMS First Responders employed by the FDNY, nearly 60% of whom identify as non-white and more than 25% of whom identify as female. (Ex. 2, Landis Report, pp. 8-9). All class and subclass members are current and/or former members of the Plaintiff unions Local 2507, Local 3621, and/or SOA. (Ex. 6-8; Ex. 1, ¶¶ 7-9).

### B.    Defendant's Policies and Practices That Discriminate Against EMS First Responders

Plaintiffs identify three (3) of Defendant's policies and practices which have resulted in discrimination against the putative class, including Defendant's failures to (1) take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders, (2) exert sufficient oversight to prevent or correct suppressed Compensation of its segregated workforce of predominantly non-white and largely female EMS First Responders despite its duty to do so, and (3) recognize EMS as uniform for purposes of collective bargaining in violation of NYC Administrative Code §12-307, as amended by Local Law 19 of 2001.

---

[4] Plaintiffs define the subclass using the gender binary of "Male" and "Female" in the demographic data produced by Defendant for EMS and Fire First Responders.

1.  **Defendant's Failure to Take the Necessary Steps to Determine Appropriate Pay for EMS First Responders' Current Job Duties in the FDNY**

    a.  ***EMS First Responders Job Duties Have Been Changing Since the Merger of EMS into the FDNY***

Prior to 1996, New York City's EMS was employed by New York City Health and Hospitals Corporation. However, in March of 1996 EMS services were merged into the FDNY. (Ex. 6-8). As a result of this merger, the FDNY integrated its emergency response into two Bureaus of first responders–EMS and Fire–with the joint mission of providing emergency and lifesaving services to the public.[5] (Ex. 6-8; Ex. 15, Deposition of Chief Michael Fields, pp. 42-52, p. 129-130, "saving lives is the priority for the FDNY."). The merger also resulted in substantial changes to the job duties and terms of employment for both EMS and Fire First Responders. As part of this merger, EMS First Responders' jobs were "restructured" to comport with those of Fire First Responders. (Ex. 6-8).[6] This included transferring EMS administrative duties over to the FDNY so that EMS First Responders would spend less time with administrative tasks and more time in the field, providing EMS First Responders with equipment similar to that of Fire First Responders for an integrated dispatch system, and requiring EMS First Responders to report in the chain of command within the FDNY including to FDNY supervisors. (Ex. 8). Fire First Responders' jobs also changed in that they were required to be certified as Certified First Responders-Defibrillation ("CFR-D") and respond to medical calls to provide patient care. The jobs of EMS and Fire First Responders continue to

---

[5] FDNY Mission and Values, *available online at*, https://www1.nyc.gov/site/fdny/about/overview/mission-and-values/mission.page (last visited November 20, 2023).

[6] EMS First Responders' jobs were restructured to follow a Battalion-Based Fire System Model that mirrored Fire First Responders' job structure. They are now required to participate in ongoing joint training sessions with Fire First Responders which take place at the FDNY Fire Academy. (Ex. 8; Ex. 15, Deposition of Cesar Escobar, pp. 181-183). Fire First Responders are now required to complete Certified First Responder and Defibliration ("CFR-D") training and be CFR-D certified, and they are dispatched to medical emergencies to provide patient care. (Ex. 15, pp. 88-90). In fact, the majority of calls that Fire First Responders are dispatched to today are medical emergencies to provide patient care. (Ex. 2, p. 11). Less than 6% percent of calls Fire First Responders are dispatched to are related to fires. (Ex. 2, p. 11). Moreover, today EMS First Responders are required to respond to fires including entering burning buildings to provide services. (Ex. 15, p. 177-179).

become more similar over time. (Ex. 2). Today EMS First Responders are required to complete joint training with Fire First Responders at the FDNY Fire Academy on a myriad of non-medical emergencies and perform additional fire related tasks such as entering burning buildings to provide medical care. (Ex. 16, pp. 181-183; Ex. 15, p. 177). Likewise, Fire First Responders are now required to complete CFR-D training at the FDNY EMS Academy and the majority of calls they are dispatched to are to provide patient care in medical emergencies. As such, "[w]hile EMS and Fire First Responders respond to fires, the most regularly encountered calls for all FDNY First Responders, are medical emergencies. By way of example, in 2020, Firefighters responded to 560,474 calls, of which at least 273,800 (49%) were medical calls ("CFRD Incidents") and only 2,252 (0.4%) were confirmed fires. In other words, it is more than one hundred times more common for a Firefighter to respond to a call to provide medical services than it is for them to respond to a call for fire suppression. (*see* Exhibit [17], Greco Declaration, Ex. B)." (Ex. 1, ¶ 59).

### b. Defendant Has a Procedure to Evaluate and Set Rates of Pay but Has Failed to do so for EMS First Responders

Notwithstanding the substantial change in the job duties of EMS First Responders, Defendant has failed to take the necessary steps to determine and/or set appropriate pay rates based on their current job. Defendant admits that it has a process to perform compensation analysis to properly set pay rates for its employees. (*See* Ex. 5, pp. 18-21, 34-35, "Q. How are pay rates for employees within the City's work force determined? A. They would look at the qualifications, the duties performed by that proposed title. We would look at comparable titles in terms of duties and qualifications…"). However, Defendant did not use this process, or any other job evaluation process to properly set rates of pay for EMS First Responders despite the restructuring of their jobs into the FDNY, the continuing changes making their work more similar to Fire First Responders, or the resolution of NYC City Council to do so. (Ex. 5, p. 38 - "Q. … you can't [set a salary]. A. … Right;" Ex. 4, Campion p. 35 – "OLR do[es]n't set the rates of pay;" Ex. 3, p. 45 "[FDNY]

7

do[es] not get to set those pay scales;" Ex. 5, p. 73). Other than the job analysis that's done as part of the titles being proposed to be created, and job analysis done in conjunction with the annual exam schedules that we just talked about, are there any other times where DCAS performs a job analysis? A. No;" Ex. 3, p. 45, "I do not get to set those pay scales.").

Despite Defendant having "acknowledged that EMS work is extremely difficult and EMS personnel should be paid more," Defendant has refused to undertake the steps to determine appropriate Compensation for EMS First Responders post-merger. Ex. 1, ¶80. In fact, the Defendant's high-ranking officials have stated that "it has not been a secret that we…think they should be paid appropriately for the job that they do, they save lives for a living," Ex. 18, p. 62, "EMS deserves additional compensation." Ex. 1, ¶ 81; Ex. 18, p. 37.

In 2020, Defendant's legislative body, the New York City Council, recognized the changing responsibilities of EMS First Responders and raised concerns regarding the corresponding Compensation. On May 28, 2020, it passed Res. 1062A, calling for pay equity between EMS and Fire First Responders. Ex. 19, City Council Resolution 1062A. In this resolution, the City Council reiterated its findings that EMS First Responders "respond to every major life threatening emergency that occurs in the City" and called on Defendant to correct its underpayment of these employees so that "the salaries of New York City emergency medical service personnel be comparable to New York City's firefighters" in order to "remedy[] this long-standing pay disparity." Id. Despite this, Defendant continues to refuse to take proper steps to perform a compensation analysis or take any other necessary steps to set the appropriate Compensation for EMS First Responders.

### c. Defendant's Inaction Resulted in Unlawful Suppressed Compensation of EMS First Responders

Because Defendant knew there was a problem with pay rates and had a process in place to determine appropriate pay which it failed to use, Plaintiffs have shown that "Defendant has perpetuated policies and practices in which members of EMS are paid substantially less" than they

should be. Ex. 1, ¶70; Ex. 2. As the Landis Report explains, conducting appropriate job analyses, including compensation analysis, is necessary for "determining whether [an employer] has set the appropriate rate of pay for its employees. (Ex. 2, p. 17). Moreover, Dr. Campion does not refute Dr. Landis' findings that "a compensation analysis based on sound job analysis data would be necessary to assert there is a non-discriminatory rationale for pay differences between Fire First Responder jobs and EMS First Responder jobs or to justify the rates of pay within a job line." (Id.; Ex. 12, p. 39). Such analysis is especially necessary here where EMS First Responders' job structure and responsibilities have changed so substantially. (Ex. 6-8). "Absent such an analysis, the FDNY cannot credibly assert that it pays EMS First Responders the appropriate pay rates for their job titles." (Ex. 2, p. 39).[7]

### 2.  Defendant's Failure to Monitor Occupational Segregation to Prevent Discriminatory Employment Practices Against EMS First Responders

#### a. Defendant Maintains a Segregated Workforce in the FDNY Which it has a Duty to Monitor

As Dr. Landis' analysis establishes, there is a statistically significant difference in the demographic makeup of the EMS and Fire First Responders as to sex, gender, and race, which establishes the existence of significant occupational segregation in the FDNY. (Ex. 2, pp. 8-9; Ex. 3, pp. 290-291, confirming that the FDNY workforce is segregated by sex, gender, and race). The New York City Council also recently published a pay equity report which singled out the FDNY as an agency with a segregated workforce (Ex. 20). Yet, despite knowledge of this, Defendant admits it has "failed to monitor the pay of the Fire side and the EMS side of the FDNY to ensure this

---

[7] All of Defendant's 30(b)(6) witnesses confirm they have not undertaken steps to determine appropriate rates of pay for EMS First Responders. The Commissioner of the New York City Office of Labor Relations ("OLR"), Renee Campion, denied that OLR has such responsibility, testifying the Department of Citywide Administrative Services ("DCAS") had this responsibility. (Ex. 4, pp. 35-40, "Q. Who sets the rate of pay for the new titles? A….It would initially be set by DCAS," p. 39, lines 10-12). But the Assistant Commissioner of DCAS, Robert Alexander, denied any responsibility, testifying DCAS relies on the user agency, i.e. the FDNY, to determine the appropriate salary for its titles. (Ex. 5, pp. 48-54, the user agency "can set the proposed salary," p. 52, lines 22-23). But the FDNY's Deputy Commissioner for Budget and Finance, Lizette Christoff, also denied responsibility, testifying that "initial salaries for new titles are established through DCAS and OLR not necessarily the department [FDNY]." (Ex. 3, p. 294, line 5-7). This conflicting testimony further establishes that "the FDNY cannot credibly assert that it pays EMS First Responders the appropriate pay rates for their job titles." (Ex. 2, p. 39).

occupational segregation did not adversely impact members of protected groups." (Ex. 1, ¶ 88; Ex. 3, p. 293, confirming that the FDNY "do[es] not monitor collectively bargained salary scales in relation to each other" despite its segregated workforce). Defendant's 30(b)(6) witness admitted Defendant has a duty to monitor these segregated workforces to prevent discriminatory pay practices. Yet all of Defendant's witnesses confirm Defendant has not done so. (Ex. 3, p. 285-286, Ex. 4, pp. 35-42, 144-146, Ex. 5, pp. 48-51, 62, 135, lines 10-16, "the FDNY [has] a duty to investigate…or review their salary process to ensure that [it] is not discriminatory").[8] Defendant's failure to properly monitor and/or analyze the Compensation of the segregated EMS workforce to stop discriminatory pay practices, despite knowing it is required to do so, has contributed to the unlawful and discriminatory disparities in Compensation of the putative class members. (Ex. 2).

### b. *Defendant's Failure to Monitor its Segregated Workforce Resulted in Unlawful Disparities in Compensation Between EMS and Fire First Responders*

i.    Fire First Responders Are Proper Comparators for EMS First Responders

To show the disparate treatment and impact of Defendant's policies on EMS First Responders, Plaintiffs identify as a comparator their counterparts in the FDNY, namely Fire First Responders, whose work is substantially similar in all material respects to EMS First Responders. *See* Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).

"The common core of the work of EMS First Responders and Fire First Responders is the same—rapidly respond to emergencies to save lives. EMS First Responders and Fire First

---

[8] For example, the FDNY's Deputy Commissioner for Budget and Finance, Lizette Christoff, explains the FDNY does not monitor segregated workforces stating "[i]f there was a concern about the salary scale [of EMS], that would be an issue for [the Office of Labor Relations,] OLR. (Ex. 3, p. 287). Assistant Commissioner of DCAS, Robert Alexander, also testified DCAS did not perform this responsibility and that OLR was the agency responsible for ensuring "pay equity for titles that are already created." (Ex. 5, p. 144, p. 64, "if an agency had a concern… that they might not be paying a group of employees in a certain title or titles correctly or they may be in violation of either their own EEO policy or laws related to Equal Employment Opportunity… [DCAS] would direct them to Office of Labor Relations."). However, the Commissioner of OLR, Renee Campion, testified that OLR has no such responsibility, and that she does not "know of any policies where the City is required to monitor or analyze rates of pay for titles where there's a large portion of women or people of color to ensure there's no adverse impact in terms of pay practices." (Ex. 4, p. 146).

Responders regularly encounter the same working conditions and in fact respond to the same emergencies." (Ex. 1, ¶ 52; Ex. 21, p. 138, "A: I would agree that [protection of] life is the most important job in the New York City Fire Department). The work of all First Responders is supervised by the same Department (*see* Ex. 22) following the same reporting structure in the field (*see* Ex. 23; Ex. 1, ¶ 61).

Dr. Landis, a highly regarded expert in the field of industrial and organizational psychology, performed an analysis of the job duties of EMS and Fire First Responders using data provided by Defendant[9] applying accepted methods in the field of industrial and organizational psychology, including a similarity index (SI)[10] to quantify the overlap in work activities, knowledge, skills and abilities between the focal jobs and found that the jobs were "substantial similar in all material respects." (Ex. 2). In specific, Dr. Landis found that the similarity index values "clearly" exceed the 0.75 threshold for all four criteria establishing with "strong evidence" that the jobs are substantially similar in all material respects, and as such that Fire First Responders are proper comparators for EMS First Responders. (Ex. 2, pp. 19, 20); Graham, 230 F.3d at 40. Dr. Landis also identifies a trend in which the data shows these jobs are becoming more similar over time. (Ex. 2, p. 16).

Defendant relies on outdated stereotypes to argue that Fire First Responders are properly paid more than EMS First Responders and should not serve as their comparators, claiming Fire First Responder's primary responsibility is to suppress fires and to perform physically challenging

---

[9] Dr. Landis explains in his rebuttal report that he "relied predominately on data provided by Defendant regarding the focal jobs and only supplemented Defendant's data with O*NET data where Defendant failed to produce data." (Ex. 12, p. 3). He further explains that supplementing Defendant's data with "generalized work activities [from O*NET] for comparing jobs is supported by both professional practice and accepted methods." Id. at 9.

[10] Dr. Landis explains in his rebuttal report that "the use of the similarity index I reported in the Landis Report is well supported and the criterion of .75 is a stringent criterion for evaluating similarity in evaluating pay equity… [which] the U.S. Department of Justice has approved… to answer the question of what constitutes… 'substantial similarity'" (Ex. 12, pp. 9).

work unique to firefighters.  (Ex. 11, p. 18).  However, this ignores the 21st century reality of New York City's emergency first responders,[11] including the fact that the <u>majority</u> of work performed by **<u>Fire</u>** First Responders entails responding to **<u>medical</u>** calls to provide **<u>patient</u> <u>care</u>**.  Conversely only 6% of the work Fire First Responders do is related to fire. (Ex. 2, p. 14).  Likewise, EMS First Responders also face significant physical and mental challenges working in similar environments as Fire First Responders, under the same leadership, in the same agency, responding to the same emergencies, and performing the same primary job duty of saving lives. (Ex. 21, p. 138).  EMS First Responders also face unique challenges such as being 47 times more likely than Fire First Responders to be exposed to workplace violence and responding to upwards of approximately 3 times more emergencies. (Ex. 13). EMS First Responders perform this work while stationed and dispatched from the cab of an ambulance over 8 to 12 hour stretches of time, without breaks.[12] (Ex. 16, pp. 144-145, 148). The present-day reality is that both EMS and Fire First Responders are entering burning buildings and responding to other non-medical emergencies such as mass casualties, active shooters, bomb threats, environmental catastrophes terrorist attacks and vehicular accidents where they are both responsible for scene safety and patient care.  (Ex. 16, pp. 181-183; Ex. 14, pp. 177, 185-186).  EMS First Responders face additional risks and hazards due to the increasing demand for emergency response to biological and environmental factors such as infectious diseases like Covid, Ebola, Legionnaires' Disease, Monkey Pox and other airborne and bloodborne pathogens.  (Ex. 10).

---

[11] With the decline in structural fires and the rise of mass casualty events since September 11, 2001 along with an increase in biological and environmental risks, the City of New York's public safety demands have continued to evolve such that today the EMS First Responders and Firefighters of the FDNY provide an interrelated web of highly advanced emergency services that address the complex public safety and mass casualty concerns of the 21st century to protect property and lives throughout the City of New York. (Ex. 2).

[12] Dr. Maguire also found that "FDNY Fire and EMS First Responders face at least substantially similar hazards and risks in their working conditions, but in many regards EMS First Responders have statistically significantly higher risks than Fire First Responders." (Ex. 10).  Indeed, Defendant regularly recognizes the extreme risks and hazards EMS First Responders face along with Fire First Responders, even awarding commendations for their outstanding service during life-threatening emergencies. (Ex. 24, Ex. 25).

Plaintiffs do not dispute that a number of Fire First Responders[13] perform fire suppression work. Indeed, even if this work is done occasionally, it is important work and exposes Fire First Responders to physical risks and challenges. But it is equally true that EMS First Responders face risks and challenges in their jobs, such as interacting directly with the public exposing them to substantially greater threats of physical violence, and additional demands to perform a higher level of medical care with greater skill and responsibility which is also important work and likewise exposes EMS First Responders to physical and mental risks and challenges. (Ex. 15, pp. 309-315; Ex. 21, pp. 106-110).

Moreover, and most importantly, none of the compensable factors that may be unique to EMS and Fire First Responders change the reality that when the work activities, including compensable factors, of Fire First Responders, including fire suppression, and the work activities of EMS First Responders, including advanced medical care, are "systematically studied through job analysis to compare if they are similar in nature when it comes to activities performed on the job and the capabilities required to form the job" the evidence establishes that the jobs are "substantially similar in all material respects."[14] (Ex. 2, pp. 17, 35). In short, the jobs are not the same, they are substantially similar in all material respects. As such, Fire First Responders are appropriate comparators to show Defendant has unlawfully underpaid Plaintiffs. Defendant's expert offers no

---

[13] Not all Fire First Responders perform fire suppression. As an initial matter, with only 2,252 confirmed fires in 2020 (Ex. 17) and more than 9,000 Fire First Responders, it is possible many Fire First Responders do not get dispatched to a working fire. Next, according to the Merger Documents provided to Plaintiff Variale by Defendant (Ex. 8), 10% of Fire First Responders are not in the field. Moreover, as a result of the merger the FDNY assumed additional management duties that were with EMS as explained in the section entitled "REDUCED DUPLICATION OF MANAGEMENT" which states "Fire Department battalion chiefs can oversee most non-medical supervision needs of EMS personnel."

[14] Dr. Landis does not exclude any criteria, such as relevant work activities, skill knowledge or ability for either EMS or First Responder jobs in his analysis. He uses the job activities as determined by Defendant to be important for each of these jobs and supplements this with O*NET data where Defendant fails to provide data. For example, as shown in the Landis Report his analysis includes the activities and abilities relevant to fire suppression such as "performing general physical activities, public safety and security, static strength, far vision, control precision, multi-limb coordination, stamina, near vision, reaction time, dynamic strength, trunk strength, extent flexibility, explosive strength, gross body coordination." (Ex. 2).

13

alternative "systematically studied" opinion to rebut Dr. Landis' findings, and instead relies on outdated stereotypes and incorrect assumptions.

The EEOC Determination provides further evidence that "workloads, working conditions, training, and risks to EMS First Responders and Firefighters are comparable, with a substantial degree of overlapping duties, especially with respect to medical emergencies. The evidence further shows the two groups have comparable accountability and responsibility." (Ex. 9, p. 2).[15]

Finally, the declaration of Anthony Sanchez provides additional evidence that the jobs are substantially similar. (Ex. 29, Declaration of Anthony Sanchez, "I began my work for the FDNY on the EMS side of the Department" and "in June of 2018 I [became] an FDNY Firefighter… The work of EMTs and Paramedics is high risk and high intensity, equal to that of a Firefighter.")

ii.    There is a Statistically Significant Difference in the Demographic Make-Up Between EMS and Fire First Responders in the FDNY

"Analyses of racial and gender diversity across Fire First Responder jobs and EMS First Responder jobs reveals that FDNY employs white and male Fire First Responders at a statistically significantly higher percentage than non-white and female Fire First Responders and the FDNY employs non-white and female EMS First Responders at a statistically significantly higher rate than it employs white and male EMS First Responders." (Ex. 2, p. 9). Dr. Campion does not refute, or even address, this finding. (Ex. 11, Ex, 12; Ex. 30, p. 311).

iii.    There is a Statistically Significant Difference in Compensation, Benefits, and Terms and Conditions of Employment Between EMS and Fire First Responders in the FDNY

Likewise, **"**[a]nalyses of compensation across Fire First Responders and EMS First Responders reveals statistically significant different gross pay at all levels [of FDNY First

---

[15] These similarities in the work performed by EMS and Fire First Responders have been recognized by Defendant's own legislative body, and the FDNY itself which prioritizes transferring EMS First Responders to the position of firefighter. (Ex. 26, Ex. 19; Ex. 27). When these transfer opportunities are offered, so many EMS First Responders become firefighters that "EMS…expects to lose a good portion of [the] EMS workforce." (Ex. 16, p. 189, line 18 – p. 190, line 3) In fact, between 2012 and 2017, more than 1,500 EMS First Responders became firefighters. (Ex. 28).

Responders]. Specifically, Fire First Responders have statistically significantly higher gross salaries than EMS First Responders. This result was observed even after controlling for time in title." (Ex. 2, p. 37). Dr. Campion again does not refute, or even address, this finding. (Ex. 11, Ex, 12; Ex. 30, p. 312). Plaintiff will also show that "Fire side personnel receive more generous overtime, pension, disability, medical, dental, line of duty death, and educational benefits than EMS personnel." (Ex. 1, ¶101-102).

### 3. Defendant's Failure to Recognize EMS as Uniform for Collective Bargaining Purposes in Violation of NYC Administrative Code §12-307 as Amended by Local Law 19 of 2001

In 2001, after conducting hearings and considering testimony, the New York City Council enacted Local Law 19, in which it determined that the job duties of EMS First Responders were "similar to those of the uniform service of the City of New York including… fire" and that "[t]hese terms and conditions of employment raise issues, which are materially different than the issues affecting non-uniform city employees." (Ex. 26). The Council amended the NYC Administrative Code §12-307 to require that "employees of the uniformed fire service shall also include persons employed…by the [FDNY] as…emergency medical technicians and advanced emergency medical technicians…and supervisors of emergency medical technicians or advanced emergency medical technicians." NYC Admin. Code §12-307.

However, after unsuccessfully seeking to overturn this law,[16] Defendant has simply ignored the fact that EMS First Responders are statutorily classified as uniform and instead continue to treat EMS First Responders as civilian for purposes of collective bargaining. (Ex. 4, pp. 98-99). This intentional act, targeted at a segregated workforce made up of predominately non-white and

---

[16] Mayor of City of New York v. Council of City of New York, 38 A.D.3d 89 (1st Dep't 2006); Mayor of City of New York v. Council of City of New York, 9 N.Y.3d 23 (2007).

largely non-male employees, has caused disparate treatment and impact to EMS First Responders, further suppressing their Compensation. (Ex. 4, pp. 98-99).

Plaintiffs will show "that the pay disparities described herein are [in part] a result of Defendant's pattern and/or practice of…refusing to recognize EMS as uniform in violation of the law." (Ex. 1, ¶ 89). Further, "[d]espite the EMS Bureau being recognized as uniformed personnel pursuant to Local Law 19 of 2001, which should entitle them to uniform pattern percentage Compensation increases in collective bargaining cycles, Defendant has subjugated EMS First Responders to civilian pattern percentage compensation increases," which results in suppressed Compensation and excludes EMS First Responders from the recognition, respect, and benefits of uniform status. Id. ¶¶ 104-105. The EEOC's Determination provides further evidence that Defendant has "improperly treated and compensated EMS First Responders as civilians, when they are uniformed personnel." (Ex. 9, p. 2). Indeed, Defendant's own 30(b)(6) witness admits Defendant does not recognize EMS First Responders as uniform (Ex. 4, p. 99, line 8-10, "Q: …are EMS First Responders uniform? A: Not as regards to collective bargaining.").

Defendant's 30(b)(6) witness, Robert Alexander, best summarizes Defendant's position regarding its failure to recognize the uniform bargaining rights EMS First Responders; "They may wear uniforms, but they are not considered part of the uniform services." (Ex. 5, p. 149). Defendant admits that "the rates of increase in the pattern bargaining [are] higher for Uniform Pattern Bargaining than for Civilian Pattern Bargaining," and that the Defendant's policy of subjecting EMS First Responders to the lower civilian percentage increases in this manner further exacerbates the suppression of the Compensation. (Ex. 2; Ex. 4, pp. 106-115, "Q. Using a

percentage increase means that a higher salary get…a larger amount of ultimate salary…correct?
A. They get more dollars than someone making a lesser salary, yes.").[17]

       Plaintiffs estimate that Defendant's refusal to recognize EMS First Responders as uniform for collective bargaining purposes has resulted in more than One Hundred Seventy Million Dollars ($170,000,000.00) in damages to members of the class.  This amount only reflects the difference in uniform pattern wage increases and non-uniform pattern wage increase for the period from December 2019 through December 2022—it does not include other benefits, such as pension benefits or damages for continuing violations.  *See* **Table 1** and **Figure 1**.

**Table 1**: **Comparison of Salary Differences for EMS Applying Civilian and Uniformed Wage Increases (2000-2023)**

| Job Title | Salary 2000* | Actual Salary with Civilian Wage Increases 2023 | Corrected Salary if Uniformed Wage Increases Were Not Withheld 2023 |
|---|---|---|---|
| Emergency Medical Technician (EMT) | $36,575 | $62,408.03 | $75,289.30 |
| Paramedic | $45,313 | $77,317.70 | $93,276.39 |
| EMS Supervisor (Lieutenant) | $48,987 | $83,586.66 | $100,839.28 |
| EMS Supervisor (Captain) | $50,296 | $85,820.21 | $103,533.85 |
| EMS Supervisor (Deputy Chief) | $65,347 | $111,501.77 | $134,516.19 |
| EMS Supervisor (Div. Commander) | $84,018 | $143,360.15 | $172,950.27 |

\* These figures are based on a position's base salary for someone with five (5) years of service in 2000, summarized from the Collective Bargaining Agreements and Costing Sheets, attached here as Exhibits 6-A, 6-B, 7-A, 7-B, 8-A, and 8-B.

---

[17] In its negotiations with unions, the City engages in pattern bargaining, with one pattern for civilian unions and another for uniformed unions, including for the unions representing EMS and Fire First Responders. (Ex. 4, pp. 102-115, confirming that "[h]istorically, there has been a civilian pattern and a uniform pattern," p. 102).  Under pattern bargaining, each civilian union receives the same net percentage increase in economic value over the term of the contract.  Id.  Likewise, each uniformed union receives the same net percentage increase in economic value over the term of their contract, which is typically three (3) to five (5) years. Id.

**Figure 1**: **Illustration of Differences Between Civilian and Uniformed Wage Increases (2000-2023)**



## III.    ARGUMENT

### A.  The Campion Report Should Not be Considered in Deciding Whether to Certify the Proposed Class and Subclasses

The Campion Report does not satisfy FRE 702 and therefore must be excluded.[18] "As gatekeeper, the district court has significant discretion to consider numerous factors" in applying FRE 702. N.K. v. Abbott Labs., 731 Fed. App'x 24, 26 (2d Cir. 2018).  FRE 702 states that an expert qualified "by knowledge, skill, experience, training, or education may testify" only if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[18] Moreover, the Campion Report, which is unsigned, does not meet the procedural requirements of FRCP 26(a)(2)(B). In re Lyman Good Dietary Supplements Litig., 2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019) (excluding an expert report that was unsigned).

FRE. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Moreover, "the Rules – especially Rule 702 – place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 579-580. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

### 1. Dr. Campion is Unqualified to Respond to the Findings of Dr. Maguire

As an initial matter, assessing a motion to exclude expert testimony requires a court to first address "the threshold question of whether a witness is 'qualified as an expert… to render his or her opinions.'" Nimely v. City of New York, 414 F.3d 381, 396 n. 11 (2d Cir. 2005) (*quoting*, FRE 702). Dr. Maguire is a highly esteemed epidemiologist, with extensive experience studying, publishing, and lecturing in epidemiology and occupational safety.  Dr. Campion, however, is not an epidemiologist and has neither studied nor published any literature in the field of epidemiology. (*See* Campion CV; *see also* Ex. 30, p. 43).  As such, Dr. Campion is not qualified to render expert opinions regarding the epidemiological analysis performed by Dr. Maguire.  Nimely, 414 F.3d at 39.

### 4. The Court Should Not Consider Dr. Campion's Discussion of Whether Fire First Responders Are Appropriate Comparators to EMS First Responders

#### a. Dr. Campion's Opinion Regarding Whether Fire First Responders Are Appropriate Comparators to EMS First Responders is Not Based on Sufficient Facts or Data

##### i. Dr. Campion Lacks Sufficient or Accurate Knowledge Regarding the Facts and Data on Which he Bases His Opinion that Fire First Responders are Not Appropriate Comparators

First, Dr. Campion admits that he does not have knowledge regarding highly relevant aspects of the jobs of EMS and Fire First Responders, which warrants exclusion of his opinion regarding whether they are comparators because it reflects Dr. Campion's "ignorance as to the

most basic facts underlying the data." AngioDynamics v. C.R. Bard, Inc., 537 F.Supp.3d 273, 339 (N.D.N.Y. 2021); *see also* Amorgianos v. Nat'l R.R. Passenger Corp, 303 F.3d 256, 267 (2d Cir. 2002). For example, Dr. Campion admits that he "do[es]n't know what the '9-1-1 system' is" (Ex. 30, p. 359, lines 7-8) and does not know "the job duties that EMTs and paramedics have, that firefighters don't have." (Id., p. 265; *see also* p. 191, "Q. "What do you find in those two [job tasks for EMS and Fire First Responders] is so different, that it justifies additional compensation or would prohibit those two tasks from being comparable? A. I have no idea.").[19]

Dr. Campion also fundamentally misunderstands the work of FDNY First Responders. For example, he asserts that "EMS employees are not trained to go into the fire building or to operate in the 'hot zone' where there are dangers to life and health." (Ex. 11, p. 18). However, Defendants' 30(b)(6) witness' testimony directly contradicts this, confirming that paramedics and EMTs are trained and expected to enter burning buildings and "to go into the hot zone" to provide medical services. (Ex. 16, pp. 229-240; Ex. 15, p. 177).

Second, Dr. Campion has insufficient knowledge regarding the records on which he bases his conclusion that Fire First Responders are not appropriate comparators. For example, Dr. Campion cannot confirm whether the Injury with Body Parts Data[20] he cites includes injuries from off duty firefighters, or illness contracted on the job. (Ex. 30, p. 477; Ex. 13, pp. 3-4). These clarifications are necessary because Dr. Campion attempts to use this data to compare rates of injuries and illness between EMS and Fire First Responders, however "without a data dictionary…we have no way to know" whether this data is complete. (Ex. 13, p. 11).[21] Since Dr.

---

[19] Dr. Campion also does not realize that "fire engine trucks…are dispatched for the sole purpose of responding to medical emergencies," and incorrectly believes that "if it is strictly a medical call,…the fire department would not be dispatched." (Ex. 30, Campion Deposition, pp. 265, 288). Dr. Campion also incorrectly believes "that [on] CFR-D calls that Fire are dispatched to, they are not actually providing medical care at those calls." (Id. at 225, lines 6-13).

[20] Dr. Campion relied on data in a file entitled "Injury with Body Parts," which Defendant produced for the first time on the same day it served the Campion Report.

[21] Chief Esposito testified that because Fire First Responders receive unlimited paid leave, they record their injuries in the FDNY's data even when they were incurred off-duty, unlike EMS First Responders. (Ex. 21, Esposito Deposition, p. 329). Defendant was also unable to produce a witness, despite being ordered to do so by Judge Gorenstein, "with full knowledge of the writing of the code and the pulling of data on injury and illness,…the data

20

Campion cannot confirm "the validity or reliability of the [Injury with Body Parts D]ata," his opinions based on this data must be excluded. Chalmers v. City of New York, 2022 WL 4330119, at \*9 (S.D.N.Y. Sept. 19, 2022).

Further, Dr. Campion confuses the Certified First Responder Manual ("CFR-D Manual"), which is created and maintained for Fire First Responders, mistakenly believing it to be a manual for EMTs.  (Ex. 21, pp. 164-165).  In Table 11 of the Campion Report, Dr. Campion includes a partial list of Fire First Responder duties in one column and then lists duties from the CFR-D Manual in the other column, claiming it illustrates the difference between EMS and Fire. (Ex. 11, Table 11, Ex. 30, pp. 164-167).  However, since the "CFRD Manual is designed for and used to train Fire First Responders," Dr. Campion is actually listing the duties of Fire First Responders in **both** columns. (Ex. 12, p. 11).  "Not only does this undermine any conclusions Dr. Campion attempts to draw from Table 11, but it also underscores the similarity in these jobs such that Defendant's own expert can confuse them. This also illustrates Dr. Campion's lack of necessary familiarity with the job duties of these titles." Id.

### ii. The Campion Report Contains Conclusory Opinions Which Are Unsupported By Facts or Data

Next, Dr. Campion's opinion that Fire First Responders are not proper comparators to EMS First Responders must be excluded as it is not supported by facts or data. Betances v. Fischer, 2021 WL 1534159 (S.D.N.Y. Feb. 23, 2021); General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).  The Campion Report "asks the reader to accept as given that Fire First Responders have great risks and physical demands because of the fire suppression element of the job, [however] he neglects to consider or value the significant risks and physical demands that EMS First Responders face such as their additional responsibilities providing advance lifesaving services through greater

---

contained therein, how it was prepared, and how that data in maintained by defendants."  (ECF No. 108).  This data is even more questionable since there are "great discrepancies" between this data and data contemporaneously maintained by Defendant in its normal course of business. (Ex. 13, Maguire Rebuttal, pp. 11-12).

exposure to contagious disease, the public, and workplace violence, and the substantially greater volume of calls they respond to compared to Fire First Responders." (Ex. 12, pp. 5-6). *See* Chen-Oster v. Goldman, Sachs & Co, 2022 WL 814074, at \*18 (S.D.N.Y. Mar. 17, 2022) (excluding expert's conclusory opinion).

### iii.  The Campion Report Does Not Contain All the Facts or Data He Considered

FRCP 26(a)(2)(B)(ii) requires that an expert report contain "the facts or data considered by the witness" when forming their opinions.  In re Lyman Good Dietary Supplements Litig., 2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019).  Yet, Defendant failed to produce 1 of the 5 datasets Dr. Campion relied on in reaching his opinion in the Campion Report that "Fire employees have a 20.3% greater injury rate, which is a 72.2% greater chance (20.3/28.1) of an injury compared to EMS employees." (Campion Report, pp. 40-43).  As such, Dr. Campion's resulting opinion that therefore Fire First Responders are not proper comparators must be excluded.

### b.  Dr. Campion's Opinion Regarding Whether Fire First Responders Are Appropriate Comparators to EMS First Responders is Not Based on Reliable Principles or Methods

Next the Court must assess Dr. Campion's "theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the degree of acceptance' within the 'relevant scientific community.'" United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015) (*quoting* Daubert, 509, U.S. at 593-94).  However, Dr. Campion does not utilize a testable methodology, let alone one with a knowable rate of error, in reaching his conclusion that Fire First Responders are not appropriate comparators.  While Dr. Maguire's analysis is frequently included in peer-reviewed articles (Ex. 13, p. 31) and Dr. Landis utilized a "well-recognized formula for calculating similarity." Chalmers, 2022 WL 4330119, at \*5, *citing*

Hough, L., & Russell, T., "Metrics for assessing similarity of jobs," 15 Indus. and Organizational Psych., 55-60 (2022).

To the contrary, Dr. Campion admits that he "just cite[s] several pages of quotations by authoritative sources, describing th[e] risks [of Fire First Responders], and…just summarizing it here…in Tables 12, 13, 14, and 15." (Ex. 30, pp. 270-271). Dr. Campion also bases his conclusions regarding the risks Fire First Responders face almost exclusively on the testimony of Chief Esposito, not his own analysis (Ex. 11, pp. 33-36; Ex. 30, pp. 236-239). Therefore, Dr. Campion's opinion that Firefighters experience more extreme risks and hazards than EMS does not go beyond "lay matters," which a fact finder can understand without an expert's help. United States v. Mulder, 273 F.3d 91, 104 (2d Cir. 2001); Fin. Guar. Ins. Co. v. Putnam Advisory Co., 2020 WL 4251229, at *4 (S.D.N.Y. Feb. 19, 2020). Therefore, Dr. Campion's opinion that Fire First Responders are not appropriate comparators must be excluded. *See*, Daubert, 509 U.S. at 593-94.

### c. Dr. Campion's Opinion Regarding Whether Fire First Responders Are Appropriate Comparators to EMS First Responders is Neither Relevant Nor Helpful to the Factfinder

Dr. Campion's opinion regarding whether Fire First Responders are appropriate comparators to EMS First Responders is neither relevant nor helpful because he does not address the question of Title VII comparability relevant in this matter and as such must be excluded. *See* Chen-Oster, 2022 WL 814074, at *4 ("Expert evidence is not immune from the relevance requirement of Federal Rule of Evidence 401.") (*citing*, United States v. Khan, 787 F.2d 28, 34 (2d Cir. 1986)). Dr. Campion testified that he found "the jobs of EMS First Responders would not be *benchmark* jobs for firefighters…" (Ex. 30, p. 83, line 17-21). However, "[b]enchmark jobs required exact job comparisons." (Ex. 12). Neither Plaintiffs nor either of their experts argue that the jobs of EMS and Fire First Responders are the *same* because the relevant question for a Title VII

23

analysis is whether the jobs are "similarly situated in all materials respects." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000); Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014).

Further, the Campion Report "do[es] not undermine or even consider [Dr. Landis'] conclusions regarding similarity of EMT/Paramedic with Firefighters based on an analysis of all relevant similarities." (Ex. 12, pp. 9-10). First, Dr. Campion ignores the fact that Dr. Landis "relied predominately on data provided by Defendant regarding the focal jobs and only supplemented Defendant's data with O*NET data where Defendant failed to produce data." (Id., p. 3). Further, and more importantly, Dr. Campion's critique of Dr. Landis' analysis of the O*NET data failed to properly consider "the joint probability that any job in O*NET would be similar to Firefighter with respect to all four comparisons." (Id., p. 9). Dr. Landis replicated the test Dr. Campion proposed, using "the entire universe of O*NET job titles" but applying the complete analysis used in the Landis Report, and the result not only did not change Dr. Landis' initial findings, but strengthened them (Id.). As such, the Campion Report's critique of Dr. Landis' conclusions regarding similarities in EMS and Fire First Responder jobs is neither relevant nor helpful to the factfinder and should be excluded. *See*, Chen-Oster, 2022 WL 814074, at *4.

Next, in utilizing Defendant's 2012 job analysis and data therefrom to assert that Firefighters have unique physical demands, Dr. Campion relies on data that is over a decade old. Yet Defendant's own FRCP 30(b)(6) witness testified that the 2012 job analysis is too old to be relied on. (Ex. 31, pp. 17-19, 64, 101, 116-17). Moreover, Dr. Campion himself has previously concluded that job analysis data this old is unreliable. (Ex. 32, pp. 8, 28). Therefore, this data is irrelevant to the current work of FDNY First Responders, "lack[s] probative value," and must be excluded. Forte v. Liquidnet Holdings, Inc., 2015 WL 5820976, at *8 (S.D.N.Y. Sept. 30, 2015), *aff'd* 675 F. App'x 21, 24 (2d Cir. 2017).; *see also* Cayuga Indian Nation of NY v. Pataki, 83

F.Supp.2d 318, 323 (N.D.N.Y. 2000) (excluding expert opinion where data could not "properly

form a basis" for their analysis).[22]

**2. The Court Should Not Consider Dr. Campion's Discussion Regarding Whether the Pay Disparities Between Fire First Responders and EMS First Responders are Justified**

**a. Dr. Campion's Opinion Regarding the Pay Disparities Between Fire First Responders and EMS First Responders is Not Based on Sufficient Facts or Data**

**i. Dr. Campion Lacks Sufficient or Accurate Knowledge Regarding the Facts and Data on Which he Bases His Opinion Regarding the Pay Disparities Between Fire First Responders and EMS First Responders**

Notably, Dr. Campion admits that he does not know what factors would determine proper

Compensation for FDNY First Responders.  (Ex. 30, p. 382 "a lot of things have influenced the

compensation [for FDNY First Responders]. And I didn't really study all of those things in any

detail.). This "ignorance as to the most basic facts" regarding the Compensation of FDNY First

Responders warrants exclusion of Dr. Campion's opinion regarding whether the pay disparities

are justified.  AngioDynamics, 537 F.Supp.3d at 339.

Further, Dr. Campion's belief that the risks and hazards described by Chief Esposito are

unique to Fire First Responders, the central basis for his argument that Fire First Responders

should be paid more, is directly contradicted by the testimony of EMS Chief Michael Fields, who

confirmed that EMS First Responders also experience those same risks and hazards. (Ex. 15, pp.

309-315; Ex. 21, pp. 106-110).  Similarly, Dr. Campion's explanation of the difference in pay

between Fire and EMS (differences in physical demands and risks) is disproven by the fact that

"the higher up a Fire First Responder goes in the promotional line…the pay disparity persists (and

---

[22] Further, as discussed *supra*, Dr. Campion fails to provide any data on EMS First Responders making a credible comparison to Fire First Responders impossible.

in some cases is even larger) between that employee and their EMS counterpart," despite the fact that supervisors have far fewer physical demands. (Ex. 12).

Further, despite basing his opinion regarding the pay disparity on a comparison of pay rates of FDNY First Responders to other cities (Table 23, Ex. 11, p. 233), Dr. Campion admitted he has no knowledge of the actual job duties of any of the positions included in Table 23, including whether the EMTs or Paramedics respond to 911 emergency calls or simply perform patient transport, or whether any of these positions are combined into joint firefighter/EMS positions. (Ex. 30, pp. 360-394, 507-551). The data contained in Table 23 is also inaccurate in that Dr. Campion acknowledges the "jobs" listed are merely composites of numerous employers' data "within a radius outside the cities listed in the table, but Dr. Campion does not control for any factors such as whether they are private or municipal employers." (Ex. 12, p. 5; *See also*, Ex. 30, pp. 375, 508). Lastly, when comparing the rate of pay for FDNY First Responders with publicly available information regarding the rates of pay for other municipal employers in the cities included in Table 23 of the Campion Report, it is clear that municipal employers in other cities consistently pay EMTs and Paramedics better than Defendant, and in fact usually more than the corresponding firefighters. (Ex. 30, pp. 514-550).[23] In the absence of this sufficient data, Dr. Campion's opinion that Defendant is justified in paying Fire First Responders more than EMS must be excluded. Amorgianos, 303 F.3d at 267.

### ii. The Campion Report Contains Conclusory Opinions Which Are Unsupported By Facts or Data

Dr. Campion's Opinion that the pay disparities between Fire and EMS First Responders is justified is not supported by sufficient facts or data and therefore must be excluded. Betances,

---

[23] By way of example, the City of Boston's EMT starting salary is $69,372 their firefighter starting salary is only $65,000, the City of Memphis' EMT Probationary starting salary is $51,308 while their Fire Recruit starting salary is just $43,558.06, the City of Philadelphia's first-year paramedic salary is $61,888 while their starting salary for firefighters is only $51,795. The rest of the publicly available municipal employers were not comparable because they offer joint firefighter/EMS positions, i.e. Chicago, Columbus, Los Angeles, Pheonix, and San Francisco. What this data does show is that Municipal employers pay consistently and substantially more than private employers in these positions. For example, the starting salary of a firefighter/EMS in San Francisco is $143,234 while Table 23 of the Campion Report reflects a median salary for EMTs in San Francisco as $43,050, and firefighters as $100,820. Id.

2021 WL 1534159; Joiner, 522 U.S. at 146. Dr. Campion opines that EMS First Responders should not be compensated for the important tasks they only "occasionally" perform. (Ex. 30, pp. 205). However, he can neither define what the cut-off is for "occasionally" nor provide a credible explanation for why EMS First Responders should not be compensated for important tasks they perform occasionally. (Id., Dr. Campion "do[es]n't know how often 'occasionally' is," p. 205).[24]

Indeed, Dr. Campion's entire argument that Fire First Responders are entitled to more pay is based on the important but occasional work of fire suppression of structural fires. (Ex. 30, pp. 205, 247). Dr. Campion's inability to explain why he *includes* the important but occasional work of Fire First Responders, i.e. fire suppression, in his valuation, but *excludes* the important but occasional work of EMS First Responders, i.e. non-medical rescue, renders his opinion regarding the pay disparity unreliable.

Further, when discussing pay disparities between Fire and EMS First Responders, the Campion Report relies on data from the Bureau of Labor Statistics in Table 23. (Ex. 11, pp. 45-49; 233-234). However, Dr. Campion admits that this data is "imprecise." (Ex. 30, p. 528, line 14).[25] Dr. Campion also acknowledges this data includes "all employers in NYC, not just the City itself." (Ex. 11, p. 47). Therefore, no conclusions can be drawn from this Table regarding *Defendant's* pay practices because the data incorporates employers other than the City. (Ex. 30, p. 375, 508).

---

[24] For example, Dr. Campion dismisses examples of EMS First Responders performing search and rescue efforts, and even omits many portions of Chief Escobar's testimony regarding the hazards EMS First Responders face. (See Ex. 30, pp. 273-274, "Q. [W]hy do you exclude the first part of Chief Escobar's answer regarding the hazards that EMS face in a fire, and…the hazards that EMS face responding to bomb threats, active shooters?...A. I didn't think his testimony on that was relevant because of the infrequency with which they do that;" *see also* Ex. 24, p. 37, in which Plaintiff Elkadi was recognized for her "quick thinking and selfless action…proceeding into a known, deadly gas environment to warn residents (including children) and evacuate them.")

[25] When asked "Isn't it fair to say, you don't know enough facts to answer [whether the jobs in Table 23 would be good comparators for FDNY firefighters] with regards to all 24 firefighter jobs listed in Table 23?" Dr. Campion testified "That's precisely why I made sure to get a large number of jobs… you know… so these averages can, kind of, you know, cancel out." (Ex. 30, pp. 527-528). But such an approach is beyond imprecise, it is simply unscientific and unreliable.

### b. Dr. Campion's Opinion Regarding the Pay Disparities Between Fire First Responders and EMS First Responders is Not Based on Reliable Principles or Methods

When asked his method to conclude that Fire First Responders should be paid more than EMS First Responders, Dr. Campion testified that he "summarize[d] the tables and testimony, and…dr[e]w conclusions based on [his] experience." (Ex. 30, p. 284-285). Further, when asked whether EMS First Responders are entitled to additional Compensation for performing work which Fire First Responders do not perform, such as administering medication, performing intravenous procedures, or providing other medical care, Dr. Campion admitted that he did not know and had not considered this question in developing his opinion. (Ex. 30, p. 266, lines 11-12).

Dr. Campion also concedes that municipal employers, such as Defendant, are much less impacted by the labor market, the central focus of his discussion on pay, and acknowledges that public employers are impacted by other unique factors such as "public funding, fiscal budgets, tax codes, collective bargaining obligations, public salaries, [and] pay scales." (Ex. 30, p. 99). However, in analyzing Defendant's pay practices, Dr. Campion did not consider any of these factors, relying only on the labor market. Id. at 101. Given this, Dr. Campion's method of analyzing Defendant's pay rates is, by Dr. Campion's own admission, not reliable and should be excluded.

While Dr. Campion does identify a reliable method of compensation analysis, the Point Method, which he admits would be the appropriate method to determine whether either Fire or EMS First Responders are paid properly, he admits that he has not applied the Point Method to any data. (Ex. 12, pp. 4-5). In fact, "he is not in possession of the underlying data necessary to apply this method." Id. Therefore, Dr. Campion's opinion regarding whether the pay disparities between Fire and EMS First Responders must be excluded because there is "too great an analytical gap between the data and the opinion proffered." *See* Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

(1997); *see also* <u>Bocoum v. Daimler Trucks North America, LLC</u>, 2022 WL 902465, at *12 (S.D.N.Y. March 28, 2022) (excluding expert testimony that "offer[ed] no cognizable methodology to bridge the logical gap between [the] facts and his conclusion").

## B. <u>The Proposed Class and Subclasses Meet The Certification Criteria Pursuant To FRCP 23(a)</u>

"The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction" <u>Id</u>*. (quoting* <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 377 (2d Cir. 1997)). Courts have also found that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of class claims under Title VII and its state and local analogues. <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 614 (1997).

FRCP 23 permits a class to be certified when it satisfies the elements of FRCP 23(a) and one of the subsections of FRCP 23(b). *See* <u>In re Initial Pub. Offerings Secs. Litig.</u>, 471 F.3d 24, 32 (2d Cir. 2006) ("<u>IPO</u>"). In the instant matter, the elements of FRCP 23(a) are satisfied in that:

   (1) the class is too numerous for joinder to be practicable;
   (2) the class shares at least one common question of law or fact;
   (3) the Representative Plaintiffs' claims are typical of the class; and
   (4) the Representative Plaintiffs will adequately represent the class.

The elements of FRCP 23(b)(3) are also satisfied since Plaintiffs have shown "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods," as explained further herein. <u>IPO</u> at 471 F.3d at 32. Therefore, Representative Plaintiffs seek to certify the following class pursuant to FRCP 23(b)(3):

> All people employed by the City of New York in the EMS Bureau of the New York City Fire Department in the titles of Emergency Medical Technician, Paramedic, Lieutenant, Captain, Deputy Chief, Division Commander/Chief as of the commencement of this action and at any time during the preceding three-year period on behalf of whom Plaintiffs bring their disparate treatment claims pursuant to NYC HRL.

Further, the Representative Plaintiffs seek to certify the following subclasses pursuant to

FRCP 23(b)(3):

>All people employed by the City of New York in the EMS Bureau
>of the New York City Fire Department in the titles of Emergency
>Medical Technician, Paramedic, Lieutenant, Captain, Deputy Chief,
>Division Commander/Chief as of the commencement of this action
>and at any time during the preceding three-year period who identify
>as non-white on behalf of whom Plaintiffs bring their disparate
>treatment and disparate impact claims pursuant to Title VII, NYS
>HRL, and NYC HRL ("Race Subclass");

and

>All people employed by the City of New York in the EMS Bureau
>of the New York City Fire Department in the titles of Emergency
>Medical Technician, Paramedic, Lieutenant, Captain, Deputy Chief,
>Division Commander/Chief as of the commencement of this action
>and at any time during the preceding three-year period who identify
>as female on behalf of whom Plaintiffs bring their disparate
>treatment and disparate impact claims pursuant to Title VII, NYS
>HRL, and NYC HRL ("Sex/Gender Subclass").

**1. The Class and Subclasses are Sufficiently Numerous and Ascertainable**

The numerosity requirement is generally satisfied where the number of class members is so numerous that "joinder of all members is impracticable." Hnot v. Willis Group Holdings Ltd., 228 F.R.D. 476, 481-82 (S.D.N.Y. 2005); *see also See* Robinson v. New York City Transit Auth., 2020 WL 5814189 (S.D.N.Y. Sep. 30, 2020) (more than 40 members will typically satisfy this requirement.). Here the Class is comprised of 4,500-5,000 members, and the Subclasses will be comprised of at least 2,500-3,000 and 1,200-1,500, respectively. (Ex. 2, pp. 8-9). It would be unnecessarily burdensome to litigate each of these cases seperately, and if even just a small percentage of putative class members proceeded individually, it would result in hundreds of similar cases, causing unecessary burden to the courts and potential conficting decisions. (Ex. 6-8).

The Class and Subclasses are also ascertainable since their members can be "ascertained by reference to objective criteria"--Defendant's employment and pay records identifying the

current and former employees working as EMS First Responders includes the entire putative class. (Ex. 2); Katz v. Prof'l Billing Collections, LLC, 2021 WL 2418387 (S.D.N.Y. June 14, 2021).

### 2. There Are Questions of Law and Fact Common to the Class and Subclasses

To satisfy the commonality requirement of FRCP 23(a)(2), Plaintiffs must show that their claims raise one or more questions on liability and/or damages common to all class members and "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). First, all putative class members are employed by Defendant in the same bureau of the FDNY and ultimately report to the same high-ranking officials—the Chief of Department and the FDNY Commissioner. (Ex. 15, pp. 136-137; Ex. 16, p. 188). Class members are also subjected in the same way to the same policies of DCAS and OLR. As such, the challenged policies "ha[ve] subjected the class...to discrimination at the hands of the same…officers," furthering the commonality of their claims. Hnot, 228 F.R.D. at 482; see also Noble v. 93 Univ. Place Corp., 224 F.R.D. 330 (S.D.N.Y. 2004) (granting certification to employees working for the same employer and alleged similar underpayment).[26]

Plaintiffs have also demonstrated "'significant proof' that the employer 'operated under a general policy of discrimination.'" Chen-Oster, 325 F.R.D. at 72 (quoting Dukes, 564 U.S at 353); Ex. 2. In specific, Plaintiffs have offered significant proof, discussed supra, that Defendant failed to (1) take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders, (2) exert sufficient oversight to prevent or correct suppressed Compensation of its segregated workforce of predominantly non-white and largely female EMS

---

[26] Another common question is whether Plaintiffs' claims constitute a continuing violation under the New York State or New York City Human Rights Laws giving rise to liability and damages preceding December 6, 2019 (three years before the Complaint was filed). See Richardson v. City of New York, 2018 WL 4682224 (S.D.N.Y. Sep. 28, 2018) (denying motion to dismiss NYCHRL disparate impact and disparate treatment claims on behalf of a putative class for which plaintiffs sought damages for over a decade under the continuing violation doctrine). The same answer should be reached for all EMS First Responders.

First Responders despite its duty to do so, and (3) recognize EMS as uniform for purposes of collective bargaining in violation of NYC Administrative Code §12-307, as amended by Local Law 19 of 2001.  To this end, Plaintiffs will prove "in one stroke" a "central" part or all of Plaintiffs' claims, i.e. the existence of these policies and the discriminatory impact and treatment thereof. Dukes, 564 U.S. at 350; Ex. 2; Ex. 14, 33.

### a. Disparate Impact

Plaintiffs have identified three (3) of Defendant's policies and/or practices which have disparately impacted the class, which include Defendant's failure to (1) take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders, (2) exert sufficient oversight to prevent or correct suppressed Compensation of its segregated workforce of predominantly non-white and largely female EMS First Responders despite its duty to do so, and (3) recognize EMS as uniform for purposes of collective bargaining in violation of NYC Administrative Code §12-307, as amended by Local Law 19 of 2001. Each of these policies or practices are centralized within the City and none involves criteria that class members' supervisors could apply in individualized ways.  Indeed, the policies are not set by class members' supervisors.[27] Therefore, class members' claims are based on Defendant's "unitary course of conduct" that resulted in the underpayment and deprivation of benefits to class members.  Chen-Oster, 325 F.R.D. at 74.

Plaintiffs have also identified significant proof, common to all class members, that these policies and practices are responsible for the pay disparities complained of. The Landis Report provides statistical evidence showing that "[t]here is no job-relevant rationale that explains the

---

[27] For example, the Commissioner of OLR, who has oversight over all putative class members in the same way, makes the decision on policy regarding withholding recognition of uniform status for collective bargaining.  (Ex. 4, p. 123 "I'm familiar with [Local Law 19 of 2001]…;" p. 126 Q. So given this law… is it still your position that EMS should be treated as civilian for purposes of collective bargaining?  A. Yes;"  pp. 116-117 "Q… how do you form your understanding of… what the law is with regards to allowing EMS first responders to participate in Civilian Pattern Bargaining or Uniform Pattern Bargaining? A. I read the decision… And consulted with the law department."

lower rate of pay for EMS First Responders." *See* Chen-Oster v. Goldman, Sachs & Co., 325 F.R.D. 55, 73 (S.D.N.Y. 2018); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir. 1999) (statistical evidence demonstrates commonality in a challenge to employment practices). Plaintiffs' experts have also shown that:

1. The jobs of class members and Fire First Responders require substantially similar tasks and work activities, and require substantially similar knowledge, skill, and ability [and at least substantially similar hazards and risks in their working conditions];

2. Fire First Responder jobs are statistically significantly more likely to be filled by White employees and the class members' jobs are statistically significantly more likely to be filled by Non-White employees;

3. Fire First Responder jobs are statistically significantly more likely to be filled by Males and the class members' jobs are statistically significantly more likely to be filled by Females;

4. Fire First Responders are paid statistically significantly more than members of the class; and

5. Given the similarity in the nature of the work including the tasks performed and capabilities needed to perform that work, there is no job-related rationale to explain the large disparity in the pay between the class and Fire First Responders.

(Ex. 2; Ex. 10). Dr. Campion does not rebut these findings.[28] Because the evidence establishes that members of the class are uniformly paid less than Fire First Responders and have a statistically significantly higher percentage of non-white and non-male employees, Plaintiffs have demonstrated significant proof of their disparate impact claims.

To that end, the question of damages can also be answered through common evidence. Fonseca v. Dircksen & Talleyrand Inc*.,* 2015 WL 5813382 (S.D.N.Y. Sep. 28, 2015) (rejecting challenge to commonality based on need to calculate damages individually). Parties agree that a

---

[28] Plaintiffs have moved to exclude the Campion Report, but regardless of whether Dr. Campion's report and/or testimony is excluded, class certification should be granted because none of Dr. Campion's opinions successfully rebut the findings in the Landis Report or Maguire Report. Indeed, Dr. Campion's criticisms of Plaintiffs' experts' reports have little merit given his lack of sufficient knowledge regarding Plaintiffs' claims, his lack of supporting data, and the speculative basis of his opinions. (Ex. 12; Ex. 13). Although it had the opportunity to do so, Defendant did not present its own expert analyses of job similarity, the demographic composition as to sex, gender, and race, or Compensation. (Ex. 12).

"comprehensive compensation analysis" is the most effective method to determine the "appropriate rate of pay for the work of EMS First Responders." (Ex. 2, p. 38; (Ex. 11, p. 14)). As part of the relief in this action, Plaintiffs will request that the Court appoint a neutral expert approved by both parties to conduct a job evaluation of the EMS First Responder job and use the results of the job evaluation to recommend the appropriate Compensation for EMS First Responders.[29]  Once the Court approves the new Compensation, calculation of damages will involve subtracting actual salary from the new salary rates and factoring in other damages such as lost overtime pay, lost pension benefits, and pre-judgment interest. *See* Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1048 (2016) (affirming class certification based largely on use of statistical sampling evidence when "each employee worked in the same facility, did similar work, and was paid under the same policy"). As such, Plaintiffs have established commonality of their disparate impact claims.[30]

### b. *Disparate Treatment*

As to Plaintiffs' claims of disparate treatment, Plaintiffs have identified significant proof of intentional discrimination common to all class members including Defendant's failure to increase the pay of EMS First Responders despite its awareness that the pay was inadequate. (Ex. 18, p. 62; Ex. 19; Ex. 9). *See* United States v. City of New York, 717 F.3d 72, 94 (2d Cir. 2013) ("the failure of senior officials to act [with awareness of the consequences]...can support an inference of discriminatory intent").  Further evidence of intentional discrimination includes: (1) statistically significant differences (Ex. 2); (2) Defendant's failure to monitor the pay of EMS First Responders to ensure the FDNY's occupational segregation does not adversely impact

---

[29] The neutral expert will establish a project plan and timeline for completing the job evaluation in order to recommend appropriate Compensation, including salary, benefits, and terms and conditions of employment. The expert with work with the Defendant to conduct the job evaluation and any needed job analysis or other steps needed to complete the job evaluation. The expert will regularly report to both parties on project progress and results.

[30] Indeed, Plaintiffs have already demonstrated that damages for lost wages based on Defendant's denial of uniform status for collective bargaining to EMS First Responders are common claims that can be easily calculated. *See supra* p. 17-18, Table 1 and Figure 1.

members of protected groups despite its knowledge of the segregated workforce and its duty to do so.  (Ex, 3, p. 292-293; Ex. 5, p. 135, lines 10-16); and (3) Defendant's refusal to recognize EMS First Responders as uniform for collective bargaining purposes in violation of NYC Administrative Code §12-307, as amended by Local Law 19 of 2001 (Ex. 4, pp. 102-115, 126).

Furthermore, "[e]vidence of historical discrimination," such as determinations in court,[31] findings of the U.S. EEOC (Ex. 9), findings of New York City's Equal Employment Practices Commission (Ex. 34), and findings of discrimination by the FDNY's own Equal Employment Opportunity ("EEO") office,[32] "is relevant to drawing an inference of purposeful discrimination." United States v. City of New York, 683 F. Supp. 2d 225 (E.D.N.Y. 2010).  As such, Plaintiffs have shown common claims of disparate treatment among the class members.

### 3. Plaintiffs' Claims Are Typical of the Claims of the Class and Subclasses

The typicality requirement of Rule 23(a)(3) "'is satisfied when the lead plaintiffs' claims arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members.'" Chen-Oster, 325 F.R.D. at 77.  "[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably coextensive with those of absent class members; they need not be substantially identical." Rodriguez v. Hayes, 591 F.3d 1105, 1124 (9th Cir. 2010) (citing, inter alia, Marisol A., 126 F.3d at 326).

The Representative Plaintiffs' claims here are typical of the class because they are all current or former EMS First Responders and therefore they have all been subject to Defendant's failure to (1) take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders, (2) exert sufficient oversight to prevent or correct suppressed

---

[31] See United States v. City of New York, 683 F. Supp. 2d 225, 241 (E.D.N.Y. 2010), in which the Court recognized consistent efforts to address the "pattern of underrepresentation" in the FDNY, including Berkman v. City of New York, 536 F.Supp. 177, 183 (E.D.N.Y. 1982); Vulcan Soc. v. Civil Serv. Comm'n, 360 F.Supp. 1265 (S.D.N.Y 1973).

[32] On October 27, 2014, the FDNY EEO office substantiated Plaintiff Tonya Boyd's Complaint of discrimination based on sex, gender, and race and determined that remedial actions were required.  See Local 3621, et al v. City of New York, et al, 1:18-cv-04476 (LJL)(JW), Dkt. No. 1-1, pp. 31-32.

Compensation of its segregated workforce of predominantly non-white and largely female EMS First Responders despite its duty to do so, and (3) recognize EMS as uniform for purposes of collective bargaining in violation of NYC Administrative Code §12-307, as amended by Local Law 19 of 2001.  None of the Representative Plaintiffs have unique claims that might render the totality of their claims atypical and all Representative Plaintiffs are prepared to fulfill their duties as fiduciaries of the class.  *See* Chen-Oster, 325 F.R.D. at 79-80; *see also* Ex. 14, 33.

Since class members are all employees of the FDNY an agency of Defendant, the "same, central group of people" are involved in determining the Compensation of EMS First Responders (Ex. 15, pp. 136-137; Ex. 16, p. 188), further demonstrating class members have all been subject to Defendant's conduct "in the same general fashion."  Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 598 (2d Cir. 1986), *quoting* General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159 n. 15 (1982); Ex. 14, 33.

Further, Representative Plaintiffs "have the 'incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'" Houser v. Pritzker*, 28 F.Supp. 3d, 222, 245 (S.D.N.Y. 2014) (*quoting* In re NASDAQ Market–Makers Antitrust Litig., 169 F.R.D. 493, 510 (S.D.N.Y. 1996).  To this end, Plaintiffs will prove their *prima facie* case of disparate impact by identifying Defendant's policies and practices, demonstrating through class-wide statistical evidence that pay disparities exist, and establishing a causal relationship between the two.  Chen-Oster, 325 F.R.D. at 81.  Similarly, Plaintiffs will make their *prima facie* case of disparate treatment with class-wide evidence, including but not limited to statistical evidence, which establishes that discrimination against EMS First Responders is Defendant's "standard operating procedure[,] the regular rather than unusual practice."  Chen-Oster, 325 F.R.D. at 82.  As such, the claims of the Representative Plaintiffs are typical of the claims of the class and subclass members they seek to represent.

### 4. Plaintiffs and Their Counsel Will Fairly and Adequately Represent the Class and Subclasses

Adequacy under Rule 23(a)(4) "typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 99 (2d Cir. 2007). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Duling v. Gristede's Operating Corp., 267 F.R.D. 86, 99 (S.D.N.Y. March 8, 2010). Representative Plaintiffs accurately reflect the proposed class and subclasses by (1) having suffered the same injury as the class members, including similarly suppressed salaries (2) having their Compensation determined in the same manner, including being treated as civilian for purposes of collective bargaining, in violation of NYC Admin. Code §12-307, and (3) possessing the same interest "to secure injunctive and monetary relief" in order to remedy past discrimination and ensure Defendant's employment policies and practices are unbiased and non-discriminatory in the future. (Ex. 1, ¶ 1, Ex. 14, 33). Further, there are no conflicts between Representative Plaintiffs and the class and Representative Plaintiffs have, and will continue to, adequately and aggressively represent the class. (Ex. 14, 33).

Finally, Plaintiffs' counsel, the Kurland Group, is knowledgeable and capable of representing the class. It has familiarity with the matter and has successfully represented Plaintiffs in the past on employment matters. (Ex. 6-8; *see also* Declaration of Yetta G. Kurland). Plaintiffs' counsel are "qualified, experienced, and generally able to conduct this litigation." Marisol A., 126 F.3d at 378. Plaintiffs' counsel also has sufficient experience and resources to litigate a class action of this size. Id. Further, Plaintiffs' counsel is intimately familiar with the procedural and factual history of the instant matter, including the complexities of municipal employment in the FDNY, along with the factual and statistical information underlying Plaintiffs' claims. As such, Plaintiffs'

counsel is best positioned to litigate this class action. Id. The experience, knowledge, and resources of Plaintiffs' counsel, together with the assistance of the Representative Plaintiffs satisfies the adequacy requirements of FRCP 23(a)(4).

### 5. The Class and Subclasses Meet the Certification Criteria Pursuant to FRCP 23(b)(3)

Plaintiffs' claims satisfy FRCP 23(b)(3) because (1) "questions of law or fact common to class members predominate" over questions affecting only individuals and (2) "a class action is superior to other available methods for…adjudicating [this] controversy." FRCP 23(b)(3); *see* Rossini v. Ogilvy & Mather, 798 F.2d 590, 598 (2d Cir. 1986).

#### a. Common Questions to All Members of the Class and Subclasses Predominate

Plaintiffs meet the predominance "requirement 'if resolution of *some* of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" Chen-Oster, 325 F.R.D. at 80. "When determining whether common questions predominate courts focus on the liability issue[,] and if the liability issue is common to the class, common questions are held to predominate[.]" Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 157-58 (S.D.N.Y. 2002).

The common questions regarding the disparities in Compensation "predominate" here because the "fundamental factual issue...is subject to generalized proof." Koss v. Wackenhut Corp., 2009 WL 928087, at *11 (S.D.N.Y. March 30, 2009). As discussed *supra*, Plaintiffs will establish their *prima facie* case with the same evidence, including the statistical analysis Dr. Landis has already conducted for his report, which will be expanded to cover the full liability period. This "generalized proof of statistical evidence is sufficient for the predominance inquiry." Chen-Oster, 325 F.R.D. at 81. Once Plaintiffs have established their *prima facie* case, Defendant would be required "to explain the business necessity of *the processes*, and, therefore, require proof on a

general level.... This is an issue capable of generalized proof." <u>Chen-Oster</u>, 325 F.R.D. at 82 (emphasis in original).  If Defendant makes this showing, the burden would shift back to Plaintiffs to establish pretext, which would also be "subject to generalized proof." <u>Id</u>.

Further, even if there were individualized defenses or damages, which "may affect different class members differently,", this would not defeat predominance. <u>In re Visa Check / MasterMoney Antitrust Litig</u>, 280 F.3d 126, 139 (2d Cir. 2001); <u>In re Omnicom Group, Inc. Sec. Litig.</u>, 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007); <u>Barone v. Safway Steel Products, Inc.</u>, 2005 WL 2009882, at *5 (E.D.N.Y. Aug. 23, 2005); <u>Mendez v. Radec Corp.</u>, 232 F.R.D. 78, 93 (W.D.N.Y. 2005).  As such, because the Compensation of all Plaintiffs and all class members are determined by the same "system," including the same salary scale and collective bargaining process, predominance is satisfied.  <u>Rossini</u>, 798 F.2d at 599; Ex. 14, 33.

### b. A Class Action is the Superior Method for Resolving This Dispute

A class action is the superior method for resolving the instant claims because the evidence establishing the disparities in question apply equally to all class members.  Requiring each class member to litigate such common claims individually would not only be unduly burdensome to the Court but could lead to common questions being decided differently. <u>Torres v. Gristede's Operating Corp.</u>, 2006 WL 2819730, *16 (S.D.N.Y. Sept. 26, 2006). Furthermore, individual class members are relying on membership in the class to vindicate their rights and many, if not most, of the class members would not have the means to initiate individual actions. *See* Ex. 6-8, Union Leaders Declarations.  However, certification also benefits Defendant in the sense that the alternative is either numerous individual lawsuits or hundreds, if not thousands, of individual Plaintiffs in this action if certification is denied. *See* <u>Chen-Oster</u>, 325 F.R.D. at 84 ("it would be nonsensical to disaggregate the claims into hundreds ...of individual proceedings).

Further, a class action would be manageable. As demonstrated *supra*, the common questions here predominate and "any individualized inquiries will be few and far between." In re Nassau County Strip Search Cases, 461 F.3d 219, 230 (2d Cir. 2006). If the class and subclasses are certified, Plaintiffs anticipate parties would engage in a brief period of additional discovery followed by liability and damages expert reports. If the Court agrees that damages can be determined formulaically, a trial of liability and damages should last no more than two to three weeks.

## IV.    CONCLUSION

As such, Plaintiffs respectfully request that the Court issue an Order to: (1) certify a Class and Subclasses pursuant to FRCP 23(a) and 23(b); (2) appoint Class Counsel pursuant to FRCP 23(g); and (3) exclude the report and testimony of Dr. Michael Campion pursuant to FRE 702.

Dated:  November 20, 2023

                              //~s~//
                              Yetta G. Kurland (YK-1251)
                              THE KURLAND GROUP
                              *Attorneys for Plaintiffs*
                              85 Broad Street, 28th Floor
                              New York, New York 10004