Case No. 1:22-CV-10336-AT-GWG
[Related Case No. 1:20-CV-03389-AT]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOCAL 2507, UNIFORMED EMTs, PARAMEDICS &
FIRE INSPECTORS, individually and on behalf of its
current and former members, *et al.*,

Plaintiffs,

-against-

CITY OF NEW YORK, on behalf of the Fire
Department of the City of New York,

Defendants.

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND TO EXCLUDE THE TESTIMONY OF DR. MICHAEL CAMPION AND CROSS-MOTION TO EXCLUDE THE TESTIMONY OF DRS. RONALD LANDIS AND BRIAN MAGUIRE

**HON. SYLVIA O. HINDS-RADIX**
Corporation Counsel of the City of New York
*Counsel for Defendant*
100 Church Street, Room 2-117
New York, New York 10007

*Of counsel*:
Lora Minicucci
(212) 356-2078
lminicuc@law.nyc.gov

Zachary T. Ellis
(212) 356-0839
zellis@law.nyc.gov

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 2

ARGUMENT ........................................................................................................................ 16

    POINT I: THE COURT SHOULD DECIDE THE CITY'S MOTION TO DISMISS
    BEFORE IT DECIDES THEIR MOTION FOR CLASS CERTIFICATION. ................ 16

    POINT II: THE COURT SHOULD DENY PLAINTIFFS' MOTION TO EXCLUDE THE
    EXPERT REPORT AND TESTIMONY OF DR. MICHAEL A. CAMPION. ............... 17

    POINT III: THE COURT SHOULD EXCLUDE DR. LANDIS' OPINION REGARDING
    THE SIMILARITY OF THE FIREFIGHTER AND EMS JOBS. ................................... 23

    POINT IV: THE COURT SHOULD EXCLUDE DR. MAGUIRE'S EXPERT REPORTS
    AND TESTIMONY. .................................................................................................... 31

    POINT V: PLAINTIFFS HAVE NOT MET THE RULE23(A) AND (B)(3)
    REQUIREMENTS FOR CLASS CERTIFICATION. .................................................... 35

CONCLUSION ...................................................................................................................... 40

**TABLE OF AUTHORITIES**

**Cases**

*AFSCME v. County of Nassau*, 609 F. Supp 695 (E.D.N.Y. 1985) .............................................. 40

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ...................................................................... 36

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ................................................................. 26

*Baffa v. Donaldson*, 222 F.3d 52 (2 Cir. 2000)........................................................................... 40

*Benfield v. Mocatta Metals Corp.*, No. 91 Civ. 8255 (LJF), 1993 U.S. Dist. LEXIS 5856

   (S.D.N.Y. May 3, 1993)................................................................................................... 16, 17

*Brown v. Kelly*, 609 F.3d 467 (2d Cir. 2010)............................................................................... 35

*Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318 (N.D.N.Y. 2000) ................. 32

*Chalmers v. City of New York*, No. 20 Civ. 3389 (AT), 2022 U.S. Dist. LEXIS 169111 (S.D.N.Y.

   Sept. 19, 2022) ...................................................................................................................... 28

*Christensen v. Kiewit-Murdock Investment Corp.*, 815 F.2d 206 (2d Cir. 1987)........................ 16

*County of Washington v. Gunther*, 452 U.S. 161 (1981) ............................................................. 24

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..................................................... 17

*DeMarco v. Lehman Bros, Inc.*, 222 F.R.D. 243 (S.D.N.Y. 2004).............................................. 39

*Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420 (2d Cir. 2011) ................................... 26

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 745 F. Supp. 2d 876 (W.D. Wis. 2010)............ 17

*EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247 (2d Cir. 2014) ............................................... 24

*Elisa W. v. City of New York*, 82 F.4th 115 (2d Cir. 2023)........................................................... 36

*Encarnacion v. Barnhart*, 191 F. Supp. 2d 463 (S.D.N.Y. 2002) ............................................... 17

*GE v. Joiner*, 522 U.S. 136 (1997) ....................................................................................... 26, 31

*In re Drexel Burnham Lambert Group*, 960 F.2d 285 (2d Cir. 1992) .................................... 36, 40

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ......................................... 35, 39

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).......................................... 36

*Johnson v. Nextel Communs. Inc.*, 780 F.3d 128 (2d Cir. 2015) ................................................. 36

*Jones v. City of New York*, No. 22-1867, 2023 U.S. App. LEXIS 25266 (2d Cir. Sept. 25, 2023)

.................................................................................................................................................. 37

*McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) ..................................................... 37

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ................................................. 39

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001)............................... 25

*Teachers Ret. Sys. v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 U.S. Dist. LEXIS 25927

(S.D.N.Y. Dec. 20, 2004)........................................................................................................ 39

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir.

2008) ....................................................................................................................................... 35

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) .................................................................. 24

*United States v. City of New York*, 717 F.3d 72 (2d Cir. 2013)...................................... 25, 37

*United States v. City of New York*, 731 F. Supp. 2d 291 (E.D.N.Y. 2010)................................. 37

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................ 36

iii

# PRELIMINARY STATEMENT

Plaintiffs Local 2507, Uniformed EMTs, Paramedics & Fire Inspectors ("Local 2507"); Local 3621, EMS Officers Union ("Local 3621"); NYC EMS Superior Officers Association ("SOA"); as well as 26 individual union members[1] (together, "Plaintiffs"), bring this putative class action against the City of New York ("City").

Plaintiffs filed their Complaint seeking declaratory, injunctive, and monetary relief based on the claim that they are being discriminated against based on race and sex with respect to pay, benefits, and terms and conditions of employment, alleging that they are paid less than New York City Fire Department ("FDNY") Firefighters for performing substantially similar work. In the instant action, Plaintiffs bring discriminatory treatment and impact claims under Title VII, the New York State Human Rights Law ("SHRL"), and the New York City Human Rights Law ("CHRL").[2]

Plaintiffs now move to certify a disparate-impact class of all employees of the FDNY's Emergency Medical Services ("EMS") Bureau in the title of Emergency Medical

---

[1] The individual union member plaintiffs are Tonya Boyd ("Boyd"); Christell Cadet ("Cadet"); Mark Carrasquillo ("Carrasquillo"); Lizette Claro ("Claro"); Beverly Cobb ("Cobb"); Ali Coutard ("Coutard"), Sencia Datilus ("Datilus"); Laitrice Edwards ("Edwards"); Alicia Elkadi ("Elkadi"); Ronald Floyd ("Floyd"); Kahlia Graham ("Graham"); Richard Guzman ("Guzman"); Maggie Hope ("Hope"); Jasmin Howard ("Howard"); Angela Jones ("Jones"); Ravivarman Kailayanathan ("Kailayanathan"); Melanie Moreno-Ketchum ("Moreno-Ketchum"); Jenelle Pierre ("Pierre"); Simon Quashie ("Quashie"); Jason Saffon ("Saffon"); Allison Shaughnessy ("Shaughnessy"); Laura Torres ("Torres"); Andre Valdez ("Valdez"); Lance Winfield ("Winfield"); Ronald Wolfe ("Wolfe"); and Marilyou Aurrichio ("Aurrichio"). Note that Plaintiffs Cadet, Graham, and Howard have withdrawn as representative Plaintiffs. See *Correspondence dated July 25, 2023*, Minicucci Decl., Ex. "FF."

[2] Plaintiffs have withdrawn their claims under 42 U.S.C. § 1983. *See* ECF No. 28; *see also* Pls.' Mem. Law Opp. Def.'s Mot. Dismiss, ECF No. 85, at 25 ("Plaintiffs do not assert a claim under 42 U.S.C. § 1983.").

Technician ("EMT"), or its promotional line of Paramedic, Lieutenant, Captain, Deputy Chief, and Division Chief, during the three-year period preceding the commencement of this action. Plaintiffs also move to certify two disparate-treatment subclasses of all of the aforementioned employees who identify as, respectively, non-white and female. Plaintiffs also move to exclude the expert report and testimony of the City's industrial-and-organizational psychology expert, Dr. Michael A. Campion, while the City cross-moves to exclude the expert reports and testimony of Plaintiffs' two experts, Dr. Ronald S. Landis and Dr. Brian J. Maguire.

### STATEMENT OF FACTS[3]

Plaintiffs Local 2507 represents about 4,000 current and former members of the FDNY's EMS Bureau, holding the ranks of EMT and Paramedic. *See* Compl., ECF No. 16, ¶ 7. Local 3621 represents approximately 500 current and former members of the FDNY's EMS Bureau, holding the ranks of Lieutenant and Captain. *See id.* ¶ 8. Plaintiff SOA represents approximately 50 current and former members of the FDNY's EMS Bureau, holding the ranks of Deputy Chief and Division Chief/Division Commander. *See id.* ¶ 9.

**I.**       **EMS Is Transferred to the FDNY:**

In 1996, Mayor Rudolph Giuliani transferred pre-hospital care emergency medical services from the control of the New York City Health and Hospitals Corporation to the FDNY. *See id.* ¶ 49; *see also* N.Y.C. Exec. Order No. 27.[4] Since then, FDNY has maintained two first response bureaus: EMS and Fire. *See* Compl. ¶ 49. FDNY is an agency of the City and employs, among others, Firefighters and EMTs. *See id.* ¶ 37.

---

[3]    Unless otherwise noted, all references to exhibits are to the exhibits annexed to the Declaration of Assistant Corporation Counsel Lora Minicucci, dated January 24, 2024, and submitted herewith.

[4]    Available at https://a860-gpp.nyc.gov/concern/nyc_government_publications/g158bh506?locale=en.

**II.**       **Jobs at the EMS bureau**

In order to become an EMT for the FDNY, an applicant must meet the following educational and certificate requirements: a four-year high school diploma and a valid New York State Department of Health EMT – Basic Certification or a valid New York State Department of Health EMT – Paramedic Certification, a valid driver's license, and passing a physical examination. *See* NOE for EMT Exam No. 3011, Minicucci Decl., Ex. "A." To become a Paramedic, a candidate must hold the Civil Service title of EMT and at the time of promotion must possess a valid NYS Department of Health EMT – Paramedic Certificate and a valid NYC Regional Medical Advisory Committee Certificate. *See* NOE for Paramedic Exam No. 3503, Minicucci Decl., Ex. "S." There is no "written examination" for applicants to the EMT or Paramedic Civil Service positions. *See* Dep. Robert Alexander ("Alexander Dep."), Minicucci Decl., Ex. "B," at 97:2–3. Applicants are assigned scores based on their experience and certifications. *See id.* The physical exam for EMT is not administered by DCAS but by FDNY. *See id.* at 131:22–24, 132:6. The physical examination requires that the applicant complete four events. *See* EMS Physical Ability Test, Minicucci Decl., Ex. "C." The first event is the stair climb, where the applicant must walk on a step mill for 3 minutes and 2 seconds while wearing a 40-pound weighted vest without holding the handrails. *See id.* If the applicant successfully completes the stair climb, they can move on to the next three events. *See id.* The remaining physical ability test events are: (1) the arm lift, where the candidate must exert a minimum average lift of 42 pounds over three separate attempts; (2) arm endurance, where the candidate must crank an arm ergometer to attempt to complete 110 complete cranks over 2 minutes; and (3) the dead lift where the candidate must exert a minimum average lift of 95 pounds over three separate attempts.

*See id.* The applicants can take breaks between the events. *See id.* The physical ability test for EMTs and Paramedics is administered by the FDNY. *See* Alexander Dep., Ex. "B," at 132:6.

An EMT is responsible for providing timely professional pre-hospital emergency medical care/Basic Life Support ("BLS") to anyone in need, as well as transportation to the appropriate medical facility. *See* EMT Job Specs, Minicucci Decl., Ex. "D." EMTs receive, prioritize, and dispatch calls for emergency medical assistance. *See id.* at 1. Typical tasks for EMTs include receiving and responding to 911 calls for pre-hospital emergency medical care; monitoring department radio; communicating with dispatchers; evaluating, stabilizing and treating patients; and providing BLS pre-hospital care. *See id.* Paramedics can administer drugs that are prescribed by FDNY doctors, either with a standing order or by confirmation. *See* Deposition Cesar Escobar ("Escobar Dep."), Minicucci Decl., Ex. "E," at 212:9–22.

Some EMTs and Paramedics are assigned to the Dispatch Unit; all EMS Dispatchers work out of a central location. *See* Dep. Lance Winfield ("Winfield Dep."), Minicucci Decl., Ex. "GG," at 25:8. Dispatchers currently work out of a building located at 11 MetroTech Center in Brooklyn. *See id.* at 25:22–25. There are currently 452 employees assigned to EMS Dispatch. *See* Decl. Caesar Escobar ("Escobar Decl."), Minicucci Decl., Ex. "N," ¶ 3. EMS Dispatchers receive calls that are entered by call takers and then they dispatch the closest most appropriate units to the call locations. *See* Winfield Dep., Ex. "GG," at 26:4–9. They are expected to liaise with the New York City Police Department, the Metropolitan Transit Authority, and area hospitals. *See id.* at 26:11–17. EMS Dispatchers use the CAD dispatch system to assign the appropriate number of EMS units to an emergency. *See id.* at 29:12. Some individuals spend their entire careers as EMS Dispatchers. *See id.* at 31:19.

EMS calls are generally organized in segments identified in order of severity: as 1 through 9, with 1 being the most critical. *See* Escobar Dep., Ex. "E," at 127:22–23. EMS personnel report to their station at the start of their shift and, once there, they take the ambulance they are assigned to an intersection within the community for quicker dispatch times. *See id.* at 144:8–16.

EMS also responds to fires if there is a confirmed fire. *See* Dep. John Esposito ("Esposito Dep."), Minicucci Decl., Ex. "F," at 85:10–11, 86:2–6. However, occasionally EMS wears personal protective equipment that appears similar to that of firefighters but is not fire-rated, and they do not perform tasks that are similar to those of Firefighters, tasks such as, *inter alia*, entering burning buildings. *See id.* 198:21. EMS would also respond if Fire Officers report an injury at other emergencies. *See id.* at 85:17–18. EMS personnel are not trained to address or repair gas or chemical leaks and do not routinely respond to these emergencies. *See id.* 165:11–12, 166:7–8, 173:25. EMS personnel are equipped with carbon monoxide meters so that they know when to leave an unsafe situation. *See id.* at 169:1–5. EMS personnel do not wear either bunker gear or self-contained breathing apparatuses ("SCBA"), unless they are assigned to specialized Haz-Tac Units. *See id.* at 169:10. EMS personnel will respond to bomb threats or active shooters but they operate in the "cold zone" where there is minimal risk of injury. *See id.* at 171:12–16. Paramedics are not generally trained on search and rescue. *See* Dep. Michael Fields ("Fields Dep."), Minicucci Decl., Ex. "G," 167:8–9. EMS personnel respond to medical emergencies and can be exposed to infectious diseases although the risk is limited by personal protective equipment. *See* Escobar Dep., Ex. "E," at 175:2–7. Fire instructors have a limited role in the training of EMS entry-level personnel. *See id.* at 180:22–23.

**III.      Haz-Tac EMTs and Paramedics and Rescue Medics:**

There are EMS personnel who are trained to operate at Haz-Mat emergencies ("Haz-Tac EMTs and Paramedics") and Technical Rescue emergencies ("Rescue Medics"), but they perform different tasks than Firefighters or Rescue Firefighters. *See id.* at 15:1–4. FDNY's EMS Bureau currently employs 274 Haz-Tac EMTs and Paramedics, as well as 65 Rescue Medics. *See* Escobar Decl., Ex. "N," ¶ 3. Generally, Rescue Medics are trained to perform patient care at the location of injury, *after* it has been made safe by Firefighters. *See* Escobar Dep., Ex. "E," at 19:13–16. For example, Rescue Medics may be called to treat or stabilize a patient within a building collapse only after Firefighters have deemed it structurally safe enough for Rescue Medics to enter. *See id.* at 18:18–19:3. Haz-Tac EMTs and Paramedics, on the other hand, are trained to operate within the "warm zone" of a hazardous materials incident. *See* Fields Dep., Ex. "G," at 168:11–13. Firefighters would remove the patient from the "hot zone" to the "warm zone" for treatment. *See id.* at 169:2–8. Since 2017, Haz-Tac EMTs and Paramedics receive a 3% differential increase on their salary upon assignment and another 3% differential increase on their salary upon completion of their first year. *See* EMS Memo of Agreement, Minicucci Decl., Ex. "H." EMS Rescue Medics are focused on treating patients during scenes that involve, *inter alia*, rescuing individuals from heights, in trenches, and collapsed buildings. *See* Esposito Dep., Ex. "F," at 15:13–14. EMS Rescue Medics are solely focused on their patients and begin their work once the Firefighters have assessed the scene and made it as safe as possible, provided access, or in many cases have brought the patient out of the "hot zone" to EMS personnel. *See id.* at 15:24–16:4. EMS Rescue Medics are trained to enter the "hot zone" if needed. *See id.* at 16:9–11. *See id.* EMS Haz-Tac EMTs and Paramedics and Rescue Medics do joint trainings with Firefighters. *See id.* at 151:19–22. There are about nine or ten Rescue Medic Units Citywide. *See id.* at 215:20–23. Although Rescue Medics can go inside a building that is actively on fire, they are rarely, if

ever, assigned to the fire floor or the floor above the fire floor. *See id.* at 219:21–25, 223:19–21. EMS Rescue Medics and Haz-Tac EMTs and Paramedics may be issued SCBAs if they have received the appropriate certification. *See* Escobar Dep., Ex. "E," at 169:14–16.

## IV.        Promotions from EMS to Firefighter:

Since 2006 there have been three promotional exams from the positions of EMT and Paramedic to Firefighter: in 2006, 2012, and 2017. *See* 2006 Promotional Exam Spreadsheet, Minicucci Decl., Ex. "I"; 2012 Promotional Exam Spreadsheet, Minicucci Decl., Ex. "J"; 2017 Promotional Exam Spreadsheet, Minicucci Decl., Ex. "K." In 2006, 294 EMTs and Paramedics took the promotional Firefighter exam and 89 were appointed to the position of Firefighter. *See* Ex. "I." In 2012, 1,187 EMTs and Paramedics took the promotional Firefighter exam and 542 individuals were promoted to the position of Firefighter. *See* Ex. "J." In 2017, 1,814 EMTs and Paramedics took the promotional exam for Firefighter and 899 were promoted. *See.* Ex. "K." The Civil Service Law requires that promotional lists be used before open competitive lists. *See* Alexander Dep., Ex. "B," at 109:9–12. Only those in the lower eligible title can sit for promotional exams. *See id.* at 89:5–7. Agencies can choose to include collateral titles as eligible for promotional exams. *See id.* at 113:13–20. Collateral titles are titles that are outside the promotional line but that the agency believes would include individuals suited for the promotional title. *See id.* When there is a promotional list from EMS to Firefighter, the EMS Bureau expects to have a portion of their personnel leave to take the position of Firefighter. *See* Escobar Dep., Ex. E, at 189:25–190:3.

## V.        Jobs at the Fire Bureau:

To become a New York City Firefighter, an applicant must have a high school diploma, and either 15 college credits, or full-time US military service with an honorable

discharge, or 6 months of full-time, satisfactory work experience. *See* Firefighter Notice of Examination Exam No. 7001, Minicucci Decl., Ex. "L." Thereafter, candidates for the title of Firefighters must take a computer-based test. *See id.* If the candidate receives a passing score in the computerized test, they must take a physical ability test referred to as the Candidate Physical Ability Test ("CPAT"). *See* CPAT Orientation Guide, Minicucci Decl., Ex. "M." The CPAT consists of a series of eight events designed to evaluate a candidate's physical ability to perform the job of Firefighter. *See* Firefighter Notice of Examination Exam No. 7001, Ex. "L," at 3. The events are as follows: stair climb, the hose drag, equipment carry, ladder raise and extension, forcible entry, search, rescue, and ceiling breach and pull. *See id.* DCAS administers the physical exam for Firefighter applicants. *See* Alexander Dep., Ex. "B," at 132:1–3. All the tests must be completed in a time of 10 minutes and 20 seconds or less, and candidates must complete the test wearing a 50-pound weighted vest. *See* CPAT Orientation Guide, Ex. "M," at 1. The events are set up in a sequence that best corresponds to the sequence of tasks a Firefighter will face when arriving at a fire. *See id.* The first event is a Step Mill stair climb while wearing an additional 25-pound weight. *See id.* at 2. After a 20-second warm up period, the candidate must walk up the step mill for three minutes at a set rate of 60 steps per minute. *See id.* If the candidate grasps any part of the stepmill or dismounts the stepmill during the test, they will fail the event and the test will end. *See id.* The second event is the hose drag, where the candidate must drag a hose 100 feet, including around a simulated corner. *See id.* at 3. The third event is the equipment carry, where the candidate must remove two gas-powered saws from a tool cabinet and then carry them while walking 75 feet and back again to place the saws back into the tool cabinet. *See id.* at 4. If the candidate drops either of the saws, they will fail the event and the test will end. *See id.* The fourth event is the ladder raise and extension, where candidates must walk to the top rung of a 24-foot

extension ladder, lift the unhinged end from the ground, and walk it up until it is stationary from the ground. *See id.* at 5. If a candidate drops the ladder or misses a rung of the ladder twice, they will fail the event and the test will end. *See id.* The fifth event is "forcible entry," where candidates must use a 10-pound sledgehammer to hit a target area while keeping their feet within the "toe box." *See id.* If the candidate releases the sledgehammer while swinging or steps out of the "toe box" more than once, they will fail this event and the test will end. *See id.* at 6. The sixth event is a search, where candidates must crawl through a tunnel while navigating obstacles within the tunnel. *See id.* If a candidate requests assistance that requires the opening of an escape hatch or entrance or exit, they will fail this event and the test will end. *See id.* at 7. The seventh event is a rescue, where applicants must drag a 165-pound mannequin 35 feet around a drum and back again. *See id.* If the candidate grasps or rests on the drum in any way, they will fail the event and the test will end. *See id.* The final event is a simulated ceiling breach using a pike pole[5] where the candidate must push a 60-pound ceiling door up three times, then hook the pike pole around an 80-pound ceiling device and pull it down five times. *See id.* at 7–8. The whole set for the final event must be repeated four times. *See id.*

## VI.        Firefighters at FDNY

According the Notice of Examination from DCAS, Firefighters:

> assist in the control and extinguishment of fires, in providing pre-hospital emergency medical care, and in the enforcement of laws, ordinances, rules and regulations regarding the prevention, control, and extinguishment of fires, as well as perform Fire Safety Education activities; perform inspections and related enforcement duties, such as issuing criminal court summonses and vacate orders, to assure compliance with provisions of the Fire Prevention Code and applicable sections of the Building Code, Multiple Dwelling Code, Housing Maintenance Code, Labor Law and other laws, rules

---

[5]    A pike pole is a piece of equipment commonly used by Firefighters that consists of a 6-foot pole with a hook at the end. *See* CPAT Orientation Guide, Ex. "M," at 7.

and regulations, within enforcement purviews of the New York City Fire Department, perform inspections of equipment and schedule as necessary the maintenance of various tools and equipment, including but not limited to power tools, company apparatus, Self-Contained Breathing Apparatus (S.C.B.A.) and other personal safety equipment; and perform related work.

DCAS NOE for Firefighter, Title Code No. 70310, Exam No. 7001, Minicucci Decl., Ex. "N."

EMS personnel have a limited role in Firefighter training. *See* Escobar Dep., Ex. "E," at 184:11–12. The training EMS instructors provide is mainly CFR-D[6] training. *See id.* at 184:17. Firefighters work 48 hours every eight days. *See* Esposito Dep., Ex. "F," at 182:22–23. Firefighters cannot work more than 24 hours in a row. *See id.* at 229:21–22.

Firefighters began taking CFR-D duties approximately one to two years before EMS merged with FDNY in 1996. *See* Fields Dep., Ex. "G," at 28:14–16. CFR Companies are assigned to the highest priority calls. *See* Escobar Dep., Ex. "E," at 89:24–90:6. Those types of calls are labeled "Priority 1" and include cardiac arrest, drowning, and choking. *See id.* CFR-D companies are dispatched to the highest priority calls that are generally described as "segments 1, 2, and 3" and could be events such as choking, drowning, or cardiac arrest. *See id.* at 90:5–6, 91:3–4; Esposito Dep., Ex. "F," at 44:19–23. When one of those emergencies comes in, a CFR-D company is dispatched along with EMS resources. *See id.* at 44:19–23. The CFR-D companies are responsible for starting medical care until an EMS unit arrives and takes charge of that care. *See* Escobar Dep., Ex. "E," at 99:8–15. Upon arrival of the EMS crew, there is a brief exchange of information and generally the EMS crew takes over the care of the patient. *See id.* at 100:6–10. Sometimes, the EMS crew will ask the Firefighters from the CFR-D company to remain on scene and continue administering medical care. *See id.* at 100:15. Every unit that performs pre-hospital care is

---

[6] CFR is the lowest level of medical certification of 9-1-1 medical responses in the City. *See* Escobar Dep., Ex. "E," at 125-25:126:3.

required to fill out a pre-hospital care report. *See id.* at 102:21–24. CFR-D companies participate in medical case reviews. *See id.* at 104:6–13. CFR-D certification has been required as a condition of employment for Firefighters since approximately 2000–01. *See* Esposito Dep., Ex. "F," at 136:4. Firefighters need to be CFR-D recertified every 3 years. *See id.* at 136:7. Firefighters cannot transport patients to a hospital. *See id.* at 169:16.Firefighters conduct searches for victims in collapsed buildings. *See* Esposito Dep., Ex. "F," at 18:23–24. They also stabilize collapsed structures and create safe passageways to make it safe for FDNY personnel to come in and treat patients. *See id.* at 18:23–19:3. Firefighters provide medical care at CFR-D incidents, at the scene of fires, building collapses, and anywhere they find people who need medical care. *See id.* at 62:15–18. It is very common for Firefighters to respond to medical emergencies. *See id.* at 63:2–3. After they respond to medical emergencies, Firefighters are responsible for decontaminating their gear, restocking their supplies, and filling out reports if necessary. *See id.* at 66:17–22. There are reviews performed by the FDNY Office of Medical Affairs when there is a suspected issue regarding the standard of medical care. *See id.* at 70:9–11. Firefighters are dispatched to utility emergencies, structural incidents, investigation of complaints, building inspections, stuck elevators without injured patients, and gas leaks. *See id.* at 87:2–5, 88:6–9. FDNY classifies fires that it responds to into two categories: structural fires and non-structural fires; structural is a fire in or on a building. *See id.* at 76:10–13. Non-structural is a fire that is not in or on a building, such as a car fire, a rubbish fire, or a brush fire. *See id.* at 76:14–19.

Some Firefighters are trained to work in Special Operations Command ("SOC") units, such as Haz-Mat and technical rescue and Marine operations. *See id.* a 14:22–25. In Haz-Mat emergencies or emergencies requiring technical or Marine rescue, Firefighters are responsible for assessing and mitigating the situation. *See id.* at 15:17–22. In that context, Firefighters have

initial contact with patients. *See id.* at 15:22–23. When Firefighters are performing patient care, they are exposed to biological contaminants, such as blood, vomit, skin, urine, and feces. *See id.* at 94:16–21, 96:18–21.

Risks inherent to the Firefighting job include building collapse, burn injuries, tripping, falling, crush injuries, being hit with tools, parts of the building falling on them, falling out of windows, falling off roofs, and falling down stairs, as well as exposures to various chemicals. *See id.* at 107:4–22. The World Health Organization ("WHO") declared that firefighting was carcinogenic because of the fireground contaminants that firefighters are exposed to daily. *See id.* at 107:23–108:2. The cancer risk that firefighters have is higher because they are dealing with various types of chemical exposure, carbon monoxide, cyanide, cyanide poisoning, other inhalation and exposure hazards (including exposure to natural gas), electricity, accidents with power tools, cold water, motor-vehicle accidents, and operating on roadways at the site of vehicle accidents. *See id.* at 108:3–9, 109:7–11. Other hazards of working as a firefighter include falling off ladders, falling from heights, injuries from working in confined spaces, being hit by falling trees, being exposed to cold water during water rescues, among others. *See id.* at 110:25–111:4, 111:16–19.

Fire ground contaminants are the residue that remains on bunker gear after operating at a fire that causes high rates of cancer. *See id.* at 113:8–10. Fire ground contaminants are the product of combustion. *See id.* at 114:2–3. Individuals outside a burning building may also be exposed to fire ground contaminants, but not at the same rate as those inside the building. *See id.* at 115:9–10. Fireground contaminants are both in the smoke and in the burn material. *See id.* at 116:3–4. Dust from building collapses also creates an inhalation hazard. *See id.* at 118:21–23.

After working at a fire, all the Firefighters' gear and apparatus is contaminated with fire ground contaminants. *See id.* at 124:9–15. All the hard surfaces must be wiped down by the Firefighters. *See id.* at 124:15–16.

Firefighters respond to scenes in either ladder trucks or engine trucks. Ladder apparatus is either a tower ladder (*i.e.*, a basket or bucket they can raise up) or a rear mount (*i.e.*, a climbing ladder). *See id.* at 128:25–129:2. Ladder companies are generally tasked with identifying the location of the fire and then the location of victims. *See id.* at 129:1–9. Engine companies work on "pumpers" that carry water and hoses to fires. *See id.* at 128:12–17. Engine companies are responsible for stretching the hoses and putting water on the fire to extinguish the fire. *See id.* at 128:12–17. Approximately 50 and 60 firefighters are assigned to a fire. *See id.* at 132:2–3. Engine companies also respond to segment 1-2-3 medical calls, engine trucks carry 5-6 firefighters. *See id.* at 132:8–9.

When Fire and EMS both respond to an incident, the incident commander is the highest-ranking Fire Officer. *See id.* at 178:16–18. Fire Alarm dispatchers are not part of the Fire Bureau; they are in the Communications Bureau. *See id.* at 59:19–22. Fire has five rescue companies. *See id.* at 216:4. Rescue Firefighters face more risks, and face those risks more frequently than Rescue Medics. *See id.* at 219:4–8.

From 2005 to 2022, Firefighters were dispatched to 18.7% of all calls that were directed to EMS dispatch. *See* Def.'s Suppl. Interrog. Resp., dated October 30, 2023, Minicucci Decl., Ex. "O." For that same date range, EMS was dispatched to, on average, 3% of all fire calls, *i.e.*, reports of fires, and 5.7% of all non-medical emergencies to which Firefighters were dispatched to. *See id.*

**VII.     Collective Bargaining**

The New York City Office of Labor Relations ("OLR") is the only City agency that is empowered to engage in collective bargaining for the City of New York under the New York City Charter. *See* Dep. Renee Campion, Minicucci Decl., Ex. "P," at 19:4–5. OLR represents the FDNY in collective bargaining with its respective unions. *See id.* at 20:10–14. Representatives from the FDNY also attend bargaining sessions. *See id.* at 21:13–16. An individual City agency, such as the FDNY, does not have the authority to unilaterally assign pay rates. *See id.* at 87:17–25. Rates of pay are negotiated between the City and the unions. *See id.* at 89:2–3. "Uniform Forces" are able to have their unions collectively bargain directly with the City. *See id.* at 99:25–100:6. This allows the respective unions of uniform forces to bargain all their terms and conditions of employment directly with the City. *See id.* at 101:9–10. Employees not employed by "uniformed" agencies collectively bargain terms and conditions of employment that are common to all non-uniform titles through the "Citywide agreement."[7] *See id.* at 102:1–3.

The City has used pattern bargaining for approximately 55 years. *See id.* at 102:8–10. In "pattern bargaining" for any round of bargaining, OLR negotiates with the first union for a certain net cost and comes to final terms for a certain net cost. *See id.* at 102:8–20. This net cost is held the same for the remaining unions who are similarly situated. *See id.* The net cost of a contract does not necessarily correspond to identical increases in pay across contracts. *See id.* at 110:7–9. Historically, there has been a "civilian pattern" and a "uniform pattern." *See id.* at 103:2–4. In the 1990s, a single pattern was used for all City employees. *See id.* at 103:10–15.[8] FDNY

---

[7]    The Citywide agreement is an agreement governing the terms and conditions of employment for approximately 50% of City employees and is negotiated between the City and District Council 37. *See* Dep. Renee Campion, Ex. "P," at 102:1–3.

[8]    The unions that are included in the uniform pattern are the Police Benevolent Association, the Sergeants Benevolent Association, the Detectives' Endowment Association, the Lieutenants Benevolent Association, the Captains' Endowment Association, the Uniformed Firefighter

EMS unions have received the Civilian Pattern since 2000.  *See id.* at 106:9.  Pursuant to Local Law 56 of 2016, a copy of which is electronically accessible at https://www.nyc.gov/assets/buildings/local_laws/ll56of2016.pdf, EMS  unions to bargain their terms and conditions of employment themselves directly with the City.  *See id.* at 115:23–116:4.

## VIII.    Job Analyses

A job analysis is the information gathering and analysis process to determine what characteristics, skills and abilities are required to perform a job.  *See* PSI 2012 Firefighter Validation Study, Minicucci Decl.,  Ex. "Q," at 2.  Job Analyses are performed by the Department of Citywide Administrative Services ("DCAS").  *See* Alexander Dep., Ex. "B," at 67.  Typically, they are performed every four years in preparation for a Civil Service exam.  *See id.* at 67:6–8.  The first part of the job analysis is creating a focus group to see which characteristics, skills and abilities survived the previous job analysis.  *See id.* at 72:12–17.  For the Fire Operations Bureau, all the titles from Firefighter to Deputy Chief have multiple-choice exams.  *See id.* at 97:1–2.  The job analysis is only used for the development of an exam.  *See id.* at 96:8–9.  In contrast, EMT and Paramedic exams are education and experience exams.  *See id.* at 97:2–3.

PSI Services, LLC ("PSI"), was retained by the City in 2010 to design and develop a job-related assessment instrument for selecting Firefighter candidates.  *See* PSI 2012 Firefighter Validation Study, Ex. "Q," at 14.  The 2012 PSI job analysis consisted of a study of the FDNY Firefighter job that identified "important abilities and characteristics that are essential to successfully learn and perform FDNY Firefighter job tasks . . . ."  *Id.* at 1.  As a result of the

---

Association, the Uniformed Fire Officers Association, Uniformed Sanitationmen's Association, Uniformed Sanitation Chiefs Association, the Correction Officers' Benevolent Association, the Correction Captains' Association, the Assistant Deputy Wardens/Deputy Wardens Union, New York City Deputy Sheriffs.  *See id.* at 104:19–105:4, 105:13.

process, 49 core abilities and characteristics were identified. *See id.* at 2. These included 18 cognitive abilities, 24 non-cognitive abilities, and 7 physical. *See id.* at 2–3, 25–26. Tasks were rated as essential when at least two-thirds of the survey's 37 Firefighter and Fire Officer respondents rated them as essential. *See id.* at 2.

In 2019, PSI produced a confirmatory report reviewing whether significant changes Firefighter job requirements had changed since 2012. *See* 2019 Confirmatory Job Analysis, Minicucci Decl., Ex. "R," at 2. In the confirmatory job analysis, 18 Firefighters and 22 Fire Officers reviewed and rated the FDNY entry-level Firefighter core job tasks. *See id.* This review indicated that changes to the Firefighter job were minimal and thus the 2012 job analysis results were still valid and that they would remain the foundation for future testing of candidates' skills, characteristics, and abilities. *See id.* at 2, 25; *see also* Alexander Dep., Ex. "B," at 98:11–18 (explaining that PSI's 2019 job analysis confirmed that the Firefighter job had not changed significantly since PSI's 2012 job analysis).

## ARGUMENT

### POINT I

### THE COURT SHOULD DECIDE THE CITY'S MOTION TO DISMISS BEFORE IT DECIDES PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

"[I]t is within a district court's discretion to reserve decision on a class certification motion pending disposition of a motion to dismiss." *Benfield v. Mocatta Metals Corp.*, No. 91 Civ. 8255 (LJF), 1993 U.S. Dist. LEXIS 5856, at *7 (S.D.N.Y. May 3, 1993) (citing *Christensen v. Kiewit-Murdock Investment Corp.*, 815 F.2d 206, 214 (2d Cir. 1987)). "At the same time, where the court decides to enter judgment on the merits in favor of defendants, certification of a plaintiff class 'could only serve to prejudice absent class members.'" *Encarnacion v. Barnhart*, 191 F.

Supp. 2d 463, 469 (S.D.N.Y. 2002) (citing *Benfield*, 1993 U.S. Dist. LEXIS 5856 at *7). Because

certification of a class at this stage is likely to implicate the due-process rights of absent class

members and possibly cause unfair prejudice to them, the Court should defer a ruling on Plaintiffs'

class-certification motion until it has decided the City's motion to dismiss, docketed at ECF No.

65.

## POINT II

### THE COURT SHOULD DENY PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. MICHAEL A. CAMPION.

Plaintiffs have moved to exclude the expert report and testimony of the City's

industrial-and-organizational psychology expert, Dr. Michael A. Campion, under the authority of

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In truth, Plaintiffs simply disagree

with Dr. Campion's opinions, which is not the proper focus of a *Daubert* inquiry, and their motion

should consequently be denied.[9]

Dr. Campion is the Herman C. Krannert Distinguished Professor of Management

at Purdue University, a position which he has held since 1986. *See* Expert Report Michael A.

Campion ("Campion Report"), Minicucci Decl., Ex. "U," at 6.) A recognized leader in his field,

Dr. Campion holds an M.S. and Ph.D. in Industrial and Organizational Psychology ("I/O

psychology"), has published over 155 articles in scientific and professional journals, including

---

[9]    Plaintiffs challenge, in a footnote, the admissibility of Dr. Campion's report because he did not
sign it, as required by Federal Rule of Civil Procedure 26(a)(2)(B). However, the City produced
a signed version of the report for Plaintiffs on January 23, 2024. This cures the inadmissibility
problem, if there ever was one. Additionally, Plaintiffs have already deposed Dr. Campion as to
the contents of his expert report and, therefore, Plaintiffs were not prejudiced by the fact that Dr.
Campion's expert report, as originally produced, was unsigned. *See Douglas Dynamics, LLC v.
Buyers Prods. Co.*, 745 F. Supp. 2d 876, 881 n.2 (W.D. Wis. 2010) (explaining that an unsigned
and unsworn expert report is admissible if its author subsequently cures the deficiency).

approximately 30 on the topic of job analysis, has conducted approximately 200 job analyses, helped guide the development of the Occupational Information Network ("O*NET"), has given over 260 presentations at professional meetings (approximately 30 of which were on the topic of job analysis), has been retained as an expert witness in about 50 discrimination-related court cases and arbitrations, and, with over 27,000 Google Scholar citations, is one of the most cited authors in his field. *See id.* at 6–9. He is past editor of *Personnel Psychology*, a scientific research journal, and past president of the Society for Industrial and Organizational Psychology, which awarded him the highly prestigious Scientific Contribution Award in 2010. *See id.* at 7.

There should be no question here of Dr. Campion's qualifications, although Plaintiffs assert that, because he is "not an epidemiologist," Dr. Campion is not qualified to render expert opinions regarding the occupational-health-and-safety analyses performed by Plaintiffs' epidemiological expert, Dr. Brian J. Maguire. In fact, Dr. Campion has explained that, as part of the process of determining comparability between jobs for compensation purposes, an I/O psychologist applying the point method must, consistent with the theory of compensating wage differentials, consider the physical demands, occupational hazards, and on-the-job injury risks of the jobs being compared. *See id.* at 12–17.[10] Plaintiffs do not explain why, then, Dr. Campion, with his admitted expertise in comparative organizational psychology in general and job analysis, compensation, and the physical aspects of work in particular, including accident prevention and job-related injuries, is not qualified to critique Dr. Maguire's cross-occupational analysis of the various job-related risks and hazards faced by Firefighters and their promotional line of

---

[10]   *See also* Dep. Michael A. Campion, Minicucci Decl., Ex. "V," at 21:5–23:10 (explaining his expertise includes "human factors and ergonomics and physical aspects of work" and the "physical demands of jobs, both in the sense of hiring and in the sense of accident prevention and injuries, on the job," and he has "been involved in a couple of other related court cases of firefighters, and EMS personnel, and physically related attributes of jobs, as they related to hiring").

Lieutenants, Captains, Battalion Chiefs, and Deputy Chiefs and EMS personnel, consisting of EMTs and their promotional line of Paramedics, Lieutenants, Captains, Deputy Chiefs, and Division Chiefs.

There is also no question that Dr. Campion's opinions regarding whether Firefighters (and their promotional line) and EMS personnel are sufficiently similar to be considered comparable for compensation purposes, whether there are key differences in the jobs that might explain the compensation differentials, and whether these differences between the jobs are relevant to compensation are relevant to the disputed issues in this case and probative on those issues. These opinions are not, as Plaintiffs argue, a matter of common sense, but are instead based on the point method of job evaluation, the most highly refined system used by most large organizations, both public and private, and which Dr. Campion has dedicated his professional life to studying.

Nor is Dr. Campion's utilization of the most widely used and sophisticated method of evaluating jobs for the purpose of setting wage or salary levels methodologically flawed, as Plaintiffs also baselessly claim. Dr. Campion's three principal opinions are that: (1) Firefighters and EMS personnel have such large differences in their tasks and requirements that they should not be considered comparable for pay purposes; (2) there are key differences in Firefighters and EMS personnel that explain the compensation differences between them, notably in their respective physical demands and hazards; and (3) these differences between Firefighters and EMS personnel are relevant to compensation and explain the pay differences between them. *See id.* at 49–50.

Even a cursory review of Dr. Campion's expert report dispels Plaintiffs' misrepresentations that Dr. Campion "does not utilize a testable methodology, let alone one with

a knowable rate of error," that his opinions are not based on his own analysis, and that he has not applied the point method to any data. Pls.' Mem. Law Supp. Certification Class and Subclasses ("Pls.' Mem."), ECF No. 120, at 29, 30. Perhaps Plaintiffs meant that Dr. Campion has not conducted his own job analysis in this case. If so, Plaintiffs have the burden backward. Plaintiffs have not explained why, to be able to critique Dr. Landis' comparative analysis of job similarity, which, to be clear, is *not* a job analysis, and Dr. Maguire's cross-occupational injury analysis, which is also, obviously, *not* a job analysis, Dr. Campion first had to conduct his own job analysis of the positions being compared. It is Plaintiffs' case and, therefore, Plaintiffs' burden. In order to show that Plaintiffs have not met their burden of showing job similarity, the City need not conduct its own job analysis to affirmatively prove that the positions being compared are dissimilar, though the evidence submitted by the City does, in fact, do just this. It is also worth emphasizing that the City has produced job analyses for the FDNY Firefighter job, which Dr. Campion cites in his report, but which neither of Plaintiffs' experts utilize.

Plaintiffs also claim Dr. Campion's opinions are not based on sufficient facts or data. Specifically, Plaintiffs contend:

> Dr. Campion also fundamentally misunderstands the work of FDNY First Responders. For example, he asserts that "EMS employees are not trained to go into the fire building or to operate in the 'hot zone' where there are dangers to life and health." However, Defendants' 30(b)(6) witness' [sic] testimony directly contradicts this, confirming that paramedics and EMTs are trained and expected to enter burning buildings and 'to go into the hot zone' to provide medical services.

*Id.* at 27 (internal citations omitted). This is (yet another) gross mischaracterization of Assistant Chief Escobar's testimony, which was that there are a small number of specially trained Rescue Medics and Haz-Taz Paramedics who may rarely and under limited circumstances provide medical treatment in a "hot zone," for which they receive additional compensation, but regular EMTs and

Paramedics, who constitute the vast majority of EMS personnel, do not do this. *See* Escobar Dep., Ex. "E," at 239:23–240:9.

Another claimed deficiency with Dr. Campion's report is that, for all he knows, the data from the file titled "Injury with Body Parts" could include both on-duty and off-duty injuries and illnesses to Firefighters, which could skew the data; however, one of the City's Rule 30(b)(6) witnesses testified that the data includes only the former. *See* Dep. Kamaldeep Deol, Minicucci Decl., Ex. "EE," at 34:5–14.

Dr. Campion's statement that "I didn't really study all of those things in any detail" was not, as Plaintiffs disingenuously claim, an admission "that he does not know what factors would determine proper Compensation [sic] for" Firefighters, Pls' Mem. at 25 (internal citation omitted); rather, Dr. Campion was merely pointing out the fact, obvious enough, that he has not studied in detail every factor that could have possibly influenced Firefighter compensation over the FDNY's entire 130-year existence.

Turning to Dr. Campion's methodology, Plaintiffs fault Dr. Campion for his alleged failure "to properly consider 'the joint probability that any job in O*NET would be similar to Firefighter with respect to all four comparisons." *Id.* at 31 (emphasis omitted). Not so. To begin with, it is not clear from Dr. Landis' affirmative expert report that he considered this "joint probability"; it was only at his deposition and in his rebuttal expert report that he articulated this argument. At any rate, Dr. Campion, who, it bears repeating, helped guide the development of O*NET, explained that:

> What I have done is I have shown that each of the analyses that he presents, all four of them – all four of them are fundamentally incapable of answering the question. And there are other problems with this analysis, in addition to this, and I can come back to that in a moment. . . . But in addition to that, his actual analyses, each one of them is flawed. So the question of, well, what if you put all four

together, won't that make a good analysis? And that just is not the point I would agree with, even though that seemed to be his argument when he did his deposition.

Dep. Michael A. Campion ("Dr. Campion Dep."), Minicucci Decl., Ex. "V," at 292:6–20.

Next, Plaintiffs claim that, in utilizing the job analysis for the 2012 Firefighter exam, Dr. Campion relied on data that was too old to be relied on. Unmentioned by Plaintiffs is the fact that PSI's 2019 job analysis confirmed that the results of its 2012 job analysis were still valid and that they would remain the foundation for future testing of candidates' skills, characteristics, and abilities (and, accordingly, the 2012 job analysis was incorporated into and annexed to the 2019 job analysis). *See* PSI 2012 Firefighter Validation Study, Ex. "Q"; 2019 Confirmatory Job Analysis, Ex. "R"; *see also* Alexander Dep., Ex. "B," at 98:11–18 (explaining that PSI's 2019 job analysis confirmed that the job had not changed significantly since its 2012 job analysis).

Finally, although Plaintiffs insist that "Dr. Campion's entire argument that Fire First Responders are entitled to more pay is based on the important but occasional work of fire suppression of structural fires," Pls' Mem. at 34, no one who has read Dr. Campion's report could honestly believe this. Plaintiffs go on to claim that "Dr. Campion's inability to explain why he *includes* the important but occasional work of Fire First Responders, i.e. fire suppression, in his valuation, but *excludes* the important but occasional work of EMS First Responders, i.e. non-medical rescue, renders his opinion regarding pay disparity unreliable." *Id.* In fact, Dr. Campion was responding to Plaintiffs' counsel's question about "what if EMS First Responders, in present time, will, from time to time, go into a burning building to provide lifesaving [sic] care, even though that is that is [sic] occasional," Dr. Campion Dep., Ex. "V," at 203:13–17, a hypothetical, which, as discussed above, is factually inaccurate. At any rate, Dr. Campion explained that, even

if EMS personnel do occasionally do this—which, again, they do not—it still does not fall within the stated job duties and responsibilities of EMS personnel and:

> if it's something they do as an exception, usually it's not considered as part of compensation, **unless it's a regular part of the job** because we're paying people every day that other price. So it can't be something that they might, you know, do just on a rare occasion, it's not even part of their job. They usually don't get any pay associated with that.

*Id.* at 205:12–20 (emphasis added). By contrast, not only do Firefighters engage in fire suppression-related work far more often than "occasionally," as Plaintiffs claim, but, "[i]n the case of a firefighter, his or her job is to do that, so that's part of the job" and, consequently, would affect Firefighters' compensation, regardless of the frequency with which they do it. *Id.* at 206:6–8.

This Court should therefore deny Plaintiffs' motion to exclude Dr. Campion's expert report.

## POINT III

### THE COURT SHOULD EXCLUDE DR. LANDIS' OPINION REGARDING THE SIMILARITY OF THE FIREFIGHTER AND EMS JOBS.

Plaintiffs' expert, Dr. Ronald S. Landis, an I/O psychologist, opines that: (1) the racial and gender compositions of the Firefighter and EMS workforces are both statistically significantly different; (2) the Firefighter and EMS jobs require substantially similar task and work activities, and require substantially similar knowledge, skill, and ability; (3) Firefighters are paid statistically significantly more than EMS personnel; and (4) there is no job-relevant rationale that explains the lower rate of pay for EMS personnel. The City moves to exclude the second and fourth of these opinions.

To begin with, the Court should exclude these opinions because they are not relevant, at least insofar as the issue here is not whether Firefighters and EMS personnel do

substantially **_similar_** work but whether they do substantially **_equal_** work, which neither Dr. Landis nor Plaintiffs' epidemiolocal expert, Dr. Brian J. Maguire, have concluded. "A claim of unequal pay for equal work under Title VII and the [NY]HRL is generally analyzed under the same standards used in an [Equal Pay Act] claim," though, "unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312-1313 (2d Cir. 1995). Under the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), "[w]hile the equal work inquiry does not demand evidence that a plaintiff's job is "identical" to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are '**substantially equal**.'" *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (emphasis added).

The City acknowledges that, in *County of Washington v. Gunther*, 452 U.S. 161, 168 (1981), the Supreme Court recognized that Title VII pay-disparity claims are not limited to only those claims that could be brought under the EPA. In *Gunther*, female prison guards sought relief under Title VII, alleging they were paid unequal wages for work substantially equal to that performed by male guards. The female guards contended that part of the pay differential was attributable to intentional sex discrimination. The lower court held, although the female guards' jobs were not substantially equal to those of the male guards and the female guards were not entitled to equal pay, they were not precluded from suing under Title VII to protest discriminatory-compensation practices merely because their jobs were not equal to higher paying jobs held by members of the opposite sex. On appeal, the court found that the female guards' claims of discriminatory compensation were not barred by Title VII merely because they did not perform work equal to that of the male guards, reasoning that they:

contend that the County of Washington evaluated the worth of their jobs; that the county determined that they should be paid approximately 95% as much as the male correctional officers; that it paid them only about 70% as much, while paying the male officers the full evaluated worth of their jobs; and that the failure of the county to pay respondents the full evaluated worth of their jobs can be proved to be attributable to intentional sex discrimination. Thus, [female guards'] suit does not require a court to make its own subjective assessment of the value of the male and female guard jobs, or to attempt by statistical technique or other method to quantify the effect of sex discrimination on the wage rates.

*Id.* at 180–81. *Gunther* clarifies that, when Title VII plaintiffs do not rely on job similarity to establish an inference of discriminatory intent, there is no requirement that the jobs being compared must be "substantially equal." However, where, as here, Title VII plaintiffs bring classic claims of unequal pay for equal work, they must comply with the EPA's "substantial-equality" standard.[11]

However, out of an abundance of caution, and because, even if Plaintiffs need only prove that the Firefighter and EMS jobs are substantially similar to prevail on their Title VII (or NYSHRL or NYCHRL) claims, the Court should still grant the City's motion to partially exclude Dr. Landis' testimony and its motion to exclude Dr. Maguire's testimony in its entirety, as well as

---

[11] It is true that Plaintiff Quashie alleges that, because she was "not properly instructed," she sat for the wrong examination, Compl. ¶ 130, but she does not explain how or by whom she was improperly instructed, or how this affected her ability to become a Firefighter. And, although Plaintiff Howard, who is no longer a Representative Plaintiff, alleges that she was "persuaded by the Department to enter the FDNY on the EMS side," she provides no further details, such as who persuaded her or what was said to persuade her. At any rate a pattern-or-practice claim of discrimination requires a showing that "racial discrimination was the company's standard operating procedure, the regular rather than the unusual practice." *United States v. City of New York*, 717 F.3d 72, 82-83 (2d Cir. 2013). Two examples fall woefully short of raising an inference of discriminatory treatment. *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001) (explaining that, to establish a pattern-or-practice claim, the plaintiffs must present "strong statistical evidence" and a substantial number of individual cases of discrimination causally related to the alleged pattern-or-practice).

deny the instant motion for class certification, the City will proceed to analyze Plaintiffs' claims under the "similarly situated" standard.

Dr. Landis' opinions as to job similarity should be excluded because they were not based on a reliable methodology or sufficient supporting facts or data and because there is "too great an analytical gap between the data and the opinion preferred." *GE v. Joiner*, 522 U.S. 136, 146 (1997); *see also Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (2d Cir. 2011) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony" (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002))).

Dr. Landis attempts to show job similarity, first, by noting that the rates of medical-emergency incidents are increasing and the rates of structural-fire incidents are decreasing, which pattern he construes as implying that Firefighters are performing more medical-type work that has traditionally been done by EMS personnel. To be clear, the data shows that, from 2005 to 2022, Firefighters were dispatched to only 18.7% of all EMS calls and that, during this same period of time, EMS personnel were dispatched to, on average, a miniscule 3% of all fire calls and 5.7% of all non-medical emergencies to which Firefighters were dispatched. *See Ex O*. But the more fundamental methodological issues with this analysis by Dr. Landis is two-fold. First, although Firefighters may, when necessary, take on some more medical-type work, though not nearly to the extent that Dr. Landis claims, the opposite is not true—that is, EMS personnel have not taken on any fire-related work. That Firefighters are doing more work does not mean that EMS personnel are entitled to the same pay as them. In other words, the facts that Firefighters are now expected to do both fire-related work and, when necessary, medical-related work, and that EMS personnel

are expected to do medical-related work, but not any fire-related work, is not evidence that Firefighters and EMS personnel do substantially similar work.

Second, it is inherently suspect to attempt to show job similarity through data as to how often Firefighters and EMS personnel respond to the same types of incidents, not only because the data shows that they do so with relatively low frequency, mostly responding to their own calls, but also because such an analysis does not consider what Firefighters and EMS personnel actually do when they respond to the same types of incidents (respectively, fire-related work and medical-related work). This would be like concluding that judges, judicial law clerks, court reporters, and bailiffs all do substantially similar jobs because they often appear together inside a courtroom, without pausing to consider that they do fundamentally different things once inside.

Dr. Landis also presents four comparative analyses of job similarity, which are so methodologically flawed that they cannot possibly provide the appropriate validation for his opinions. Because the publicly available occupational-level data from O*NET is intended to apply across all the occupations in the United States, it is very broad, which makes cross-occupational comparisons possible only at a very general level. When asked why he used O*NET's extremely broad categories based on national survey data, instead of the highly detailed job analyses conducted by PSI for FDNY Firefighters, Dr. Landis said that he did this because that data "is more than a decade old." *See* Second Dep. Ronald S. Landis, Minicucci Decl., Ex. "CC," at 46:22–25.[12] However, despite the fact that Dr. Landis claimed in his report to have read both of these job

---

[12]  Dr. Landis also claimed that a Rule 30(b)(6) witness for the City testified that "that's too old to be relied on." *See id.* at 46:24–25. In his rebuttal report, Dr. Landis identifies Phoebe Fong, DCAS' Director of Exam Development, as the person who allegedly said this. *See* Expert Rebuttal Report Dr. Brian J. Maguire, Minicucci Decl., Ex. "Y." at 13 n.23. But this is not at all what Director Fong said. *See* Dep. Phoebe Fong, ECF No. 119-31, at 28:12 ("[I]t's **not** where we can't use a job analysis if it's older than four or five years") (emphasis added); *see also id.* at 28:16–23

analyses, *see* Expert Report Dr. Ronald S. Landis ("Landis Report"), Minicucci Decl., Ex. "X," at 69 (listing "Firefighter (with appendices), dated December 18, 2019," and "Firefighter Test and Validation Report (with appendices), dated September 21, 2012," among the "DCAS Job Analysis Reports" that he read in preparing his report), he evidently did not realize that PSI's 2019 job analysis confirmed the continued validity of its 2012 job analysis. *See* PSI 2012 Firefighter Validation Study, Ex. "Q"; 2019 Confirmatory Job Analysis, Ex. "R"; *see also* Alexander Dep., Ex. "B," at 98:11–18 (explaining that PSI's 2019 job analysis confirmed that the job had not changed significantly since PSI's 2012 job analysis).

It is for this reason that Plaintiffs' reliance on this Court's decision in *Chalmers v. City of New York*, No. 20 Civ. 3389 (AT), 2022 U.S. Dist. LEXIS 169111 (S.D.N.Y. Sept. 19, 2022), is inapposite. In *Chalmers*, Fire Protection Inspectors ("FPIs") employed by the FDNY brought a putative class action against the City, claiming that it had paid FPIs salaries substantially lower than those paid to Building Inspectors ("BIs") employed by the New York City Department of Buildings. In admitting the plaintiffs' experts' testimony on the similarity of the FPI and BI jobs, the Court found their reliance on O*NET was not a methodological flaw, reasoning that "the lack of a comparable FPI job analysis is due to the City's failure to locate those documents," leaving Plaintiffs' experts to "rely on the next best available information." *Id.* at 6.[13] Because, in this case, the City produced for Dr. Landis the job analysis for the Firefighter position, the accuracy

---

("Q: So the City **doesn't** maintain a policy to – not to use job analyses that are older than five years; is that correct? A: Correct.") (emphasis added); *see also id.* 38:15–20 ("To use the job analysis that's going to be older than four to five years, we would have on record what – the job analysis to confirm that the job hasn't significantly changed through job analysis interviews and focus group.") With respect to that last quote, that is exactly what happened here. In 2019, PSI did a confirmatory report finding that the Firefighter job had not changed significantly since PSI's 2012 job analysis. *See also* Alexander Dep., Ex. "B," at 98:11–18

[13]   To be clear, the City does not concede the correctness of *Chalmers*

of which was confirmed as recently as 2019—within the statute of limitations for some of Plaintiffs' claims—and which Dr. Landis simply disregarded based on a factual mistake as to its age, *Chalmers* does not support Plaintiffs' position.[14]

Further undermining Dr. Landis' methodology is the fact that, because O*NET does not have complete data for EMTs and Paramedics, Dr. Landis had to try and plug in the gaps in the data by using his subjective judgment based on his review of City documents. *See* Landis Report, Ex. "X" at 25 ("Because O*NET does not provide ratings of importance of work activities for Paramedics or EMTs, I relied on City documentation for this purpose"); First Dep. Ronald S. Landis, Minicucci Decl., Ex. "AA," at 43: 5 8 ("Because the EMT part of O*NET is not as well developed, we don't have scores, we just have the work activities. That's where I had to use information provided by the City to complete that part of the table. So, the table [Table 9] incorporates O*NET information in terms of defining the work activities, and the firefighter importance ratings, and then the EMT column is from the City's information to what degree or is there evidence that that work activity gets performed by EMTs.").

For example, for Knowledge areas, Dr. Landis' expert report found that 14 of 33 were important to the Fire job, that 19 were important to both EMTs and Paramedics, and that 9 were shared, leading to a Similarity Index of .76. However, the important Knowledge areas as subjectively judge by Dr. Landis excludes the Knowledge area of "Therapy and Counseling." This is a serious omission, for that is required by the EMT and Paramedic jobs. In fact, O*NET itself appears to imply as such, listing as important for both EMTs and Paramedics the Detail Work

---

[14]   *See* First Dep. Ronald S. Landis, Minicucci Decl., Ex. "AA," at 43:19–23 ("So, to just clarify, O*NET would not do a job analysis. The O*NET is a collection of information accumulated across municipalities or across locations. The information that's included in O*NET is only as detailed as the depth of that information"; ); *id.* at 44:17–18 ("O*NET provides a more generic and generalized view.").

Activity of "[i]nteract with patients to build rapport or provide emotional support." *See* Dr. Campion Report, Ex. "U," at 24, 213. As. Dr. Campion explains, "[i]ncluding that Knowledge area drops the Similarity Index to .725, which is below the threshold value for indicating comparability." *Id.* at 24.

Dr. Campion succinctly summarizes the myriad additional flaws with considering job similarity based on O*NET data instead of the job analysis for the Firefighter position.

> The first flaw is that the analysis uses very broad dimensions of jobs to serve as stand-in compensable factors, which may not be of worth to the organization or relevant to compensation decisions. The second flaw is the analysis is based on the importance of the dimensions to the job, and a very gross measure of importance (above or below a midpoint), which erroneously counts most dimensions as important to most jobs. The third flaw is that comparable worth using job evaluation not only requires using relevant dimensions (as compensable factors) but data on the level of responsibility or skill as opposed to importance, and showing that the points (based on the levels) across the compensable factors is similar between the jobs and they would thus be in the same pay band. A simple count of important descriptors in common between jobs is inadequate and misleading. I demonstrate the relevance of these flaws below by showing that when you apply this analysis to all other jobs in the U.S. labor market, you find that most jobs would be considered of comparable worth to Fire jobs and/or the comparable jobs identified are illogical.

*Id.* at 19–20 (footnote omitted)).[15] For the reasons stated herein, Dr. Landis' opinions as to job similar should be excluded.

---

[15]     As noted in Point "II" above, Dr. Landis' "joint-probability" argument does not save his analysis. *See* Dr. Campion Dep., Ex. "V" at 304:6–20 ("I don't look at it as though – as though somehow the compounding of four fraud analyses make an accurate analysis. I just don't agree with that in any way shape or form. Furthermore, we are not studying compensable factors. We are studying these very general attributes unrelated to compensation. And, moreover, even if we showed there was some similarity, we are studying the wrong thing. In order to show comparable worth, you have to show that they have similar points or other indicators across all the compensable factors, so they would be put in the same job grade. So this analysis is wrong in every possible way.").

**THE COURT SHOULD EXCLUDE DR. MAGUIRE'S EXPERT REPORTS AND TESTIMONY.**

Plaintiffs' epidemiological expert, Dr. Brian J. Maguire, opines that there are substantially similar occupational risks and hazards for Firefighters and EMS personnel employed by the FDNY. The City does not contest Dr. Maguire's qualifications as an epidemiologist; however, Dr. Maguire's expertise does not extend to I/O psychology in general or comparative analysis of job duties and requirements in particular. Yet, in his expert rebuttal report, Dr. Maguire purports to critique Dr. Campion's opinion that the Firefighters perform more extreme physical tasks that EMS personnel. See Maguire Rebuttal Report annexed to the Minicucci Decl. as Exhibit at 9. Dr. Maguire is not qualified to do this, and his expert report and testimony should be excluded accordingly.

In addition, Dr. Maguire's testimony should be excluded in its entirety because it was not based on a reliable methodology or sufficient supporting facts or data and because there is "too great an analytical gap between the data and the opinion preferred." *Joiner*, 522 U.S. at 146. This is true for at least seven reasons.

*First*, Dr. Maguire begins the "results" portion of his report with a figure that appears to show that the per capita occupational fatality rate for EMS personnel is fourteen times than for Firefighters. But appearances can be deceptive. In fact, Figure 1 is based on data collected only from the first eight months of 2020, which was during the dark, early days of the COVID-19 pandemic and reflects a mere thirteen fatalities across both EMS personnel and Firefighters, and,

what is more, all, or nearly all, of these deaths appear to be related to COVID-19.[16]  Of course, EMS personnel faced a greater occupational exposure to COVID-19 because their work requires greater direct, close interaction with the public.  Comparing fatal occupational injuries based on data collected only from the first eight months of the COVID-19 pandemic is akin to comparing fatal occupational injuries based on data collected only from an eight-month period of time that included the September 11 attacks, which would cause Firefighters to have a much, much higher fatality rate due to that single incident.

   *Second*, Dr. Maguire's finding that "[a]n analysis of five years of data shows that from 2018 to 2022, there were 10 FDNY Fire Responder, and 21 FDNY EMS First Responder occupational fatalities (not including the three FDNY EMS suicides)," is unreliable because it, too, is totally distorted by EMS personnel' far greater exposure to COVID-19.  Expert Report of Dr. Brian J. Maguire ("Maguire Report"), Minicucci Decl., Ex. "W," at 5.  Note, for example, that, according to Dr. Maguire, 16 EMS personnel died from COVID-19 in 2020 alone, which is over three-quarters of all EMS fatalities during this five-year period of time, and that does not even include the EMS personnel who (presumably) died from COVID-19 in 2021 or 2022.  *See id.*  (In fact, based on Dr. Maguire's data, it is even possible that every single EMS death from 2018 to 2022 was caused by COVID-19.)  In other words, all Dr. Maguire's data shows is that it takes a once-in-a-century health crisis for EMS personnel to face a greater risk of occupational fatality than Firefighters.  *See Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318, 323 (N.D.N.Y. 2000) (excluding an expert opinion where the data on which the expert relied, which

---

[16]   Dr. Maguire states that this data shows that, "during the first eight months of 2020, two Fire First Responders and 11 EMS First Responders died."  Expert Report of Dr. Brian J. Maguire, Minicucci Decl., Ex. "W," at 5.  He goes on to state that sixteen EMS personnel died from COVID-19 in 2020.  *See id.*  One can only assume from these numbers that all, or almost all, of the eleven EMS personnel who died in the first eight months of 2020 died from COVID-19.

was culled from allegedly representative comparable sales, because "the court ha[d] serious concerns as to whether the comparison sales used by [the expert] are truly representative" and, therefore, could not "properly form a basis" for his analysis).[17]

*Third*, to create Figure 2, Dr. Maguire uses data from the United States Bureau of Labor Statistics, which shows that, from 2014 to 2018, the per capital occupational fatality rate for Firefighters was nearly twice that of EMTs and Paramedics. Despite this, Dr. Maguire opines that this "establish[es] that the risks and hazards for EMS and firefighters [sic] are similar." Maguire Report at 6. This conclusion does not follow from this data. It bears emphasizing that this is the first data that Dr. Maguire presents that is not skewed by the COVID-19 pandemic, and it undermines his conclusion that there are substantially similar occupational risks and hazards for Firefighters and EMS personnel.

*Fourth*, Dr. Maguire claims "the transportation-related fatality rate for EMS providers is higher than the transportation-related fatality rates for firefighters." *Id.* at 7. This is possible, but it is also highly selective and, by itself, irrelevant, for it is only the overall occupational fatality rates, on a per capita basis, that matter here. Dr. Maguire's own data (Figure 2) shows that this rate is higher for Firefighters than EMS personnel because there are many non-transportation-related types of occupational fatalities that, on a per capita basis, are higher for Firefighters than EMS personnel.

*Fifth*, Dr. Maguire also considers non-fatal occupational injury data, opining that, "[t]he most reliable data available for this report was the FDNY's Fire Department Operation

---

[17] It is also worth noting that Dr. Maguire is comparing two different datasets collected by two different sources (respectively, the Uniformed Firefighters Association of Greater New York, Local 94 IAFF, AFL-CIO, and an article published in the Journal of Emergency Medical Services), which appear to have employed two different, though unknown, methods of collecting data, and, therefore, are of uncertain comparability.

Center, Daily Activity Report for 12/30/2022 to 12/31/2022. It reports that in 2022 there were 7,644 injuries to Fire First Responders and 3,610 injuries and illnesses among EMS First Responders." *Id.* This is inaccurate. In fact, "[t]his isn't a report, this is updating a signal status and letter us known which units are or are not available for an assignment in CAD," which stands for Computer-Aided Dispatch and is the Emergency Medical Dispatch system used by the FDNY. Dep. Harold J. Wagner, III, Minicucci Decl., Ex. "T," at 153:13–16. In other words, the numbers that Dr. Maguire misrepresents as non-fatal occupational injuries for EMS personnel are, in fact, simply reflections of the number of times that EMS personnel said they were not available to receive an assignment, no matter the reason, including an off-duty injury or illness or because, during a shift, they had to change their uniform or just use the bathroom. *See id.* at 153:1–158:9

*Sixth*, misunderstanding what this CAD data represents, Dr. Maguire uses it to claim that, in 2022, "[t]he rate for EMS is 26% higher than the rate for Fire First Responders." *Id.* at 7. Because the CAD data cited by Dr. Maguire is not an accurate count of the number of non-fatal injuries to Firefighters and EMS personnel, this conclusion is also unsupportable.

*Seventh*, Dr. Maguire cites national data from a not-yet-published article that he is writing, which he follows with a discussion of some of the types of occupational hazards that he believes EMS personnel face to a greater extent than EMS personnel because of the nature of these jobs, including infectious diseases in general and COVID-19 in particular, terrorism—which inclusion is strange, considering that, by Dr. Maguire's own estimation, 643 Firefighters have died as a result of the September 11 attacks, compared to 100 EMS personnel—violence, and transportation. Not only does one of these four occupational hazards contradict Dr. Maguire's conclusion (that is, terrorism), but, more fundamentally, Dr. Maguire does not so much as acknowledge any of the occupational hazards for which Firefighters have a greater exposure, such

as those related to their fire-suppression work, which EMS personnel do not engage in, or slips and falls, or being struck by objects, all of which Dr. Campion, using accurate, complete data and applying a proper methodology, show Firefighters have greater exposure to. *See* Dr. Campion Report, Ex. "U," at 40–45.

The cumulative effect of these errors in Dr. Maguire's analysis deprives his report of the necessary reliability required by *Daubert*. Therefore, this Court should exclude Dr. Maguire's opinion that Firefighters and EMS personnel have substantially similar occupational risks.

## POINT V

### PLAINTIFFS HAVE NOT MET THE RULE 23 (a) AND (b)(3) REQUIREMENTS FOR CLASS CERTIFICATION.

Federal Rule of Civil Procedure 23(a) requires numerosity, commonality, typicality, and adequacy, whereas Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs must meet each of these requirements by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). "In evaluating a motion for class certification, the district court is required to make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)). The City does not contest numerosity or superiority (or the Second Circuit's additional ascertainability requirement).

# I.  Commonality, Typicality, and Predominance

For purposes of class certification, the commonality requirement is satisfied "if there is a question such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Elisa W. v. City of New York*, 82 F.4th 115, 123 (2d Cir. 2023) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011)).  Plaintiffs here allege both "disparate impact" and "disparate treatment."  As to Plaintiffs' disparate-impact claims, they must identify the specific, facially neutral employment practice or practices being challenged and provide "significant proof" of disparate impact.  *Dukes*, 564 U.S. at 353.  With respect to their disparate-treatment claims, if Plaintiffs can prove that the City had the intention to discriminate, it is irrelevant whether the City carried out that intention through a specific company-wide employment practice.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992).

Rule 23(b)(3)'s predominance requirement is "more demanding" than the commonality requirement under Rule 23(a).  *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997).  It requires the district court to consider: "(1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson v. Nextel Communs. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (internal quotation marks and citation omitted).  Here, Plaintiffs' Title VII disparate-impact and disparate-treatment claims are governed by the three-step *McDonnell Douglas* burden-shifting framework.

*See*, *e.g.*, *United States v. City of New York*, 731 F. Supp. 2d 291, 299 (E.D.N.Y. 2010) (applying *McDonnell Douglas* in the context of disparate impact); *United States v. City of New York*, 717 F.3d 72, 83 (2d Cir. 2013) (applying *McDonnell Douglas* to a disparate-treatment claim); *see also McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). Plaintiffs' state-law claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See*, *e.g.*, *Jones v. City of New York*, N. 22-1867, 2023 U.S. App. LEXIS 25266, at *2 (2d Cir. Sept. 25, 2023) (summary order) (applying *McDonnell Douglas* to NYSHRL and NYCHRL disparate-treatment claims).

Plaintiffs have not satisfied Rule 23(a)'s commonality and typicality requirements because they have not accounted for the marked differences in job duties and responsibilities, as well as the physical demands and job hazards, among EMS personnel, instead portraying them as a monolith. Most EMTs and Paramedics are assigned to one of the five divisions in the FDNY Bureau of Emergency Medical Services and from these field positions provide direct medical and patient care by, *inter alia*, responding to calls for medical assistances and transporting individuals to the appropriate medical receiving facility. However, a substantial minority of EMTs and Paramedics are assigned to non-field positions, including at the FDNY Bureau of Training – EMS Academy, Emergency Medical Dispatch, and the EMS Resource Coordination Center. *See* Escobar Decl., Ex. "N," ¶ 3. Plaintiffs do not explain how the duties of EMTs and Paramedics in the field are substantially similar to those of EMTs and Paramedics assigned to the EMS Academy, who are responsible for teaching classes on EMS-related subjects, or to Emergency Medical Dispatch or the Resource Coordination Center, who are responsible for answering emergency calls and dispatching ambulances and other units to emergencies. Winfield Dep., Ex. "GG," 25-26.

Nor do Plaintiffs acknowledge that the FDNY employs Haz-Tac EMTs and Paramedics and Rescue Medics who are specially trained, respectively, to provide emergency

medical care and decontamination in a hazardous environment and to perform advanced pre-hospital emergency medical care during rescue operations, for which they receive an assignment differential, as discussed in greater detail above. Escobar Dep., Ex. "E," at 19:13–16. Plaintiffs have also not explained how EMTs and Paramedics do substantially similar work as their entire promotional line, including Lieutenants, Captains, Deputy Chiefs, and Division Chiefs.[18]

To be clear, the City believes that the instant motion for class certification should be denied in its entirety. If, however, the Court is inclined to certify a disparate-impact class and/or disparate-treatment subclasses, they should, given these issues, be limited to Haz-Tac EMTs and Paramedics and Rescue Medics, who, by virtue of their previously discussed special training and unique job duties and responsibilities among EMS personnel, are the only EMS personnel who even arguably do substantially similar work as Firefighters. (The disparate-treatment subclasses should be limited to, respectively, non-white and female Haz-Tac EMTs and Paramedics and Rescue Medics.) Barring that, the Court should certify a disparate-impact class and/or disparate-treatment subclasses of only field-assigned EMTs and Paramedics, excluding non-field-assigned EMTs and Paramedics, such as EMS Dispatchers, and all Lieutenants, Captains, Deputy Chiefs, and Division Chiefs.

Nor have Plaintiffs satisfied Rule 23(a)'s commonality or Rule 23(b)(3)'s predominance requirements because they have no reasonable chance of showing that EMS personnel do substantially similar work to Firefighters. Of course, Plaintiffs need not show that

---

[18]   This is both a commonality and a typicality problem for Plaintiffs because they are themselves a mix-and-match of such employees. For example, Plaintiffs include not only field-assigned "regular" EMTs and Paramedics, but also employees like Plaintiff Carrasquillo, who is an EMT and a Dispatcher, *see* Compl. ¶¶ 12, 114; Plaintiff Torres, who is a Lieutenant and a Haz-Tac Instructor, *see id.* ¶¶ 31, 133; Plaintiff Wolfe, who is a Haz-Tac Paramedic, *see id.* ¶¶ 34, 136; Plaintiff Guzman, who is a Rescue Paramedic, *see id.* ¶¶ 21, 123; and Plaintiff Kailayanathan, who is a Lieutenant and an Instructor, *see id.* ¶¶ 25, 127.

they are likely to prevail on the merits of their claims at this stage in the litigation. However, in the interest of fairness to the litigants and the conservation of scarce judicial resources, the Court should require Plaintiffs to demonstrate that they have at least a reasonable chance of success before the heavy costs attendant on certification of a several-thousand-person class are shouldered by the City. *See Teachers Ret. Sys. v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 U.S. Dist. LEXIS 25927, at *7 (S.D.N.Y. Dec. 20, 2004) (explaining "the Court may require a plaintiff seeking class certification to 'adduce admissible evidence that, taken most favorably to the plaintiff, establishes a *prima facie* entitlement to such certification.'" (quoting *DeMarco v. Lehman Bros, Inc.*, 222 F.R.D. 243, 247 (S.D.N.Y. 2004))). In addition, as the Second Circuit has made clear, "'a district judge may not certify a class without making a ruling that each Rule 23 requirement is met and all evidence must be assessed as with any other threshold issue,' whether or not any such assessment also bears on the merits of the case*." McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 221 (2d Cir. 2008) (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d at 27).

With respect to their disparate-impact claim, Plaintiffs have not identified a specific, neutral policy that had disparate impacts on the compensation of racial minority and female EMS personnel. Plaintiffs identify three putative policies that allegedly disparately impacted the proposed subclasses: (1) the City's alleged failure to take the necessary steps to determine appropriate pay for the Fire and EMS jobs; (2) the City's alleged failure to monitor occupational segregation to prevent discriminatory employment practices; and (3) the City's recognition of Firefighters, but not EMS personnel, as "uniformed" for collective-bargaining purposes. But the first and third of these purported policies are not facially neutral practices, as required to make out a Title VII disparate-impact claim. And the second purported policy does not identify the specific employment practice being challenged; "[t]he disparate impact theory is not an appropriate vehicle

for launching a broad-based attack on a wage system." *AFSCME v. County of Nassau*, 609 F. Supp 695, 712 (E.D.N.Y. 1985).

Moreover, for the reasons detailed in length in the *Daubert* analyses above, and which, for the sake of brevity, the City will not repeat here, Plaintiffs have not made a *prima facie* showing that Firefighters and EMS personnel are similarly situated, let alone that they are substantially equal, and Plaintiffs' disparate-treatment claims will, therefore, also fail.

## II.      Adequacy

Adequacy requires a court to consider whether (1) "plaintiff's interests are antagonistic to the interest of other members of the class" and (2) "plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson*, 222 F.3d 52, 60 (2 Cir. 2000) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 at 291). In addition, Rule 23(g)(1)(A)(2) requires the court to consider "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action." Plaintiffs' counsel, Yetta G. Kurland of the Kurland Group, does not represent that she has ever litigated a class-action case, let alone one involving a putative class of between 4,500 and 5,500 individuals.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests the Court issue an order granting Defendant's motion, dismissing the Complaint in its entirety, with prejudice, and awarding Defendant such other and further relief as the Court deems just and proper.

Dated:      New York, New York
              January 24, 2024

**HON. SYLVIA O. HINDS-RADIX**
Corporation Counsel of the
  City of New York
Attorney for the Defendant
100 Church Street, Room 2-117
New York, New York 10007
T:  (212) 356-2078
E:  lminicuc@law.nyc.gov

         /s/
_____
Lora Minicucci
Assistant Corporation Counsel

Zachary Ellis
Assistant Corporation Counsel