UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LOCAL 2507, UNIFORMED EMTs, PARAMEDICS &
FIRE INSPECTORS, Individually and on behalf of its
current and former members; LOCAL 3621, EMS
OFFICERS UNION, Individually and on behalf of its
current and former members; NYC EMS SUPERIOR
OFFICERS ASSOCIATION, Individually and on behalf of
its current and former members; TONYA BOYD,
CHRISTELL CADET, MARK CARRASQUILLO,
LIZETTE CLARO, BEVERLY COBB, ALI COUTARD,
SENCIA DATILUS, LAITRICE EDWARDS, ALICIA
ELKADI, RONALD FLOYD, KAHLIA GRAHAM,
RICHARD GUZMAN, MAGGIE HOPE, JASMIN
HOWARD,    ANGELA    JONES,    RAVIVARMAN
KAILAYANATHAN,    MELANIE    MORENO-
KETCHUM, JENELLE PIERRE, SIMONE QUASHIE,    Case No. 22-cv-10336 (AT) (GWG)
JASON SAFFON, ALLISON SHAUGHNESSY, LAURA    [rel. 20-cv-3389]
TORRES, ANDRE VALDEZ, LANCE WINFIELD,
RONALD WOLFE, MARYLOU AURRICHIO on behalf
of themselves and all other similarly-situated individuals,

                              Plaintiffs,

               -against-

CITY OF NEW YORK on behalf of the Fire Department of
the City of New York,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFFS' MEMORANDUM OF LAW IN REPLY TO DEFENDANT'S OPPOSITION
TO CERTIFICATION OF A CLASS AND SUBCLASSES, APPOINTMENT OF CLASS
COUNSEL, AND EXCLUSION OF THE REPORT AND TESTIMONY OF DR. MICHAEL
CAMPION, AND IN OPPOSITION TO DEFENDANT'S CROSS-MOTION TO
EXCLUDE THE TESTIMONY OF DRS. RONALD LANDIS AND BRIAN MAGUIRE**

THE KURLAND GROUP
*Attorneys for Plaintiffs*
85 Broad Street, 28th Floor
New York, New York 10004

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................................................ i

**PRELIMINARY STATEMENT** ................................................................................................... 1

**ARGUMENT** ............................................................................................................................... 3

**POINT I: THE PROPOSED CLASS AND SUBCLASSES MEET ALL THE REQUIREMENTS OF FRCP 23** ................................................................................................. 3

   **A.**  **Defendant's objections to commonality, typicality, and predominance are unavailing** ............................................................................................................. 3

     i.  Plaintiffs have shown that EMS First Responders do substantially similar work to Fire First Responders ................................................................... 4

     ii.  Contrary to Defendant's claim, EMS jobs do not have "marked differences," but even if they did, FRCP 23 does not require a showing of "substantial similarity" of job duties within a putative class ................................................... 5

     iii. Defendant fails to rebut that Plaintiffs have shown significant proof of their disparate impact and disparate treatment claims ........................................ 8

   **B.**  **Defendant does not contest the ascertainability, numerosity, adequacy, or superiority of the class and subclasses and fails to dispute facts relevant to class certification** ............................................................................... 12

**POINT II: DR. CAMPION'S REPORT AND TESTIMONY DO NOT COMPLY WITH FRE 702 AND SHOULD NOT BE CONSIDERED** ................................. 13

**POINT III: DR. LANDIS' OPINION REGARDING THE SIMILARITY OF THE JOBS OF EMS AND FIRE FIRST RESPONDERS COMPLIES WITH FRE 702** ......................................................................................................................... 16

**POINT IV: DR. MAGUIRE'S REPORT AND TESTIMONY COMPLY WITH FRE 702** ......................................................................................................................... 22

**CONCLUSION** ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Almeciga v. Ctr. for Investigative Reporting,
    185 F. Supp. 3d 401 (S.D.N.Y. 2016)........................................................................................ 14

Berkman v. City of New York,
    536 F.Supp. 177 (E.D.N.Y. 1982)............................................................................................ 11

Bocoum v. Daimler Trucks North America, LLC,
    2022 WL 902465 (S.D.N.Y. March 28, 2022).................................................................... 14, 15

Brown v. Daikin Am. Inc.,
    756 F.3d 219 (2d Cir. 2014) .................................................................................................. 14, 16

Caridad v. Metro-North Commuter R.R.,
    191 F.3d 283 (2d Cir. 1999) ...................................................................................................... 10

Chalmers v. City of New York,
    2021 WL 4226181 (S.D.N.Y. Sept. 16, 2021) ............................................................................ 5

Chalmers v. City of New York,
    2022 WL 4330119 (September 19, 2022) ............................................................................ passim

Chen-Oster v. Goldman, Sachs & Co,
    2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ........................................................................... 3, 9

Clark v. City of New York,
    2021 WL 603046 (S.D.N.Y. Feb. 16, 2021)................................................................................ 8

Deutsch v. Novartis Pharms. Corp.,
    768 F. Supp. 2d 420 (E.D.N.Y. 2011) ...................................................................................... 22

Gen. Elec. Co. v. Joiner,
    522 U.S. 136 (1997) .................................................................................................................. 15

Gonzalez v. Allied Concrete Indus. Inc.,
    2019 WL 13134862 (E.D.N.Y. July 15, 2019)............................................................................ 7

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000) ........................................................................................................ 16

Hill v. City of New York,
    136 F. Supp. 3d 304 (E.D.N.Y. 2015) ............................................................................... 2, 4, 14

Hnot v. Willis Grp. Holdings Ltd.,
    228 F.R.D. 476 (S.D.N.Y. 2005)................................................................................................ 8

Houser v. Pritzker,
28 F. Supp. 3d 222 (S.D.N.Y. 2014) .......................................................................................... 7

In re Abilify (Aripiprazole) Prods. Liab. Litig.,
299 F. Supp. 3d 1291 (N.D. Fla. 2018) ..................................................................................... 21

In re LIBOR-Based Fin. Instruments Antitrust Litig.,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....................................................................................... 22

In re Lyman Good Dietary Supplements Litig.,
2019 WL 5682880 (S.D.N.Y. October 31, 2019)............................................................... 13, 15

Langan v Johnson & Johnson Consumer Cos.,
897 F3d 88 (2d Cir. 2018) ........................................................................................................... 7

Local 2507, et al v. City of New York,
2024 WL 916520 (S.D.N.Y March 4, 2024) ...................................................................... passim

Lucky Brand Dungarees, Inc. v. Ally Apparel Res., LLC,
2009 WL 72982 (S.D.N.Y. Jan. 8, 2009) ................................................................................... 13

Marsteller v. MD Helicopter Inc.,
2018 U.S. Dist. LEXIS 197946 (D. Ariz. May 21, 2018) ......................................................... 21

Mfon v. Cnty. of Dutchess,
2017 WL 946303 (S.D.N.Y. Mar. 9, 2017), aff'd, 722 F. App'x 46 (2d Cir. 2018) ................. 13

Moore v. PaineWebber, Inc.,
306 F.3d 1247 (2d Cir. 2002) ...................................................................................................... 3

NECA-IBEW Health & Welfare Fund v Goldman Sachs & Co.,
693 F3d 145 (2d Cir. 2012) ......................................................................................................... 7

Nimely v. City of New York,
414 F.3d 381 (2d Cir. 2005) ...................................................................................................... 16

Rivera v. Harvest Bakery, Inc.,
312 F.R.D. 254, 269 (E.D.N.Y. 2016) ......................................................................................... 2

S. Dist. of N.Y. United States v. Blakstad,
2021 U.S. Dist. LEXIS 217854 (S.D.N.Y. Nov. 9, 2021) ......................................................... 15

Showers v. Pfizer, Inc.,
819 F.3d 642 (2d Cir. 2016) ...................................................................................................... 13

Sirota v. Solitron Devices, Inc.,
673 F.2d 566 (2d Cir. 1982) ........................................................................................................ 5

United States v. City of New York,
  683 F. Supp. 2d 225 (E.D.N.Y. 2010) ......................................................................................... 11

United States v. City of New York,
  717 F.3d 72 (2d Cir. 2013)............................................................................................... 10, 11

Valjean Mfg. v. Michael Werdiger, Inc.,
  2007 U.S. App. LEXIS 20475 (2d Cir. Aug. 27, 2007) ............................................................. 15

Vulcan Soc. v. Civil Serv. Comm'n,
  360 F.Supp. 1265 (S.D.N.Y 1973) ............................................................................................ 11

Wal-Mart Stores, Inc. v. Dukes,
  564 U.S. 338 (2011) ....................................................................................................................... 3

**Statutes**

FRCP 12(b)(6) ......................................................................................................................... 2, 4

FRCP 23(a) .............................................................................................................................. 2, 3

FRCP 23(b)(3) ......................................................................................................................... 2, 3

FRCP 26(a)(2)(B)................................................................................................................. 13, 15

FRCP 30(b)(6) ........................................................................................................................... 18

FRCP 37....................................................................................................................................... 19

FRE 702 ............................................................................................................... 14, 16, 21, 25

N.Y. Civ. Serv. Law §2(11) ......................................................................................................... 6

## PRELIMINARY STATEMENT

Plaintiffs have met their burden under FRCP 23 to establish that class certification is appropriate and Representative Plaintiffs and Class Counsel will adequately represent the class and subclasses. Defendant fails to raise any persuasive argument in opposition and instead offers only the following three arguments for why the Court should deny class certification:

(1) Defendant claims Plaintiffs "have no reasonable chance of showing that EMS [First Responders][1] do substantially similar work compared to [Fire First Responders];"

(2) Defendant claims Plaintiffs have not accounted for the "marked differences" in jobs within the EMS Bureau or shown EMS jobs are "substantially similar" to each other; and

(3) Defendant claims Plaintiffs do not establish proof necessary to certify disparate impact claims because the policies and practices identified by Plaintiffs are not facially neutral.[2]

In doing so, Defendant raises only limited objections to some portions of Plaintiffs' proposed classes. Moreover, Defendant's objections are either mooted by this Court's March 4, 2024 Order denying Defendant's motion to dismiss Plaintiffs' claims [ECF No. 139] and/or not relevant to the questions before the Court in the instant motion. In summary, Defendant's arguments in opposition to certification fail because:

(1) The evidence, including Dr. Landis' reports (dated July 7, 2023, "Landis Report," Ex. 2[3], and November 2, 2023, "Landis Rebuttal Report," Ex. 12, together "Dr. Landis' Reports"),

---

[1] As used in their initial motion, the term EMS First Responders refers to all those first responders employed by the FDNY in the EMS Bureau, which is staffed by emergency medical technicians ("EMTs") and their promotional line which is paramedic, lieutenant, captain, deputy chief and division chief/commander ("EMS or EMS First Responders"). The term Fire First Responders refers to all those first responders employed by the FDNY in the Fire Bureau, which consists of firefighters and their promotional line which is lieutenant, captain, battalion chief and deputy chief ("Fire" or "Fire First Responders," and collectively "FDNY First Responders").

[2] Defendant also raises an objection to the specificity of the second policy identified by Plaintiffs regarding Defendant's failure to monitor the pay disparities of its segregated workforce in the EMS Bureau. However, this Court determined in its recent March 4, 2024 Order that Defendant has not failed to monitor given its admission of the pay differences between the titles. As such, Defendant's objection to this policy as stated is moot.

[3] References to exhibits numbered 1-34 are exhibits attached to Plaintiffs' underlying motion (ECF No. 119), and Lettered exhibits refer to exhibits attached to Defendant's opposition and cross-motion. (ECF No. 138).

establish significant proof "that EMS and Fire First Responders 'work together and in tandem to perform the same function,' and are, therefore, similarly situated,"[4] Local 2507, et al v. City of New York, 2024 WL 916520, at \*6 (S.D.N.Y March 4, 2024) (*citing* Hill v. City of New York, 136 F. Supp. 3d 304, 335–36 & n.10 (E.D.N.Y. 2015);

(2) FRCP 23 does not require "substantial similarity" of job duties within a class of plaintiffs and Defendant does not explain how any potential differences in job duties would impact parties' ability to generate common answers, use generalized proof, or impact the fact that the claims arise from the same series of events and legal theories; and

(3) The policies and practices identified by Plaintiffs apply to all EMS employees equally, including the members of the class and subclasses, and are therefore facially neutral. To that end, this Court has found that the policy of "paying EMS First Responders the civilian pattern percentage increase when Fire First Responders receive the uniformed pattern increase is a facially neutral policy." Local 2507, 2024 WL 916520 at \*9.

Finally, Plaintiffs have shown by a preponderance of the evidence that they meet the FRCP 23(a) requirements of numerosity, commonality, typicality and adequacy, and the FRCP 23(b)(3) requirements of predominance and superiority. Plaintiffs have also shown members of the proposed class are ascertainable and there is significant proof of Plaintiffs' disparate impact and treatment claims. Neither Defendant's expert nor its factual claims, most of which are disputed by Plaintiffs and simply restate claims made in Defendant's FRCP 12(b)(6) motion, refute Plaintiffs' showing of significant proof of disparate impact and treatment.[5]

---

[4] Plaintiffs will prove this "using evidence common to all class and subclass members." Chalmers v. City of New York, 2022 WL 4330119, at \*16 (S.D.N.Y. September 19, 2022).

[5] The requirement that Plaintiffs produce "significant proof" of class-wide discrimination is not intended to be difficult to meet—instead requiring "some proof" that the alleged policy or practice exists and affects all class members. *See* Rivera v. Harvest Bakery, Inc., 312 F.R.D. 254, 269, 271 (E.D.N.Y. 2016).

**ARGUMENT**

**POINT I: THE PROPOSED CLASS AND SUBCLASSES MEET ALL THE
REQUIREMENTS OF FRCP 23**

**A.  Defendant's objections to commonality, typicality, and predominance are unavailing**

Defendant's only objections to class certification, i.e. commonality and typicality requirements of FRCP 23(a) and the predominance requirement of FRCP 23(b)(3), are unavailing. As an initial matter, commonality requires only that Plaintiffs show their claims raise one or more (not all) questions common to the class which can "generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  Here, since "the putative class includes all EMS employees and their unions," all of whom have been denied by the Defendant their right to uniform pattern wage increases in collective bargaining, Local 2507, 2024 WL 916520 at *n 4, 7, Plaintiffs satisfy the commonality requirement.  Likewise, "the typicality requirement is permissive and requires only that the representative's claims are reasonably coextensive with those of absent class members; they need not be substantially identical." Chen-Oster v. Goldman, Sachs & Co, 2022 WL 814074, at *18 (S.D.N.Y. Mar. 17, 2022).  Here, the Representative Plaintiffs are all EMS First Responders who are women of color and therefore represent the class as well as both subclasses in litigating discrimination claims on the basis of sex/gender and race. (Ex. 14).  Similarly, predominance requires only that "resolution of some of the legal or factual questions…can be achieved through generalized proof, [and] are more substantial than the issues subject only to individualized proof."  Chalmers v. City of New York, 2022 WL 4330119, at *17 (September 19, 2022) (*citing* Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  Here, predominance is satisfied since "the elements of the claims and defenses to be litigated are governed by the three-step *McDonnell Douglas* burden-shifting framework for Title VII disparate impact and disparate treatment claims." Chalmers, 2022 WL 4330119 at *17 (quotation marks and citation omitted).

### i.    *Plaintiffs have shown that EMS First Responders do substantially similar work to Fire First Responders*

Defendant spends considerable time in its brief recycling factual assertions from its FRCP 12(b)(6) motion in an attempt to distinguish the duties of EMS First Responders from Fire First Responders and argue that Plaintiffs "have no reasonable chance of showing that EMS [First Responders] do substantially similar work to Fire [First Responders]." (Def. Memo, p. 38). But this Court declined to agree with Defendant's conclusions regarding what these facts establish. Local 2507, 2024 WL 916520 at *6. Moreover, Plaintiffs have established significant proof through evidence including Dr. Landis' Reports that the job duties of EMS and Fire First Responders have significant overlap and "that EMS and Fire First Responders 'work together and in tandem to perform the same function,' and are, therefore, similarly situated." Id. (*citing* Hill, 136 F. Supp. 3d at 335–36 & n.10). The Equal Employment Opportunity Commission ("EEOC") also found in its December 22, 2021 Determination[6], after a two year investigation of Plaintiffs' claims, that "any difference in duties between the EMS First Responders and Firefighters fails to explain the pronounced gap in wages and benefits." (Ex. 9). As such, the record reflects most of Defendant's factual claims are incorrect, irrelevant and/or not supported by the cited record,[7] and fail to rebut Plaintiffs' claims.

---

[6] The EEOC's Determination is admissible as probative evidence to establish that Plaintiffs have met their burden at this juncture in the litigation. Strauss v Microsoft Corp., 1995 US Dist. LEXIS 7433, at *7 (S.D.N.Y. June 1, 1995).

[7] For example, Defendant misstates how EMS calls are organized, citing inapplicable testimony (Ex. E at 127:22-23), states that "EMS [] are not trained to address or repair gas or chemical leaks" omitting the fact that neither are Fire, while citing inapplicable testimony (Ex. F at 165:11-12, 166:7-8, 173:25), misstates that EMS do not wear bunker gear unless they are assigned to specialized Hat-Tac Units, citing inapplicable testimony. (Ex. F at 169:10), states only that "EMS [] have a limited role in Firefighting training," omitting that EMS are also trained by Fire and both EMS and Fire participate in regular joint training (Ex. G at 211:8-212:13), incorrectly claims that CFR-D companies are only called to Segment 1-3 calls when Defendant's 30(b)(6) witness confirmed "[Fire] respond to other calls… that are not segment 1, 2 and 3s" (Ex. E at 91:13-92:12), misstates that EMS only respond to "confirmed" fires (Ex. F at 85:10-11, 86:2-6), claims EMS do not wear personal protective equipment similar to Fire, when only difference cited is EMS wear "beige gear" (Ex. F at 198:21), incorrectly claims that EMS have carbon monoxide detectors to leave dangerous environments rather than render care, citing inapplicable testimony (Ex. F at 169:1-5), falsely claims that EMS operate in the "cold zone" for bomb threats when there is no such "cold zone" and Fire and EMS operate in the exact same zone (Ex. F at171:12-16), misstates that "Firefighters" are dispatched to emergencies without EMS while citing testimony that refers to calls both EMS and Fire are dispatched to (Ex. F at 88:23-90:2), lists risks inherent to Fire First Responders (Ex. F at 107:4-22) while omitting that these same risks are inherent for EMS (Ex. G at 309:24-

Further, "the question of whether comparators are sufficiently similar is typically resolved at the earliest at the summary judgment stage, following discovery." Chalmers v. City of New York, 2021 WL 4226181, at \*4 (S.D.N.Y. Sept. 16, 2021); *see also* Sirota v. Solitron Devices, Inc., 673 F.2d 566, 570-72 (2d Cir. 1982) (at the certification stage, courts refrain from deciding questions of material facts); Chalmers, 2022 WL 4330119 at \*18 (questions of "[w]hether Plaintiffs' evidence actually makes out a prima facie case is a question left for trial"). More importantly, though, since the question of whether EMS and Fire First Responders are sufficiently similar will be answered "using evidence common to all class and subclass members," Defendant's argument does not justify the denial of class certification. Chalmers, 2022 WL 4330119 at \*16.

## *ii.* *Contrary to Defendant's claim, EMS jobs do not have "marked differences," but even if they did, FRCP 23 does not require a showing of "substantial similarity" of job duties within a putative class*

Next, Defendant lists a litany of facts, mostly disputed[8], regarding the jobs of EMTs and Paramedics who elect to complete training in HazTac and rescue and are assigned to the EMS Specialty Operations Command ("EMS SOC") as well as those in non-field assignments and their Supervisors. (Def. Memo. of Law, pp. 4-7). Defendant does this in an attempt to distinguish these job duties from those of other EMTs and Paramedics as "marked[ly] differen[t]" and not

---

315:13), misstates "CFR-D companies only start medical care (Ex. E at 99:8-15) ignoring that Fire will stay and continue medical care with EMS (Ex. E at 100:3-10), misstates testimony to claim "cancer risk that firefighters have is higher" when the witness never testified to this (Ex. F at 108:3-9, 109:7-11), editorializes on "hazards of working as a firefighter" that are not in the record and/or omits its own witness' testimony that EMS experiences the same hazards, explains decontamination process for Firefighters while omitting the same procedure is required for EMS (Ex. G at 227:15-24), and incorrectly claims that Defendant's witness testified that "Rescue Firefighters face more risks… than Rescue Medics" when in fact the witness testified that "the hazard is similar or the same" (Ex F at 219:4-8.).

[8] For example, Defendant claims "EMS Rescue Medics are focused on treating patients during the scenes that involve, inter alia, rescuing individuals from heights, in trenches, and collapsed buildings." (Def. Memo. of Law, p. 6), but the witness only testified that EMS Rescue Medics are "focused on the patient and treating the patient," (Ex. F at 15:13-14), materially misstates testimony that there are EMS personnel who are trained to operate at Haz-Mat emergencies ("Haz-Tac EMTs and Paramedics") and Technical Rescue emergencies ("Rescue Medics"), but they perform different tasks than Firefighters or Rescue Firefighters" witness does not say this at all (Ex. E at 15:1–4), states "EMS Haz-Tac EMTs and Paramedics and Rescue Medics [go] to joint trainings with Firefighters," (Ex. F at 151:19-22), but omits the fact that all EMS First Responders complete regular and ongoing joint training with Fire First Responders. (Ex. G at 211:8-212:13), states "Rescue Medics can go inside a building that is actively on fire," (Ex. F at 219:21-25, 223:19-21), but omits the fact that all EMS First Responders can go inside a building that is actively on fire (Ex. G at 178:14-179:3).

"substantially similar."  However, such a distinction is not only irrelevant, as explained *infra,* but also squarely rebutted by Defendant's own job analysis data, including its Tasks and Standards for EMS First Responders which show their core job duties remain the same. (*See* Ex. 35, pp. 2-4). Defendant's argument is also undermined by the fact that Defendant has affirmatively classified all EMS First Responders, regardless of whether field, non-field, SOC or non-SOC, in the same competitive civil service titles.  This means Defendant has expressly determined that these positions "are substantially similar in the essential character and scope of their duties and responsibilities."  N.Y. Civ. Serv. Law §2(11).[9]

Defendant overstates differences in these assignments without offering a "systematic evaluation" that considers the weight, frequency or importance of these alleged differences while ignoring the fact that the core job duties of all EMS First Responders remain the same. (*See* Ex. 35, pp. 2-4; Ex. 38, p. 2; Ex. 36, p. 2; Ex. 37, p. 2).[10]  As explained by Dr. Landis, the Tasks and Standards establish that "there is significant overlap in the duties and responsibilities of subordinates and supervisors in EMS." (Ex. 36, ¶ 5).  Further, "even if assigned to a non-field location, EMS First Responders can and overwhelmingly do perform field work" (Ex. 36, ¶ 5), in fact "at time it [i]s even a requirement that [they] work in the field." (Ex. 37, ¶ 4).  Lastly, and contrary to Defendant's claims, "the overwhelming majority of calls [EMS SOC is] dispatched to [is] not HazTac or rescue." (Ex. 38, ¶ 7)

Moreover, the only way in which these differences in job duties among the proposed class members would be relevant to class certification is if those difference impacted FRCP 23

---

[9] Further contradicting Defendant's position here, it is Defendant's stated position that the titles of EMS Lieutenant, Captain, Deputy Chief and Division Chief are all one title, Supervising Emergency Medical Services Supervisor ("SEMSS"), and that "that the abilities and knowledge required to perform…[the] tasks" of Lieutenants, Captains, Deputy Chiefs and Division Chiefs/Commanders "are identical." *See* Local 3621, et al v. City of New York, et al, 18-cv-4476, ECF Nos. 307-1; 307-2, pp. 60-64.  Nor are these Supervisors high-ranking officials responsible for setting or maintaining the policies complained of here.

[10] By way of example, Defendant infers that some EMS First Responders never do field work, claiming "some individuals spend their entire careers as EMS Dispatchers." (Winfield 31:19).  But, as Plaintiff Winfield makes clear, throughout his 28 years assigned to Dispatch, he regularly worked in the field. (Ex. 35, ¶ 5). Plaintiff Claro likewise testifies that as an Instructor in the EMS Academy, she regularly completed field work and that field work was even a requirement of her work as an EMS Instructor.  (Ex. 37, ¶ 4).

requirements such as parties' ability to use common evidence to prove or defend against claims or answer common questions of fact or law. *See* NECA-IBEW Health & Welfare Fund v Goldman Sachs & Co., 693 F3d 145, 162 (2d Cir. 2012); *see also* Langan v Johnson & Johnson Consumer Cos., 897 F3d 88, 98 (2d Cir. 2018). But Defendant fails to identify how these purported differences interfere with typicality, commonality, predominance or any other element of FRCP 23 including any way in which parties' ability to use common evidence would be impacted.[11]

Defendant also fails to identify a legal or factual question that cannot be addressed through generalized proof and does not dispute that the question of liability here is common to the class and that the same "system," including the same salary scale, collective bargaining process, and recruitment practices, predominates the class claims. Instead, Defendant argues that the putative class members must be "monolithic," without explaining why this applies to the FRCP 23 requirements, essentially asking the Court to add an additional requirement for class certification— one of "substantial similarity" for putative class members, akin to that of a Title VII comparator. However, such a requirement does not exist. *See, e.g.*, Houser v. Pritzker, 28 F. Supp. 3d 222, 243 (S.D.N.Y. 2014) (FRCP 23 "does not require that all class members' circumstances be identical, so long as their claims can be proven or disproven on a classwide basis"). Nor does "typicality," "commonality," or "predominance" prevent supervisors from being in the same class as their subordinates. Gonzalez v. Allied Concrete Indus. Inc., 2019 WL 13134862, at *3 (E.D.N.Y. July 15, 2019) ("even assuming that their job title and responsibilities were significantly different from

---

[11] For example, whether EMS SOC Paramedics undergo training to enter confined spaces, utilize a self-contained breathing apparatus, or receive a 3% salary differential, when other Paramedics do not is not relevant to determining whether EMS First Responders were given the higher uniform pattern increase or the lower civilian pattern increase in Defendant's collective bargaining process. This is especially true since it is undisputed that all EMTs, Paramedics, and Supervisors enter into the same collective bargaining agreements (ECF No. 16-22) and Defendant treats all EMS First Responders as civilian despite the fact that the law requires all EMS First Responders be treated as uniform. The uniform and civilian pattern increases are the same for all civilians and all uniform personnel, respectively. (Ex. 4, pp. 106-115). Nor are these alleged differences relevant to establishing whether Defendant failed to take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders. (As defined in Plaintiffs' underlying motion, "Compensation" refers to salary, benefits, and terms and conditions of employment). They are also not relevant to the question of whether Defendant steers women and people of color away from the Fire side and towards the EMS side of the FDNY.

those of all other plaintiffs in this action, those differences do not automatically render plaintiffs'
claims unique"); *see also* Hnot v. Willis Grp. Holdings Ltd., 228 F.R.D. 476, 485 (S.D.N.Y. 2005)
("Even if one female officer supervised another, it is still possible, as plaintiffs allege, that they all
suffered from gender discrimination by the key decisionmakers.").

As such, contrary to Defendant's claim, there are not "marked differences" in jobs within
EMS.  But even if there were, there is no independent FRCP 23 requirement to show "substantial
similarity" of job duties within a putative class.  Any such differences, even if they existed, would
not prevent class certification here because they do not impact the requirements of FRCP 23.

### iii.   *Defendant fails to rebut that Plaintiffs have shown significant proof of their disparate impact and disparate treatment claims*

#### a.  Disparate Impact

While Defendant argues that Plaintiffs have failed to identify facially neutral policies in
support of their disparate impact claims, Defendant does not dispute that these policies and/or
practices exist.  For example, Defendant does not dispute that it has treated EMS First Responders
as civilian for purposes of collective bargaining pattern increases and that it has not adjusted the
Compensation of EMS First Responders to properly reflect their current job duties.  Defendant also
does not dispute that these policies and/or practices are centralized and based on Defendant's
"unitary course of conduct."[12]  Clark v. City of New York, 2021 WL 603046, at *3 (S.D.N.Y. Feb.
16, 2021).  Moreover, contrary to Defendant's argument, the Court has found that Defendant's
policy of "paying EMS First Responders the civilian pattern percentage increase when Fire First
Responders receive the uniformed pattern increase is a facially neutral policy that Plaintiffs allege
has disparate impact on compensation." Local 2507, 2024 WL 916520 at *9; *see also* Chalmers,

---

[12] For example, the Commissioner of OLR, who has oversight over all putative class members in the same way, makes
the decision regarding whether to treat EMS as uniform for collective bargaining.  (Ex. 4, p. 123 "I'm familiar with
[Local Law 19 of 2001]…;" p. 126 Q. So given this law… is it still your position that EMS should be treated as civilian
for purposes of collective bargaining?  A. Yes;"  pp. 116-117, "Q… how do you form your understanding…? A. I
read the decision… And consulted with the law department."

2022 WL 4330119 at *13-14. Also, Defendant's failure to adjust the Compensation of EMS First Responders to keep pace with the changes in their job duties "appl[y] to all [EMS] employees, including all subclass members, equally" and is therefore facially neutral. Id., at *14.

Plaintiffs have also shown significant proof that these identified policies disparately impact the subclasses. This includes the opinions of Dr. Landis and Dr. Maguire that EMS and Fire First Responders perform similar jobs, and Dr. Landis' findings that the EMS workforce consists of significantly more women and people of color than the Fire workforce, that EMS First Responders are paid significantly less than Fire First Responders, and that there are no differences in the content of the jobs that would explain the difference in compensation. (Ex. 2, p. 3). In doing so, Plaintiffs have also "provided generalized proof sufficient [to satisfy] the predominance inquiry" regarding their disparate impact claims, and the manner in which the *McDonnell Douglas* burden-shifting framework will be applied to their claims. Chalmers, 2022 WL 4330119 at *18.

### b. Disparate Treatment

Defendant also fails to rebut the anecdotal and statistical evidence supporting Plaintiffs' disparate treatment claims, or raise objections regarding Plaintiffs stated policies with regards to their disparate treatment claims including not disputing that "the proposed class and subclass members were subject to the same policies that disadvantaged them relative to [Fire First Responders who] perform[] similar duties." Chalmers, 2022 WL 4330119 at *15. This includes, but is not limited to, Dr. Landis' finding that "[g]iven the similarity in the nature of the work including the tasks performed and capabilities needed to perform that work, there is no job-related rationale to explain the large disparity in the pay between EMS and Fire First Responders." Ex. 2, p. 3, ¶ 6; *See also* Chen-Oster, 325 F.R.D. at 76 (finding that evidence of statistically significant

9

pay disparities supported plaintiffs' disparate treatment claim); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir. 1999).[13]

Dr. Landis' Reports also provide significant proof that Defendant has failed to take the necessary steps to properly determine the appropriate Compensation for the current job duties of EMS First Responders. This evidence also establishes that Defendant failed to do so despite its awareness that EMS First Responders' Compensation was inadequate, and despite being called on to do so by Defendant's own legislative body as recently as May 28, 2020 (Ex. 19), which provides further proof of Plaintiffs' disparate treatment claims. *See* United States v. City of New York, 717 F.3d 72, 94 (2d Cir. 2013) ("the failure of senior officials to act [with awareness of the consequences]…can support an inference of discriminatory intent").

Plaintiffs have also identified significant proof, common to all class members, that Defendant "confin[ing] the[EMS] Union[s] to civilian pattern percentage compensation increases in collective bargaining cycles, even though the New York City Administrative Code (the "Administrative Code") deems [EMS] to be uniformed employees for the purpose of collective bargaining" has resulted in disparities in Compensation for EMS First Responders, especially since "[u]niformed pattern percentage compensation increases have either matched or exceeded civilian pattern increases in all relevant years. Chalmers, 2022 WL 4330119 at *3; *see also* Table 1 and Figure 1 in Plaintiffs' Memorandum of Law, pp. 17-18 [ECF No. 120].

Likewise, the evidence establishes, and Plaintiffs will prove, that Defendant steers women and non-white applicants for employment with the FDNY to the lower-paying EMS jobs, instead of the higher-paying Fire jobs. While Defendant raises a question regarding whether Plaintiffs can establish this pattern-or-practice claim, the Court recently ruled that Plaintiffs have alleged sufficient

---

[13] Regardless of whether Dr. Campion's report and/or testimony is excluded, class certification should be granted because none of Dr. Campion's opinions successfully rebut the findings in the Landis Report or Maguire Report. Indeed, Dr. Campion's criticisms of Plaintiffs' experts' reports have little merit given his lack of sufficient knowledge regarding Plaintiffs' claims, his lack of supporting data, and the speculative basis of his opinions. (Ex. 12; Ex. 13). Although it had the opportunity to do so, Defendant chose not present its own expert analyses of job similarity, the demographic composition as to sex, gender, and race, or Compensation of FDNY First Responders. (Ex. 12).

detail to support this claim by alleging that "two Plaintiffs, both African-American women, [who] allege being directed to apply to EMS despite inquiring about a Fire First Responder position, one after scoring '98% on the written firefighter exam." Local 2507, 2024 WL 916520 at *7.  Moreover, additional evidence has already been produced further strengthening this claim, including the testimony of EMT Ramla Evans, "an African-American woman and an Emergency Medical Technician" who "was hired by the FDNY in February of 2000 after [applying] to be an FDNY [fire] cadet" but was instead placed in EMS and "told that [she] was being hired initially as an EMT on the EMS side."  (Ex. 39, ¶¶ 1-2, 5).  The evidence also includes testimony of EMS Deputy Chief Arlene Simmons, who worked in the FDNY's Office of Recruitment and Retention and details the process by which Defendant "funnel[ed] women and people of color into the EMS side." (Ex. 40, ¶¶ 2, 14).

Furthermore, "the FDNY has a longstanding history of underrepresentation of racial minorities and disparate-treatment and disparate-impact litigation concerning its employment practices.  *See* City of New York, 717 F.3d at 77–79 (summarizing this history)." Local 2507, 2024 WL 916520 at *7.  Such "[e]vidence of historical discrimination," such as determinations in court,[14] findings of the U.S. EEOC (Ex. 9), findings of New York City's Equal Employment Practices Commission (Ex. 34), and findings of discrimination by the FDNY's own Equal Employment Opportunity ("EEO") office,[15] "is relevant to drawing an inference of purposeful discrimination." United States v. City of New York, 683 F. Supp. 2d 225 (E.D.N.Y. 2010).

As such, and since both Plaintiffs' prima facie case and Defendant's assertion of a non-discriminatory, legitimate business reason for the alleged conduct will all "be subject to generalized proof," Defendant has failed to rebut that Plaintiffs have shown significant common

---

[14] *See* United States v. City of New York, 683 F. Supp. 2d 225, 241 (E.D.N.Y. 2010), in which the Court recognized consistent efforts to address the "pattern of underrepresentation" in the FDNY, including Berkman v. City of New York, 536 F.Supp. 177, 183 (E.D.N.Y. 1982); Vulcan Soc. v. Civil Serv. Comm'n, 360 F.Supp. 1265 (S.D.N.Y 1973).
[15] On October 27, 2014, the FDNY EEO office substantiated Plaintiff Tonya Boyd's Complaint of discrimination based on sex, gender, and race and determined that remedial actions were required.  *See* Local 3621, et al v. City of New York, et al, 1:18-cv-04476 (LJL)(JW), Dkt. No. 1-1, pp. 31-32.

proof, and a predominance of common issues, in support of their disparate treatment claims. Chalmers, 2022 WL 4330119 at *19.

**B.** **Defendant does not contest the ascertainability, numerosity, adequacy, or superiority of the class and subclasses and fails to dispute facts relevant to class certification**

Defendant does not object to the ascertainability, numerosity, adequacy[16], or superiority of the proposed class and subclasses. Instead, in its 15-page Statement of Facts, Defendant fails to offer a single pertinent detail relevant to the question before the Court, namely whether the claims of the 4,500 members of the putative class are best litigated individually or as a class.

Notably, Defendant also does not dispute, or even address, the EEOC's findings, including that Defendant "discriminated against current and former First Responders of the FDNY EMS…with respect to pay, benefits, and terms and conditions of employment," that "any difference in duties between the EMS First Responders and Firefighters fails to explain the pronounced gap in wages and benefits," and that "[Defendant has] failed to adjust the pay scales of EMS First Responders to keep pace with the changes to their duties since the City merged EMS with the Fire Department in 1996." (Ex. 9, p. 3).

Further, Defendant does not dispute that EMS First Responders are underpaid. In fact, Defendant ignores the fact that the FDNY's high ranking officials and New York City's legislative body have repeatedly raised concerns regarding Defendant's pay practices for EMS First Responders, not only identifying the segregated workforce of the FDNY but also calling on the FDNY to correct "long-standing pay disparity" so that "salaries of New York City emergency

---

[16] Although it does not dispute the adequacy of the Kurland Group to serve as class counsel, Defendant claims that Plaintiffs' counsel "does not represent that she had ever litigated a class-action case." But Plaintiffs' counsel specifically lists in the declaration of Yetta G. Kurland actions in which the Kurland Group has represented putative and class members. Upon information and belief, Defendant is aware of these actions, as the Kurland Group has represented plaintiffs in at least one prior class action against Defendant and is currently representing plaintiffs in another pending putative class action against Defendant.

medical service personnel [are] comparable to New York City's firefighters." (pp. 7-10, Plaintiffs' Memorandum of Law in Support of Certification).

Defendant also does not effectively dispute the trend identified by Dr. Landis that since the merger of EMS into the FDNY in 1996, jobs of FDNY First Responders have become more similar including a decrease in frequency of structural fires and an increase in incidence of medical care. (Ex. 2, p. 16). In fact, Defendant admits "[i]t is very common for Firefighters to respond to medical emergencies." (Def. Memo. of Law, p.11; *see also* Ex. 21, 63:2-3). Indeed, the most regularly encountered calls for all FDNY First Responders, whether Fire or EMS, are medical emergencies in which both EMS and Fire First Responders perform medical care. (Ex. 2., pp. 11-16).

## POINT II: DR. CAMPION'S REPORT AND TESTIMONY DO NOT COMPLY WITH FRE 702 AND SHOULD NOT BE CONSIDERED

Defendant's unsigned[17] expert report, marked "Privileged and Confidential – Created for Legal Counsel," is not admissible pursuant to FRCP 26(a)(2)(B). Even if it were, Defendant has failed to meet its burden, by a preponderance of the evidence, to show that Dr. Campion's testimony "both rests on a reliable foundation and is relevant to the task at hand." Showers v. Pfizer, Inc., 819 F.3d 642, 658 (2d Cir. 2016). Defendant's response does not rebut Plaintiffs' showing that Dr. Campion's report must be excluded for many reasons, including that he (1) only considered equivalence of the focal jobs, not substantial similarity, (2) did not use an identified methodology, (3) did not produce information supporting critical opinions; and (4) did not sign his report. *See*

---

[17] Defendant's attempt to cure the inadmissibility of Dr. Campion's unsigned report by simply producing a signed version more than 5 months later, and one day before their opposition was due, does nothing to overcome this defect. FRCP 26(a)(2)(B) "requires parties to disclose written reports, 'prepared and signed by the expert witness.'" In re Lyman Good Dietary Supplements Litig., 2019 WL 5682880, at *7 (S.D.N.Y. Oct. 31, 2019) (*quoting* FRCP 26(a)(2)(B)). In the case of an expert report which fails to comply with FRCP 26(a)(2)(B), including an unsigned report, if the party fails to explain and/or justify their failure to comply with FRCP 26, "preclusion is appropriate." Mfon v. Cnty. of Dutchess, 2017 WL 946303, at *5 (S.D.N.Y. Mar. 9, 2017), aff'd, 722 F. App'x 46 (2d Cir. 2018) (finding that party's attempt to cure deficiencies in expert discovery, which was only made in opposition to adversary's motion to strike the expert testimony, could not cure the defects especially since it was submitted "more than seven months after the submission of the Report"). Lastly, when a party has "been in violation of their discovery obligations…[for] more than seven months after the end of…discovery [and i]n the absence of any colorable explanation or excuse," the party's conduct "was at least grossly negligent, and,,accordingly sanctions, including…preclusion…are appropriate." Lucky Brand Dungarees, Inc. v. Ally Apparel Res., LLC, 2009 WL 72982, at *1 (S.D.N.Y. Jan. 8, 2009).

Almeciga v. Ctr. for Investigative Reporting, 185 F. Supp. 3d 401, 415 (S.D.N.Y. 2016) (finding "unreliable expert testimony" including one whose methodology cannot be tested, must be excluded).

First, Defendant ignores the most fatal defect of Dr. Campion's opinion, which is that it is not helpful to the fact finder because he considers only equivalence of Fire and EMS First Responders' jobs and not whether the jobs are substantially similar. (Ex. 30, p. 83, line 17-21). Rather than correct this, Defendant simply insists that Plaintiffs are asserting an "unequal pay for equal work" claim. (Def. Memo. of Law, p. 24). However, the record is clear that Plaintiffs are not asserting equal pay claims and that "Plaintiffs raise an 'atypical discrimination claim' in that they 'do[ ] not rely on a comparator group of [non-minority] 'co-employees,' [but instead] that the predominantly minority EMS First Responders are paid significantly lower salaries than Fire First Responders with comparable job titles and functions—who are also likelier to be white and male. Local 2507, 2024 WL 916520 at *6 (citing Hill, 136 F. Supp. 3d at 335). As such, "Plaintiffs' and their comparators' circumstances must bear a 'reasonably close resemblance'; they need not be 'identical.'" Id. (citing Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014)).

Next, while Plaintiffs are not arguing that Dr. Campion had to do a job analysis, as Defendant claims, it is undisputed that he was required, but failed, to conduct some sort of analysis that applied a cognizable and testable methodology. See FRE 702(c); see also Bocoum v. Daimler Trucks North America, LLC, 2022 WL 902465, at *12 (S.D.N.Y. March 28, 2022). Defendant spends 3.5 pages insisting Dr. Campion performed an analysis with testable methodology, but never explains where. The closest Defendant comes is its claim Dr. Campion "utilized" the Point Method. But even Dr. Campion admits that he has not applied the Point Method. (Ex. 12, pp. 4-5). In fact, he admits "he is not in possession of the underlying data necessary to apply this method." Id.

Dr. Campion further admits in his deposition that he did not utilize a testable methodology, let alone one with a knowable rate of error, in reaching his conclusions, testifying he "just cite[s]

several pages of quotations by authoritative sources, describing th[e] risks [of Fire First Responders], and…just summarizing it." (Ex. 30, pp. 270-271).  As such, Dr. Campion's report does not go beyond "lay matters," which a fact finder can understand without an expert's help. *See* Valjean Mfg. v. Michael Werdiger, Inc*.,* 2007 U.S. App. LEXIS 20475*,* at *5 (2d Cir. Aug. 27, 2007) ("[a] lay witness could have testified to each of the numbers depicted on each sales record and then performed the required mathematical computations on them"); S. Dist. of N.Y. United States v. Blakstad, 2021 U.S. Dist. LEXIS 217854, at *16-19 (S.D.N.Y. Nov. 9, 2021) (tracing money into and out of accounts was not appropriate as expert testimony because "all of this is something that I think is within the ken of the average juror").

For these reasons, Dr. Campion's opinions must be excluded because, without an identified methodology, there is "too great an analytical gap between the data and the opinion proffered." *See* Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); *see also* Bocoum v. Daimler Trucks North America, LLC, 2022 WL 902465, at *12 (S.D.N.Y. March 28, 2022) (excluding expert testimony that "offer[ed] no cognizable methodology").

Next, Defendant does not dispute that it failed to produce all the data Dr. Campion considered.  This missing data ("Active member days per year.xlsx," *see* Ex. 11, p. 41, n. 48) is what Dr. Campion relied on in his assertion that the working conditions for Fire have greater risks and hazards than EMS (Campion Report, pp. 40-43).  Because Defendant did not produce this data, Dr. Campion's findings related to that data, i.e. comparisons of working conditions between Fire and EMS, must be excluded pursuant to FRCP 26(a)(2)(B)(ii).  In re Lyman Good Dietary Supplements Litig., 2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019).

Furthermore, Defendant's opposition is riddled with unsupported conclusory assertions, such as "no one who has read Dr. Campion's report could honestly believe this" without any explanation of why counsel believes this. (Def. Memo. of Law, p 22).  These blanket statements

are insufficient to rebut the identified defects in Dr. Campion's report.  For example, Defendant

cannot deny that Dr. Campion is not an epidemiologist and has neither studied nor published any

literature in the field of epidemiology. (*See* Campion CV; *see also* Ex. 30, p. 43).  Contrary to

Defendant's assertion, Plaintiffs are not arguing that Dr. Campion may not discuss job hazards

generally.  However, Dr. Campion is simply not qualified to rebut the epidemiological opinions of

Dr. Maguire.  Nimely v. City of New York, 414 F.3d 381, 396, n. 11 & 13 (2d Cir. 2005).

### POINT III: DR. LANDIS' OPINION REGARDING THE SIMILARITY OF THE JOBS OF EMS AND FIRE FIRST RESPONDERS COMPLIES WITH FRE 702

As explained in Plaintiff's motion to certify, Dr. Landis' report and testimony provide

significant proof which supports class certification, most of which Defendant does not dispute.  (Ex.

2, pp. 17, 35).  For example, Defendant does not seek to exclude Dr. Landis' opinion that there are

statistically significant differences in the sex, gender, and race of EMS and Fire First Responders.

(Ex. 2, p. 3).  Nor does Defendant seek to exclude Dr. Landis' opinion that there are statistically

significant differences in the Compensation of EMS and Fire First Responders. (Id.).  Nor does

Defendant seek to exclude Dr. Landis' opinion that "there is no job-related rationale to explain the

large disparity in the pay between EMS and Fire First Responders."  (Id.).  Lastly, Defendant does

not seek to exclude Dr. Landis' opinion that without a proper compensation analysis, "the FDNY

cannot credibly assert that it pays EMS First Responders the appropriate pay rates."  (Id., p. 9).

Defendant only asks to exclude Dr. Landis' finding that EMS First Responders and Fire First

Responders are appropriate comparators, yet fails to meet its burden under FRE 702 to do so.

First, as discussed *supra*, Defendant misstates the appropriate standard and

mischaracterizes Title VII case law regarding Plaintiffs' burden of proof.  (Def. Memo. of Law,

pp. 24-25).  Plaintiffs are not required to show that the work of comparators is "equal," but only

substantially similar. *See, e.g.,* Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000); Brown,

756 F.3d at 230; Local 2507, 2024 WL 916520 at *6.  By insisting on applying the wrong standard, Defendant renders both its arguments and the opinions rendered in Dr. Campion's report irrelevant.

Next, Defendant argues that this Court's certification of a class and subclass in the related matter, Chalmers v. City of New York, 20-CV-3389 (AT), was incorrect and repeats arguments, which the Court rejected in Chalmers. (Def. Memo. of Law, p. 28 n. 13, "[Defendant] does not concede the correctness of *Chalmers*.").  Then, in an attempt to differentiate this matter from Chalmers, Defendant fabricates a claim that the reason Dr. Landis used O*NET information for EMS work activities is because he refused to use the EMS work activities produced by Defendant because they were too old.  Defendant misstates that "the City produced for Dr. Landis the job analysis for the Firefighter position…and which Dr. Landis simply disregarded based on a factual mistake as to its age." (Def. Memo. of Law, p. 27-29).  As Dr. Landis explains in his declaration attached hereto, this is not true and in fact Defendant has never produced the EMS work activities that Dr. Landis had to take from O*NET.  (*See* Ex. 35, ¶ 13).  In order to make such a far-fetched claim, Defendant goes out of its way to cobble together partial statements on a myriad of unrelated topics and then misattributes those statements to Dr. Landis.

In fact, the discussion of outdated data has nothing to do with Dr. Landis' use of O*NET data or even EMS work activities.  The outdated data relates to the critique in the Landis Rebuttal Report (Ex. 12, p. 13) of Table 13 in Dr. Campion's Report (Ex. 11, pp. 217, 219). In specific, Dr. Landis explains that Dr. Campion's use of 10 of the 125 "characteristics/abilities" for Firefighters listed in the Appendix of a 2012 Job Analysis of Firefighters is not reliable because it forms a conclusion that Fire First Responders have greater physical demands than EMS First Responders without providing any data on the physical demands of EMS First Responders. (Ex. 12, p. 13). Dr. Landis also explains that Defendant's 30(b)(6) witness (not Dr. Landis, as Defendant claims) testified that the data Dr. Campion relies on for these characteristics/abilities for Firefighters (not

work activities for EMS First Responders) is too old to be relied on.  (Ex. 12, p. 13).  In specific, the

Landis Rebuttal Report states:

> Dr. Campion also ineffectively points to differences in the physical
> demands of Fire and EMS jobs as explanations for pay differences. For
> example, he asserts that the physical ability tests used for Fire First
> Responders are much more difficult than those for EMS. To support his
> position, he describes the extreme demands of Fire First Responder jobs.
> But he never specifies the physical demands of EMS jobs (Tables 12 and
> 13 in Campion Report). There is simply no way to compare the physical
> demands across the jobs without explicitly identifying such demands for
> both. One cannot credibly list requirements for Fire First Responders and
> not list corresponding requirements for EMS First Responders while
> drawing a conclusion on their similarities or differences. Further, Dr.
> Campion relies on data that is over a decade old, which Defendant's FRCP
> 30(b)(6) witness testified is too old to be relied on. (Ex. 12, p. 13).

The testimony of Dr. Landis in his rebuttal deposition, which Defendant misconstrues by

omitting relevant portions, also has nothing to do with Dr. Landis' use of O*NET data for EMS

work activities.  It merely answers questions related to the above paragraph from Dr. Landis' report

and reiterates the problem with Dr. Campion's use of incomplete data on physical demands.  Dr.

Landis is not, as Defendant claims, answering the question of "why he uses O*NET's extremely

broad categories based on national survey data, instead of the highly detailed job analyses

conducted by PSI for FDNY Firefighters?"  Not only is the outdated data in question about

Firefighters, not EMS, but it is also not the work activities Dr. Landis used from O*NET.  The

questions and answers in Dr. Landis' testimony regarding outdated data are as follows:

> Q. This paragraph discusses the physical demands of firefighters and EMS.
> Did you for this rebuttal, review any of the physical demands for firefighters
> or EMS?
>
> A. No.  This is based on the data that he provides in those tables and saying
> that he is not doing a comparison…and it's unclear how he goes about
> selecting the demands for one but not the other.
>
> Q. And you say that the job analysis he uses is too old, is that correct?
>
> A. So what I am saying, he is relying on data that is more than a decade
> old… there was testimony given by [Defendant's 30(b)(6)] witness that's

too old to be relied on.  So that is from the deposition.  That is not my – I didn't just create that.

(Ex. CC, pp. 46-47).

Next, Defendant attempts to rebut the accuracy of Dr. Landis' comprehensive analysis by comparing Dr. Landis' findings to a "report," which Defendant served in the form of a discovery response many months after certification discovery closed (Ex. O).  However, Defendant's use of this "report" raises significant concerns.  Most importantly, this document is the focus of a pending FRCP 37 motion before Magistrate Judge Gorenstein.  Given the irregularities with how this "report" was produced as well as serious concerns regarding the accuracy of its contents, parties stipulated on the record, and the Court has taken judicial notice, that parties would not use this information in the instant motion. (ECF No. 128, "Parties confirmed at the December 11, 2023 conference that this dispute would not impact class certification deadlines; ECF No. 129, "[T]he new discovery ordered on December 11 is not necessary for the class certification briefing").

Magistrate Judge Gorenstein had already found on December 11, 2023 that it is "a no-brainer" that Defendant may not rely on this "report" without producing the underlying data. (*See* ECF No. 132, pp. 13:25; 22:1-8).  Judge Gorenstein ordered Defendant to either produce this data or produce a witness to explain why doing so would be "literally impossible," and made clear that if Defendant failed to do so, this report would be stricken from the record.  Id.

Not only is Defendant's "report" not admissible until Defendant complies with Judge Gorenstein's order, but it is also inaccurate for many reasons.  Perhaps most noticeably, it omits the most relevant data, i.e. CFR-D calls in which Fire First Responders are dispatched to medical emergencies to provide medical care with EMS First Responders. (*See* Def. Memo. of Law, p. 10, "When one of those emergencies comes in, a CFR-D company is dispatched along with EMS resources."). This makes up the majority of fire calls and according to Defendant's own data comprised 54% of fire calls in 2022.  (*See* Ex. 2, p. 11).  Without explanation, Defendant omits

this data from its "report," in an attempt to claim that EMS only responds to a "miniscule 3%" of all fire calls (*See* Ex. O).

Defendant then states, "it is inherently suspect to attempt to show job similarity through data as to how often Firefighters and EMS personnel respond to the same types of incidents because such an analysis does not consider what Firefighters and EMS personnel actually do when they respond to the same types of incidents." (Def. Memo. of Law, p. 27). However, as an initial matter, the environments employees are working in is relevant to their respective working conditions. Upon information and belief, EMS First Responders are dispatched to at least 90% of all calls Fire First Responders are dispatched to. Also, in all calls EMS and Fire First Responders respond to, they are "working together and in tandem to perform the same function", i.e. an integrated emergency response to save lives. Hill, 136 F. Supp. 3d at 335–36 & n.10.

Moreover, as illustrated in Table 4 of Dr. Landis' Report (Ex. 2, p. 12), the 54% of fire calls that Dr. Landis references are only data related to the percentage of fire calls that are medical (CFR-D) calls, which Firefighters and EMS personnel respond to together to perform only medical services, i.e. CFR-D runs. (Ex. 2, p. 11). The number of all fire calls that EMS are also dispatched to is significantly higher and upon information and belief includes the overwhelming majority of all fire calls. (Ex. 2, pp. 9-13). In fact, Fire First Responders will regularly perform medical services for calls that are not recorded as CFR-D calls such as motor vehicle accidents and gas leaks, where EMS First Responders will also be dispatched and in addition to medical work perform non-medical related work such as scene safety and directing traffic. (*See* Ex. 42, transcript excerpts of Plaintiffs Claro, Cobb, Datilus, Edwards, and Elkadi). Indeed, as Plaintiff Pierre testifies, Fire First Responders perform all the same duties as those outlined in EMS First Responders' Tasks and Standards. (*See* Ex. 43, transcript excerpts of Plaintiff Jenelle Pierre).

Next, "Defendant's claim that [Dr. Landis'] method is improper because although Fire First Responders have taken on more work, 'the opposite is not true—that is, EMS personnel have not

taken on any fire-related work." (Def. Memo. of Law, p. 26). This argument also lacks credibility. Whether or not EMS First Responders have taken on fire-related work is irrelevant to the question of whether the jobs in question are similar. Similarity means that there is a substantial overlap of work activities, and required knowledges, skills, and abilities across the jobs, not that they are exactly the same." (Ex. 35, ¶¶ 16-17).

Lastly, Defendant argues that Dr. Landis' "opinion is not based on a reliable methodology…[b]ut Defendant does not credibly explain why." (Ex. 35, ¶ 14). In fact, while Defendant criticizes Dr. Landis' use of O*NET data, this argument ignores the fact that Dr. Landis "relied predominately on data provided by Defendant regarding the focal jobs and only supplemented Defendant's data with O*NET data where Defendant failed to produce data." (Ex. 12, p. 3). It is well-settled that expert testimony should not be excluded when the opposing party failed to produce the best possible evidence, which was in the sole control of that party, and the expert based their opinions on the best information available. *See, e.g.,* Marsteller v. MD Helicopter Inc., 2018 U.S. Dist. LEXIS 197946 at *3-4 (D. Ariz. May 21, 2018) (denying motion to exclude expert's testimony when it was "based on the best available evidence, the [alternative] data having not been collected or released by Defendant"); *see also* In re Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d 1291, 1339 (N.D. Fla. 2018) (denying motion to exclude expert's testimony based partly on "the only or best available evidence"). Moreover, Defendant's critique of Dr. Landis' use of O*NET data ignores that Defendant's own 30(b)(6) witness confirmed that using O*NET data in this way is an appropriate and credible method of job analysis (Ex. 5, pp. 151-152). *See also* Chalmers, 2022 WL 4330119 at *5 (finding that "O*NET is a reputable source regularly relied upon by experts in [the] field of I/O psychology to assess job similarity" and defendant's criticism of such data was "a red herring"). As such, Defendant fails to meet its burden to exclude any of Dr. Landis' opinions under FRE 702.

**POINT IV: DR. MAGUIRE'S REPORT AND TESTIMONY COMPLY WITH FRE 702**

Contrary to Defendant's arguments, Dr. Maguire's report and testimony comply with FRE 702.  Defendant's motion simply repeats Dr. Campion's unsupported critiques of Dr. Maguire's opinions, which Dr. Maguire has already thoroughly rebutted in his November 2, 2023 report ("Rebuttal Report") (Ex. 13).  While Defendant moves to exclude Dr. Maguire's report and testimony in their entirety, it offers only very limited arguments in support of this, ignoring most of Dr. Maguire's analysis.[18]  Moreover, many of the arguments Defendant makes in support of its motion to exclude the testimony of Dr. Maguire instead illustrates the flaws in Defendant's own position.

For example, the fact that Defendant refers to the lives lost of its own employees, mostly EMS First Responders, who died in the line of duty giving service to others, as a "mere" thirteen fatalities underscores how little value Defendant ascribes to these First Responders.  (Def. Memo. of Law, p. 31).  Likewise, the dismissal of the real and significant threat of death and serious illness caused by COVID-19 and other contagious disease, which EMS First Responders are on the frontlines of, and most vulnerable to, underscores that Defendant is unwilling to value the sacrifices or underlying risk and hazards EMS First Responders face in the same way Defendant values the sacrifices and risks Fire First Responders face. Id. at 31-32.  To then insist that the fatalities of fallen EMS First Responders should be excluded from consideration because Defendant (incorrectly) believes they died from COVID-19 again underscores the disparity in value Defendant places on the lives of EMS First Responders.  Id. Using Defendant's example of September 11, 2001 attacks, one need only imagine how unthinkable and inappropriate it would be for Defendant to make a similar claim after those attacks, i.e. that the resulting deaths of

---

[18] This request is clearly overbroad.  Even if certain aspects of an expert report is insufficient, the entire report should not be excluded based on alleged deficiencies in a separable portion of the analysis. *See, e.g.,* In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) ("the fact that some of an expert's opinions are irrelevant does not render all of the expert's opinions inadmissible"); Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 464 (E.D.N.Y. 2011) (excluding only part of expert's report despite party's argument that entirety should be excluded).

Firefighters who sacrificed their lives should not be considered in determining the risks and hazards of Fire First Responders because it was an anomaly that was unlikely to happen again.

But setting aside what Defendant's position says about its failure to value the sacrifices of EMS First Responders, Defendant offers no rational basis to justify excluding data it feels is unhelpful to its position.  This flies in the face of all valid scientific methods.  Defendant's objections to Dr. Maguire's opinion also misrepresent and misapply the facts.  Contrary to Defendant's claims, the majority of EMS fatalities were not caused by COVID-19. (*See* Ex. 41, ¶¶ 8, 12, explaining that "only 4 of the 11 EMS First Responders who died were reported to have died of COVID-19" while "3 EMS First Responders included in that number…committed suicide" and one, "Alison Russo-Elling was stabbed to death while at work.")   Nor are Dr. Maguire's conclusions "deceptive." Id. at ¶7.

As explained in Dr. Maguire's Rebuttal Report, "the methodologies [Dr. Maguire] relied on in the Maguire Report are standard epidemiological analyses, and have been subject to peer review and publication." (Ex. 13, p. 16).  The Maguire Report's analysis of fatality rates "describe[s] two published reports [which]…list the names of each decedent, so both reports can be expected to be accurate."  Id.  "Moreover, regardless of the cause of deaths, whether COVID or otherwise, all fatalities are relevant to the risks and hazards of the job titles identified. [Defendant] offers no authority that would support the idea that certain types of deaths should be ignored while others recognized. Such a belief departs from scientific methods and seems to only perpetuate some of the stereotypes that have resulted in EMS risks and hazards being understudied, underreported, and underappreciated."  Id.  Defendant's repetition of "Dr. Campion's position, in which he states that the consideration of Covid deaths is 'distorted' (Ex. 11, p. 38)" only re-emphasized the "serious questions about [Dr. Campion's] knowledge and understanding of epidemiology and the current realities of the hazards faced by EMS First Responders." (Ex. 13, p. 16).  Defendant's criticism of Dr. Maguire's use of eight months of data does nothing to prove this data is not accurate—in fact,

23

as Dr. Maguire explains in his Rebuttal Report, "[u]sing eight months of data is a perfectly reasonable epidemiological analysis; for example, FDNY's own authors used just three months of data in their published research paper."[19] (Id., p. 17). Also, far from undermining Dr. Maguire's findings, his inclusion of data from September 11, 2001 only further proves that Dr. Maguire is objectively analyzing all data available to him. (Ex. 41, ¶7, "Whether a fatality is caused by a terrorist attack, homicide, or by a contagious disease, each fatality must be considered.")

Importantly, Defendant completely ignores Dr. Maguire's discussion of the "dataset titled 'Workplace Violence Incidents' (LOCAL2507_02357–LOCAL2507_02380, hereinafter 'Workplace Violence Data'), which shows that the risk of workplace violence is 47 times higher for EMS compared to Fire First Responders." Id. at 3. Defendant also fails to explain why the Workplace Violence Data includes incidents of violence against EMS First Responders that are not included in the injury data Dr. Campion relied on, referred to as the "Injury with Body Parts Data."[20]

Further, Defendant claims that Dr. Maguire "compar[es] two different datasets collected by two different sources…and, therefore, are of uncertain comparability." (Def. Memo. of Law, p. 33). However, "[b]oth of those published reports had the same objective: to list the names of each fallen first responder. Each name in each published report can be compared to public records to confirm their accuracy, and there is nothing improper or unusual about using these reports." (Ex. 41, ¶ 14). And while Defendant attempts to argue that Dr. Maguire's Figure 2 undermines his opinion that EMS and Fire First Responders have comparable risks and hazards, to the contrary, this data shows that

---

[19] *See* Prezant DJ, Zeig-Owens R, Schwartz T, et al. Medical Leave Associated With COVID-19 Among Emergency Medical System Responders and Firefighters in New York City. *JAMA-Open.* 2020; 3(7):e2016094.

[20] Defendant claims that Kamaldeep Deol testified regarding the numerous outstanding questions regarding what data is contained in its "Injury with Body Parts Data," but Ms. Deol's testimony actually confirmed that she did not know. (Ex. EE, p. 22:2-13). Instead, the testimony cited by Defendant is only about what types of information an employee can enter directly into one of Defendant's databases—she was not testifying regarding the contents of the "Injury with Body Parts Data" (Ex. EE, p. 34:5-14) and she was not even testifying as a FRCP 30(b)(6) witness on this topic. She further stated she ultimately did not know. (Ex. EE, p. 22:2-13). As such, Defendant's use of the "Injury with Body Parts Data" raises serious issues with reliability and validity as addressed in Dr. Maguire's Expert Rebuttal Report.

24

"[c]ompared to other occupations nationally, the rates for EMS personnel and fire fighters are similar." Id. at ¶ 16. This only further supports Dr. Maguire's findings.

Lastly, Defendant's criticism of Dr. Maguire's use of the 2022 FDOC report recycles a discredited argument that is now moot because Dr. Maguire replaced the 2022 FDOC report with the 2020 FDOC data that did not have the MOSILL and MOSINJ data Defendant complained of. Defendant simply ignores the fact that Dr. Maguire's "Expert Rebuttal Report…replaced the 2022 report with the 2020 FDOC data which used the same "injuries" data as used by Fire[, and he] found that the 2020 EMS First Responder injury rate is 2.3 times higher than the rate for Fire First Responders." (*See* Ex. 41, ¶ 20). Notably, "Defendant does not dispute [Dr. Maguire's] findings in the subsequent analysis in [his] Expert Rebuttal Report using the FDOC 2020 data..." that EMS First Responders face more risk of injuries. Id. at ¶ 20. As such, Defendant fails to meet its burden to establish that Dr. Maguire's report and testimony do not comply with FRE 702. As such, Defendant's motion to exclude Dr. Maguire opinions must also be denied.

## CONCLUSION

As such, Plaintiffs respectfully request that the Court issue an Order to: (1) designate Tonya Boyd, Lizette Claro, Beverly Cobb, Sencia Datilus, Laitrice Edwards, Alicia Elkadi, Angela Jones, Melanie Moreno-Ketchum, Jenelle Pierre, Simone Quashie, and Laura Torres as Representative Plaintiffs; (2) certify a Class and Subclasses pursuant to FRCP 23(a) and 23(b); (3) appoint Class Counsel pursuant to FRCP 23(g); and (4) exclude the report and testimony of Dr. Michael Campion pursuant to FRE 702. Plaintiffs further respectfully request that the Court deny Defendant's cross-motion to exclude the testimony of Drs. Ronald Landis and Brian Maguire pursuant to FRE 702.

Dated: March 11, 2024

//~s~//

Yetta G. Kurland (YK-1251)
THE KURLAND GROUP
*Attorneys for Plaintiffs*
85 Broad Street, 28th Floor
New York, New York 10004
