July 21, 2025

<u>**VIA ECF**</u>
The Honorable Gabriel W. Gorenstein, U.S.M.J.
United States District Court Southern District of New York
40 Foley Square, Room 519
New York, New York 10007

Re:    <u>**Local 2507, et al v. City of New York, 22-cv-10336 (AT)(GWG) [rel. 20-cv-3389]**</u>

Dear Your Honor:

      Plaintiffs write in furtherance of their efforts to compel production of certain discovery for which parties have reached impasse.

      In an effort to resolve these disputes, the undersigned along with David Rankin and Tala Alfoqaha on behalf of Plaintiffs and Rachel Philion, Jacob Tucker and Lora Minicucci on behalf of Defendant conferred on May 30, 2025 for one hour from 5:30pm to 6:30pm, for one hour on June 5, 2025 from 1:00pm to 2:00pm, on June 6, 2025 for one and a half hours from 2:00pm to 3:30pm, on June 9, 2025 for one hour from 1:00pm to 2:00pm, and June 25, 2025 for one hour from 12:00pm to 1:00pm.

      Through this process, some disputes were resolved, but there remain several items that parties were unable to resolve and have come to impasse on.  In addition, other items which Defendant represented it would produce or was ordered to produce have not been fully produced.  As such, Plaintiffs respectfully ask that the Court compel Defendant to produce the following by a date certain:

### 1.  Examination Information to the Position of Firefighter

**Plaintiffs' Position:** Defendant has been ordered to produce this information from 1996 to present for both promotional and open examinations and further represented to the Court that it did not oppose this production.  [ECF No. 213].  While some of this data has been produced, there remains missing information.  In specific, the following information has been omitted:

A.  The rank and title of the individuals who took the examination if applicable.[1]
B.  Defendant has not confirmed that all individuals who took the examinations have been produced, not just those who passed the examination.

---

[1] Several applicants for the Open Examination may not have rank or title information, because they may not be employed by Defendant, but some will.  All individuals who take the Promotional Examination have rank and title at the time they applied.  Defendant misdirects in its response stating that it does not "track" information on rank and title for those who take the Open Examination.  It ignores this request for the Promotional Examination.  Also, as explained below, Defendant maintains this information for both Open and Promotional Examinations and must produce it.

C.  Defendant has failed to produce information regarding the most recent examinations and has only produced information through 2017.

Defendant refuses to produce the above missing information, arguing that Plaintiffs can pull rank and title information from the data produced regarding FDNY First Responders.  But this is not completely true because several individuals are eligible to take the examination that are not in the dataset of FDNY First Responders, including the new position of Fire Cadets, and other uniform servicemembers such as Police.  Their respective rank and title are not in the data produced regarding FDNY First Responders.  Defendant further claims that information has been produced "as it is maintained by the City in the regular course" and that because it does not "track the rank and title of applicants" it need not produce this information.  As an initial matter, Defendant *does* maintain this information in the regular course. Whether it is maintained at DCAS or elsewhere is irrelevant.  Plaintiffs also believe that this information is "tracked" with examination information, as Defendant has produced this information as part of examination data without issue in other matters.  Plaintiffs can provide a copy of such production at the Court's request.  But regardless of whether Defendant "tracks" this information on examinations, Defendant is in possession of the requested information, which has been ordered produced.  As such, Defendant must produce it.

Finally, while promising to produce information on examinations from 2018 to present, it has simply failed to do so and had refused to give a date by which it will complete production.  Instead, Defendant claims that there are no finalized examinations since 2017.  This is not accurate. For example, the Fire Cadets at issue in recent disputes were hired from examinations after 2017 administered on May 13, 2024. *See* **Exhibit A**.

Since the initial draft of this letter, Defendant has also agreed to produce a 30(b)(6) witness on this topic.  Of concern, Defendant now seems to equivocate on this as well, citing a July 14, 2025 email exchange that is inapplicable.  Defendant offers circular reasoning to argue it need not produce the 30(b)(6) witness expediently, complaining that this will result in having to produce its witness twice.  But, as long as Defendant makes a complete production of ordered discovery this would not be the case.  The issue here is that Defendant has refused to answer simple questions about this data and insisted that these questions be answered through a 30(b)(6) witness.  Plaintiffs offered to resolve this issue without the need for any witness depositions.  To the extent Defendant is claiming this creates a burden, that burden has been created by Defendant.  Defendant can't now complain Defendant is agreeing with the process insisted to by Defendant.  Lastly, Plaintiffs don't disagree with Defendant's position that the production should be complete first before the 30(b)(6) witness is produced to answer questions.  As such, Plaintiffs respectfully ask that Defendant be directed to produce the identified missing information by a set expedited deadline and that the deposition be scheduled thereafter also by a set expedited date, so that any remaining issues can be properly addressed with the Court.

**Defendant's Position**: On June 20, 2025, the City produced data for all Open Examinations since 1996. *See* LOCAL 2507-DEF-0036289-36292. Those productions reflected the data for exam participants as maintained by the City in the regular course and included the following fields of data requested by Plaintiffs: Exam Year, Exam Number, Civil Service Title for the Exam, Civil Service Title Code, Social Security Number (last four digits), Applicant First Name, Applicant Middle Name, Applicant Last Name, Employee ID, Adjusted Final Average, Civil Service List Number, Document Status, Gender, and Ethnicity. The datasets also showed whether the applicant was appointed and, if so, the date of appointment. The City provided a corresponding data dictionary for these datasets on June 20, 2025. The City had previously produced data for all Promotional Examinations since 1996. *See* LOCAL 2507-DEF-0016384-16386; LOCAL 2507-DEF-0020806-20807; LOCAL 2507-DEF-0036059. While these datasets contained most of the data that Plaintiffs requested, they did not include Race, Gender, or the Adjusted Final Average (the "grade"). The City produced updated versions of these datasets that match the fields in the datasets for the Open Examinations, including Race, Gender, and Adjusted Final Average on July 18, 2025. *See* LOCAL 2507-DEF-0041464-41469. As with the latest Open Examination data, the Promotional Examination data includes all individuals who applied to take the Firefighter examinations.

The City is not "refus[ing] to produce" anything and no information is "missing." There have been no established examination lists since 2017 and the City has not hired as Firefighters any Fire Cadets who took an examination after 2017. As soon as additional examination lists are established, the City will produce them in accordance with its continuing discovery obligations. As for Plaintiffs' claim that the City must produce rank and title information for applicants, as the City has explained to Plaintiffs, DCAS, which is responsible for administering the examinations and maintains the data on applicants for said examinations, does not track the rank and title of applicants as part of the examination process. The City has explained to Plaintiffs that, to the extent applicants were previously EMTs and/or Paramedics, Plaintiffs can use the information in the produced examination data (*i.e.*, First Name, Last Name, Employee ID) and cross reference the applicants to the demographic data that the City has produced to find their rank and title. As for non-EMT or Paramedics who applied to become Firefighters, the City also does not track their rank and title as part of the examination process (to the extent they have one, since the Open Examination is "Open" to the general public, and therefore individuals without a rank and title can apply).

Plaintiffs' position above concerning depositions related to this topic is inconsistent with the course of events, as on July 14, 2025, Plaintiffs proposed that the parties "reschedule [all noticed depositions], but to hold off until the Court rules on the schedule after which [the parties] can confer and set dates[.]" *See* City Ex. 1, July 14, 2025 Email from Y. Kurland to R. Philion. The City accepted Plaintiffs' proposal and will meet and confer with Plaintiffs to schedule both parties' depositions once the Court rules on the broader discovery schedule, as Plaintiffs proposed. *See id.* The City should not be required to undertake this process more than once—

3

particularly where it requires employees with full-time jobs to plan for time away from their work responsibilities—based on Plaintiffs' demand, inconsistent with an email they sent the City only days ago, concerning depositions.

As the City noted in an email to Plaintiffs on July 14 regarding the 30(b)(6) depositions, the City wishes to proceed efficiently. *See* City Ex. 2, July 14, 2025 Email from J. Tucker to Y. Kurland. Plaintiffs' position concerning depositions is also inefficient and unduly burdensome. First, for the reasons discussed above, there are no deficiencies in the City's production and the Court should therefore not "set an expedited deadline" for additional production—but certainly while Plaintiffs are claiming this, the City should not be required to produce City employees for depositions concerning datasets that Plaintiffs claim should change or be supplemented. Second, Plaintiffs' position ignores completely that document discovery, including ESI, is currently outstanding (including from Plaintiffs, which is an active dispute before the Court). It also makes no sense for Plaintiffs to arbitrarily request that the Court "set expedited dates" for depositions to take place, only for Plaintiffs to likely later claim they want to recall witnesses if additional documents are produced by either side for which Plaintiffs seek to question such witnesses. *See id.* To the extent the Court considers Plaintiffs' position, Plaintiffs should be required to agree that they will not seek subsequent depositions of the individuals the City produces concerning the datasets prior to resolution of these issues and completion of document discovery. *See id.* If Plaintiffs will not agree to this, the Court should deny the request.

Accordingly, the City has produced all responsive documents located following a good-faith reasonable search and is not withholding any responsive documents.

## 2. Expression of Interest Data

**Plaintiffs' Position**: Defendant was ordered to produce this information from 1996 to present. [ECF No. 213]. Defendant raised all objections including privacy and the Court overruled those objections. In conferring with Defendant, Plaintiffs agreed to accept a reduced scope of production for the period of time for which Defendant maintained this information electronically. On June 20, 2025 Defendant produced the dataset LOCAL-DEF-0036336 purporting to be the EOI data Your Honor had ordered, without disclosing that fact that it had omitted several fields from this production. Indeed, Defendant has produced only a portion of the ordered data and has removed some of the most important fields including individuals' names and last four digits of their social security number which are necessary to track the migration of these individuals through the application process and ultimately being hired or not hired as EMS and/or Fire First Responder positions. Defendant has also removed their contact information which is necessary in the event Plaintiffs need to contact these individuals to act as witnesses or otherwise provide information, because Defendant is correct that the information on the EOI alone won't confirm whether these individuals were steered to EMS. Defendant was ordered to produce this information and it may not *sua sponte* exclude portions of that production. Defendant claims it can withhold this information because these individuals are "not involved in the litigation." But

we do not know that is the case.  It is very possible and probable that some of these individuals are even class members. All fields included in the EOI forms should be produced, as ordered by the Court.

Defendant makes the hyperbolic assertion that complying with the Court's order and producing the EOI information would provide "unfettered access to personal information of these over 500,000 individuals."  Incorrect.  Far from unfettered, Plaintiffs would only be provided with the limited personal information that Defendant has at its disposal with regards to these individuals.  Moreover Defendant raised this objection with the Court at the May 14, 2025 and the Court overruled the objection ordering the production of this information.  Plaintiffs have explained why this information is relevant, and have further agreed that Defendant can produce it under the standing protective order in this matter so that the information will be kept confidential.

Defendant next claim that because Plaintiffs have not specifically requested certain portions of the EOI forms, Defendant are entitled to exclude those portions.  But that is not how production of documents work.  The entire document has been ordered produced.  Defendant then claims that Plaintiffs have only "exclusively" asked for the demographics on those forms and therefore its all they are entitled to.  This too is incorrect.  As an initial matter, the passage Defendant references in the May 14, 2025 transcript makes clear that demographics were examples of the datapoints in the EOI forms. *See* **Exhibit 3**, p. 17:3-4 ("*For example*, as counsel had acknowledged, race and gender demographics"). (emphasis added).  Defendant did not request and was not given permission to simply withhold information.  Finally, as Defendant is aware, Plaintiffs are unable to fully utilize the demographic information produced because they have no way to track those individuals to see who applied and became EMS or Fire First responders along *with* their corresponding demographics.

**Defendant's Position**: Expression of interest ("EOI") forms are forms that members of the public can fill out at FDNY recruiting events to indicate interest in learning more about becoming a Firefighter, EMT, or Paramedic.  The form asks for identifying information (*e.g.*, name, date of birth, SSN, license number), contact information (*e.g.*, mailing address, email address, telephone number), and demographic information (*e.g.*, race and gender).

On April 29, 2025, Plaintiffs moved to compel the production of a dataset reflecting all EOI records that the City maintains.  *See* Dkt. No. 208 at 7-8.  Plaintiffs argued that "this information is relevant" because "[t]he EOIs will show that when women and non-white candidates expressed an interest in becoming a firefighter they were told to also fill out an EOI for EMS and told that they should start working in EMS with promises that they would be "promoted" to Fire at some point."  *See id.* at 3 n. 3.  Plaintiffs did not argue that they needed any of the personal identifying information from the EOI forms.

During the May 14, 2025 hearing on Plaintiffs' motion, when asked why they needed access to the EOI data, Plaintiffs again focused exclusively on *demographic* information, and not personal identifying information contained in the forms: "…we're going to show that those expression of

interests where you're going to see, I think, that women and people of color have both of [the EMS and Firefighter] boxes checked. . . It's going to corroborate . . . defendant was steering women and people of color to the EMS side which is an important and relevant topic for our segregated, occupational segregation." *See* City Ex. 3, May 14, 2025 Transcript at 15:16-16:8. The Court and Plaintiffs' counsel then had the following exchange:

> THE COURT: Okay, so if we have 100 percent
> white males check Fire and 100 percent black and females
> check both, you think that would be indicative, that
> would back up your affiants.
> MS. KURLAND: It would.

*Id*. at 17:8-12.[2]

On June 20, 2025, the City produced a dataset reflecting EOI records that the City maintains. *See* LOCAL 2507-DEF-0036336. This dataset includes 536,126 individual records of individuals who completed EOI forms expressing their interest in learning more about how to apply to become Firefighters and/or EMS (*i.e.*, EMTs or Paramedics). This dataset includes the following fields: PanelistID (a unique identifier for each record); Date Entered; Gender; Ethnicity; Interest in Firefighter (*e.g.*, "Very Interested"); Interest in EMS (*e.g.*, "Very Interested"). The City provided a corresponding data dictionary for these datasets on June 20, 2025. As the City explained to Plaintiffs, it is withholding personal identifying information (*e.g.*, names, addresses, contact information) about the individuals who completed EOI forms. Most of the individuals who complete EOI forms are not City employees—they are members of the general public. Plaintiffs provide no compelling reason why they require unfettered access to the personal information of these over 500,000 individuals. The data that the City produced includes demographic information as well as information as to which role(s) individuals indicated interest in.

In Plaintiffs' April 29, 2025 motion to compel and during the May 14, 2025 hearing, Plaintiffs claimed that they needed this data to identify individuals with certain demographic backgrounds who indicated interest in learning more about becoming both Firefighters and EMS. That information is in the produced dataset. There is no way that Plaintiffs would be able to tell from a dataset whether certain individuals "were told that they should start working in EMS with promises that they would be 'promoted' to Fire at some point." *See* Dkt. No. 208 at 3 n. 3. For that information, Plaintiffs' counsel can either speak with their own clients, the EMS members who would have supposedly received that alleged guidance, or question the 30(b)(6) witness that the City has already agreed to produce on "The FDNY's solicitation of interests in applying for the titles of EMT, Paramedic, and Firefighter (including tabling events), as well as any steps

---

[2] Plaintiffs repeatedly claim, without support, that the Court "overruled" the City's objections to producing the personal identifying information for over 500,000 members of the public who completed EOI forms. The Court did no such thing, and Plaintiffs do not cite to record evidence of the Court "overruling" the City because none exists.

FDNY takes to encourage individuals who express interest in applying for the titles of EMT, Paramedic, and/or Firefighter to apply for those titles."

Accordingly, the City has produced all responsive documents located following a good-faith reasonable search and is not withholding any responsive documents.

### 3. Information Regarding Creation of the Promotional Process from EMS to Fire

**Plaintiffs' Position**: As Ordered by the Court, Defendant produced on June 7, 2025 a letter detailing certain steps that were taken to identify the application completed to allow EMS First Responders to apply to the position of Firefighter, as testified to by Defendant's 30(b)(6) witness (Document Request No. 22 of Plaintiffs' 4th RFP).  See **Exhibit B**.  It is clear from this letter, the only search conducted was by individuals in DCAS which is of little to no value.  Defendant catalogues in detail the many steps to search DCAS files it has undertaken.  But importantly, no search was completed within the FDNY which, as Defendant's own 30(b)(6) witness explains, is the only agency that would have this information.  Plaintiffs asked Defendant to conduct an additional search of FDNY records, but Defendant refused, stating that it had met its obligations under Your Honor's Order of May 14, 2025.

Defendant is correct that it would know best what files to search to retrieve this information. And Defendant's representation that DCAS is the correct agency is disproven by its 30(b)(6) witness. As Robert Alexander, the 30(b)(6) witness produced on this topic testified, the process to allow EMS to promote to Fire is done exclusively within the FDNY.  *See* **Exhibit C**, p. 115:19-116:11. ("Q: …you're also saying… that a user agency can decide on its own that it wants to link up two titles to the same career path and allow one title to promote to the other title, is that correct? A: On an exam by exam basis, that's correct. Q: Do[es the FDNY] have to give you a proposal or an explanation for why they think those titles are related enough such that one can promote to the other? A: They do not.").  As such, we ask that Your Honor direct Defendant to undergo a search of FDNY's records for the requested information and either produce that information or a letter detailing its search if no records are located.  Plaintiffs reserve their right to request an ESI search for this information.

Defendant, claims Plaintiffs "intentionally omitted a full question and response from the middle of Mr. Alexander's testimony" and that Plaintiffs offer only "cherry-picked" testimony.  But, as an initial matter, Plaintiffs have produced the entire exchange, and nothing in the additional testimony changes the reality that this information is maintained at the FDNY.  Defendant in essence admits this by now agreeing as a result of this letter to make a search for this information at FDNY.[3]

---

[3] This speaks to a greater challenge with Defendant's across-the-board unwillingness to disclose any details regarding its search efforts.  Plaintiffs had to seek Court intervention to require the letter explaining Defendant's search efforts.  Defendant now only corrects those search efforts because of this joint letter in anticipation of additional Court intervention.

**Defendant's Position**:  The City conducted an appropriate and diligent search, as DCAS is the agency responsible for administering the examination process as well as the process by which a civil service title becomes eligible for promotion to another civil service title and therefore is the agency that would be in the possession, custody or control of responsive documents.

Accordingly, and as the City explained in its June 7, 2025 letter to Plaintiffs, the City took the following steps to search for documents responsive to Request for Production No. 22 in Plaintiffs' Fourth Combined Set of Interrogatories and Request for Production of Documents.

To locate documents responsive to Request for Production No. 22, Robert Alexander (Assistant Commissioner for Bureau of Examinations) searched his email box, local electronic files, and shared electronic files where Mr. Alexander reasonably believed responsive documents might be located. Mr. Alexander located the 1998 Notice of Examination produced by the City on February 20, 2025 at LOCAL 2507-DEF-0031508-31511.  Phoebe Fong (Director of Exam Development Group), William Lotti (Deputy Director of Exam Development Group), and Rene Pryor (Deputy Director of Exam Development Group) also conducted searches of their email inboxes, local electronic files, and shared electronic files where they reasonably believed responsive documents might be located. Following the conclusion of their search, Mrs. Fong, Mr. Lotti, and Mrs. Pryor confirmed they could not locate documents responsive to this Request. Mr. Alexander, Mrs. Fong, Mr. Lotti, and Mrs. Pryor collectively spent approximately seven hours looking through these locations for responsive documents.

In the deposition excerpt cited in Plaintiffs' position above, Plaintiffs intentionally omitted a full question and response from the middle of Mr. Alexander's testimony.  During his testimony, after Mr. Alexander responded that the user agency can decide on promotional decisions, Plaintiffs' counsel asked: "Q. When you say exam by exam basis, does that mean that the agency ***has to tell you each time***, okay, we'd like to link these two titles up again?"  Mr. Alexander responds: "That's correct."  *See* City Ex. 4, at 116:3-6 (emphasis added).  Mr. Alexander's testimony is consistent with DCAS's involvement in the process.  Moreover, the squib of cherry-picked, incomplete testimony that Plaintiffs included does not change the undisputed fact that it is DCAS, and not FDNY, that administers the examination process and the process by which a civil service title is included as eligible for promotion through the examination process, and thus is the agency that would have relevant documents, if any.  Accordingly, the City had several individuals in relevant roles at the relevant agency conduct a diligent search for documents.  That Plaintiffs are not satisfied with the result of the City's search does not make it deficient.

Nonetheless, in an attempt to resolve this discovery dispute, FDNY will conduct a search for documents responsive to this Request and agrees to provide an update within 14 days.

### 4.  Demographic and Pay Data

 **Plaintiffs' Position**: Defendant was ordered to produce Demographic and Pay Data requested by Plaintiffs from 1996 to present.  [ECF No. 213].  Defendant did in fact make a production of

Demographic and Pay Data.  However, there are issues that remain regarding this production. For example, does ***LOCAL 2507-DEF-0036347-36374*** replace ***Demographic Data - LOCAL 2507-DEF0034248_CONFIDENTIAL MATERIALS Earnings Data - LOCAL 2507-DEF-0034249_CONFIDENTIAL MATERIALS - LOCAL 2507 DEF-0034256_CONFIDENTIAL MATERIALS Leave Data - LOCAL 2507-DEF-0034257_CONFIDENTIAL MATERIALS - LOCAL 2507-DEF-0034258_CONFIDENTIAL MATERIALS***.  Also it seems that ***DEF00003380Demographic12062022*** is missing from production.  There are also questions regarding how the leave data should be associated with the pay data and how pay data can be determined.

Plaintiffs requested that Defendant make available the custodian of this information to meet and confer and resolve these issues.  However, on June 12, 2025 Defendant advised that it wished to proceed with resolving these issues through a formal deposition.  On June 23, 2025 Plaintiffs' served Defendant with a 30(b)(6) Notice requesting the deposition of a witness to answer questions related to this production.  *See* **Exhibit D**.  Since the initial draft of this letter, Defendant has now agreed to produce a 30(b)(6) witness on this topic, but has neglected despite numerous requests to provide dates or names of witnesses.  Plaintiffs ask that Defendant be directed by an expedited date certain to provide this information. Of concern, Defendant now seems to equivocate on this as well, citing a July 14, 2025 email exchange that is inapplicable. Defendant offers circular reasoning to argue it need not produce the 30(b)(6) witness expediently, complaining that this will result in having to produce its witness twice.  But, as long as Defendant makes a complete production of ordered discovery this would not be the case.  The issue here is that Defendant has refused to answer simple questions about this data and insisted that these questions be answered through a 30(b)(6) witness.  Plaintiffs offered to resolve this issue without the need for any witness depositions.  To the extent Defendant is claiming this creates a burden, that burden has been created by Defendant.  Defendant can't now complain Defendant is agreeing with the process insisted to by Defendant.  Lastly, Plaintiffs don't disagree with Defendant's position that the production should be complete first before the 30(b)(6) witness is produced to answer questions.  As such, Plaintiffs respectfully ask that Defendant be directed to produce the identified missing information by a set expedited deadline and that the deposition be scheduled thereafter also by a set expedited date, so that any remaining issues can be properly addressed with the Court.

**Defendant's Position:** On June 20, 2025, the City produced the requested demographic and pay data.  *See* LOCAL 2507-DEF-0036347-36374.  In the cover letter for that production, the City explicitly stated: "This data goes back to 1996 and supersedes the versions of the datasets produced on February 28, 2025."  The same day, the City provided a data dictionary for the produced datasets.  The production is complete and data is not missing.

The parties agreed that any outstanding questions Plaintiffs have concerning the produced datasets would be addressed through on the record deposition testimony.   On June 23, 2025, Plaintiffs served the City with a notice pursuant to FRCP 30(b)(6).  The City replied on July 9,

2025, and agreed to produce a witness to testify about the produced demographic and pay datasets.  Accordingly, no Court intervention is necessary as to these datasets.

Plaintiffs' position above concerning depositions related to this topic is inconsistent with the course of events, as on July 14, 2025, Plaintiffs proposed that the parties "reschedule [all noticed depositions], but to hold off until the Court rules on the schedule after which [the parties] can confer and set dates[.]"  *See* City Ex. 1.  The City accepted Plaintiffs' proposal and will meet and confer with Plaintiffs to schedule both parties' depositions once the Court rules on the broader discovery schedule, as Plaintiffs proposed.   *See id*.  The City should not be required to undertake this process more than once—particularly where it requires employees with full-time jobs to plan for time away from their work responsibilities—based on Plaintiffs' demand, inconsistent with an email they sent the City only days ago, concerning depositions.

As the City noted in an email to Plaintiffs on July 14 regarding the 30(b)(6) depositions, the City wishes to proceed efficiently.  *See* City Ex. 2.  Plaintiffs' position concerning depositions is also inefficient and unduly burdensome.  First, for the reasons discussed above, there are no deficiencies in the City's production and the Court should therefore not "set an expedited deadline" for additional production—but certainly while Plaintiffs are claiming this, the City should not be required to produce City employees for depositions concerning datasets that Plaintiffs claim should change or be supplemented.  Second, Plaintiffs' position ignores completely that document discovery, including ESI, is currently outstanding (including from Plaintiffs, which is an active dispute before the Court).  It also makes no sense for Plaintiffs to arbitrarily request that the Court "set expedited dates" for depositions to take place, only for Plaintiffs to likely later claim they want to recall witnesses if additional documents are produced by either side for which Plaintiffs seek to questions such witnesses.  *See id.*  To the extent the Court considers Plaintiffs' position, Plaintiffs should be required to agree that they will not seek subsequent depositions of the individuals the City produces concerning the datasets prior to resolution of these issues and completion of document discovery.  *See id.*  If Plaintiffs will not agree to this, the Court should deny the request.

### 5.  CAD Data

**Plaintiffs' Position**: Parties are at impasse on their dispute regarding outstanding information in the CAD data requested by Plaintiffs.  Plaintiffs assert there are several data points that are missing from Defendant's production.  Defendant insists it has produced all requested information.

Most important to Plaintiffs is that Defendant has not produced the alarm and codes for the CAD data that identify the severity of the calls as well as information like whether a call is a working fire, or a major emergency.[4]  *See* **Exhibit E**.  Removing this information from the CAD data

---

[4] For example, a 1060 code means the call is a major emergency, a 1075 code means all assigned units must respond. There are also alarms assigned to the severity of a fire.

masks whether the calls are high risk or low risk.  For example, as Defendant's 30(b)(6) witness explains a "structural fire" could be a serious five alarm fire of an entire building or a small fire in a frying pan on someone's stove.  *See* **Exhibit F**.  Without the alarm and code information Plaintiffs' experts have no way of assessing the severity and therefore risk or hazard associated with the work.  While Defendant has provided a field that purports to list "HIGHEST_ALARM_LEVEL" in some of the Fire data, this is missing altogether in the EMS data and does not include the codes that provide more detail regarding the emergency.  Excluding alarm and code information stops Plaintiffs from determining whether the Fire calls that EMS are responding to are the high risk calls or not.  This information is maintained by the FDNY and must be produced.  Defendant's counsel claims that "code" information is not necessary to determine severity, but this is something Defendant's witness under oath needs to explain.  Moreover, Defendant simply ignores that no information regarding severity, even the "HIGHEST_ALARM_LEVEL" Defendant references is provided for EMS CAD data.

Also importantly Plaintiffs have not gotten a response to its request for the period from 2005 to present what is the annual number of 911 calls that EMS and Fire were both ultimately dispatched to.

In addition, the joined CAD data the Defendant was ordered to produce has only been produced from 2017 to 2022.  It should be updated to reflect 2005 to present.

In addition to the above, Plaintiffs have requested:

•  Total number of incidents in which Fire First Responders provided medical care regardless of whether the call was coded as a medical call (again CFR-D has been provided but nothing else)
•  Total number of fire incidents EMS First Responders responded to
•  Total Number of calls that EMS and Fire First Responders both responded to
•  Total number of calls Fire First Responders responded to without EMS First Responders
•  A breakdown of calls Fire and EMS First Responders responded to by fire code (such as 2 alarm fire, explosion, etc.).
•  Total number of emergency incidents FDNY First Responders were dispatched to, whether EMS or Fire;
•  Total number of emergency incidents that came through Fire dispatch which FDNY First Responders were dispatched to, with a breakdown by fire code (such as 2 alarm fire, explosion, etc.), total number of CFRD dispatches, and which emergency incidents resulted in an EMS matrix activation in which EMS First Responders were dispatched whether initially or at a later point in the response, as well as which ones were designated as major emergency responses;
•  Total number of emergency incidents that came through EMS dispatch, which FDNY First Responders were dispatched to, with a breakdown of the EMS Segments 1-9, and which ones resulted in a Fire matrix activation in which Fire First Responders were dispatched whether initially or at a later point in the response, as well as which ones were deemed major emergency responses;

11

• Total number of non-CFRD emergency incidents that came through Fire dispatch in which Fire First Responders completed a PCR reflecting that a Fire First Responder performed medical care.

Plaintiffs requested that Defendant make available the custodian of this information to meet and confer and resolve these issues. However, on June 12, 2025 Defendant advised that it wished to proceed with resolving these issues through a formal deposition. On June 23, 2025 Plaintiffs' served Defendant with a 30(b)(6) Notice requesting the deposition of a witness to answer questions related to this production. *See* **Exhibit D**. Since the initial draft of this letter, Defendant has now agreed to produce a 30(b)(6) witness on this topic, but has neglected despite numerous requests to provide dates or names of witnesses. Plaintiffs ask that Defendant be directed by an expedited date certain to provide this information. Of concern, Defendant now seems to equivocate on this as well, citing a July 14, 2025 email exchange that is inapplicable. Defendant offers circular reasoning to argue it need not produce the 30(b)(6) witness expediently, complaining that this will result in having to produce its witness twice. But, as long as Defendant makes a complete production of ordered discovery this would not be the case. The issue here is that Defendant has refused to answer simple questions about this data and insisted that these questions be answered through a 30(b)(6) witness. Plaintiffs offered to resolve this issue without the need for any witness depositions. To the extent Defendant is claiming this creates a burden, that burden has been created by Defendant. Defendant can't now complain Defendant is agreeing with the process insisted to by Defendant. Lastly, Plaintiffs don't disagree with Defendant's position that the production should be complete first before the 30(b)(6) witness is produced to answer questions. As such, Plaintiffs respectfully ask that Defendant be directed to produce the identified missing information by a set expedited deadline and that the deposition be scheduled thereafter also by a set expedited date, so that any remaining issues can be properly addressed with the Court.

**Defendant's Position**: The City has not "mask[ed]" or "exclude[ed]" anything from its production, and it has explained this several times to Plaintiffs. The City has produced an immense amount of CAD data. The City previously produced CAD data from 2005 until the present. *See* LOCAL 2507-DEF-0005403-5409; LOCAL 2507-DEF-008024; LOCAL 2507-DEF-0017477-17488; LOCAL 2507-DEF-0005507-5512; LOCAL 2507-DEF-0008026; LOCAL 2507-DEF-0017489-17501; EMS_Joined_Data_2005-EMS_Joined_Data_2022; Fire_Joined_Data_2005-Fire_Joined_Data_2022. On June 20, 2025, the City produced the same information for 1996-2004. *See* LOCAL 2507-DEF-0036338-36346. The City produced data dictionaries corresponding to this data. *See* LOCAL 2507-DEF-0008025; LOCAL 2507-DEF-0008027. The City also provided detailed interrogatory answers to Plaintiffs' questions about the CAD data on October 30, 2023.

The City has worked diligently and exhaustively to provide Plaintiffs with the data that they request. Contrary to Plaintiffs' claims, the produced data includes information as to the severity of an incident, using the categories that the City uses to categorize severity in CAD data. For

example, the Fire CAD data includes columns for "HIGHEST_ALARM_LEVEL" (*e.g.*, First Alarm, All Hands Working). The EMS CAD data includes columns for "FINAL_CALL_TYPE" (*e.g.*, Drug, Injury, Shot) and "FINAL_SEVERITY." Plaintiffs focus on "10-codes," but the 10-code system is not used to reflect the severity of CAD incidents or categorize CAD incidents. 10-codes are radio calls that happen during an incident. Each incident has several 10-codes depending on the initial call, who is dispatched to the incident, assessments once resources arrive at the incident, how the incident develops, and the outcome of the incident.

To address Plaintiffs' questions about the CAD dataset, the parties agreed that Plaintiffs would share their questions in written format. The parties agreed that the City would answer the questions where possible and would otherwise identify where the City believed the question would be more appropriately addressed through deposition testimony. On May 30, 2025, the City responded to Plaintiffs' letter. On June 23, 2025, Plaintiffs served the City with a notice pursuant to FRCP 30(b)(6). The City replied on July 9, 2025, and agreed to produce a witness to testify about the produced CAD datasets. Plaintiffs repeat here many of the same purported deficiencies that they outlined in writing and to which the City responded on May 30, 2025. The City has already agreed to produce a witness to answer those questions, to the extent Plaintiffs are not satisfied with the City's written answers. Accordingly, no Court intervention is necessary as to CAD data.

Plaintiffs' position above concerning depositions related to this topic is inconsistent with the course of events, as on July 14, 2025, Plaintiffs proposed that the parties "reschedule [all noticed depositions], but to hold off until the Court rules on the schedule after which [the parties] can confer and set dates[.]" *See* City Ex. 1. The City accepted Plaintiffs' proposal and will meet and confer with Plaintiffs to schedule both parties' depositions once the Court rules on the broader discovery schedule, as Plaintiffs proposed. *See id*. The City should not be required to undertake this process more than once—particularly where it requires employees with full-time jobs to plan for time away from their work responsibilities—based on Plaintiffs' demand, inconsistent with an email they sent the City only days ago, concerning depositions.

As the City noted in an email to Plaintiffs on July 14 regarding the 30(b)(6) depositions, the City wishes to proceed efficiently. *See* City Ex. 2. Plaintiffs' position concerning depositions is also inefficient and unduly burdensome. First, for the reasons discussed above, there are no deficiencies in the City's production and the Court should therefore not "set an expedited deadline" for additional production—but certainly while Plaintiffs are claiming this, the City should not be required to produce City employees for depositions concerning datasets that Plaintiffs claim should change or be supplemented. Second, Plaintiffs' position ignores completely that document discovery, including ESI, is currently outstanding (including from Plaintiffs, which is an active dispute before the Court). It also makes no sense for Plaintiffs to arbitrarily request that the Court "set expedited dates" for depositions to take place, only for Plaintiffs to likely later claim they want to recall witnesses if additional documents are produced by either side for which Plaintiffs seek to question such witnesses. *See id.* To the extent the

Court considers Plaintiffs' position, Plaintiffs should be required to agree that they will not seek subsequent depositions of the individuals the City produces concerning the datasets prior to resolution of these issues and completion of document discovery. *See id.* If Plaintiffs will not agree to this, the Court should deny the request.

### 6. Injury/Illness/Workplace Violence Data

**Plaintiffs' Position**: Defendant refuses to resolve outstanding issues with the datasets it has produced entitled "Injury with Body Parts" for EMS and Fire First Responders, which Defendant purports accurately reflect the injuries and illnesses sustained by FDNY First Responders in the line of duty.

For example, Defendant refuses to explain why there are multiple entries for the same injuries with different incident IDs, when it represents that each incident ID represents a different injury. *See* ECF No. 228-1. Defendant also promised to produce data that would allow Plaintiffs' expert to determine frequency of incidents, and severity measured in leave time for incidents. However, Defendant will not confirm whether that information has been produced or how that information should be utilized.

Defendant has also produced SH-900.1 forms in an unusable format. While this information is maintained electronically, Defendant has insisted on producing it in non-searchable PDF form that do not delineate which injuries are attributed to EMS or Fire First Responders.

Defendant has also refued to produce information requested in Doc. Req. No. 1(e) of Plaintiffs' 12.10.24 RFP:

"Total number of injuries, illnesses, and fatalities of Fire and EMS First Responders along with the amount of leave and/or hospitalization and/or emergency room visits taken for such injuries or illnesses and whether it resulted in a short or long term disability, or required a transfer or modification of work duties."

There are other questions that remain unanswered which Plaintiffs have attempted to get answered from Defendant such as if the "start date" and "end date" identified in the data are the days out based on injury/illness or something else.

Plaintiffs requested that Defendant make available the custodian of this information to meet and confer and resolve these issues. However, on June 12, 2025 Defendant advised that it wished to proceed with resolving these issues through a formal deposition. On June 23, 2025 Plaintiffs' served Defendant with a 30(b)(6) Notice requesting the deposition of a witness to answer questions related to this production. *See* **Exhibit D**. Since the initial draft of this letter, Defendant has now agreed to produce a 30(b)(6) witness on this topic, but has neglected despite numerous requests to provide dates or names of witnesses. Plaintiffs ask that Defendant be directed by an expedited date certain to provide this information. Of concern, Defendant now seems to equivocate on this as well, citing a July 14, 2025 email exchange that is inapplicable.

Defendant offers circular reasoning to argue it need not produce the 30(b)(6) witness expediently, complaining that this will result in having to produce its witness twice.  But, as long as Defendant makes a complete production of ordered discovery this would not be the case.  The issue here is that Defendant has refused to answer simple questions about this data and insisted that these questions be answered through a 30(b)(6) witness.   Plaintiffs offered to resolve this issue without the need for any witness depositions.  To the extent Defendant is claiming this creates a burden, that burden has been created by Defendant.  Defendant can't now complain Defendant is agreeing with the process insisted to by Defendant.  Lastly, Plaintiffs don't disagree with Defendant's position that the production should be complete first before the 30(b)(6) witness is produced to answer questions.  As such, Plaintiffs respectfully ask that Defendant be directed to produce the identified missing information by a set expedited deadline and that the deposition be scheduled thereafter also by a set expedited date, so that any remaining issues can be properly addressed with the Court.

**Defendant's Position**: The City has not "refused" to resolve anything.  Plaintiffs believe there are "duplicates" in the produced "Injury with Body Parts" dataset that reflects line of duty injuries to EMS First Responders and Fire First Responders.  Plaintiffs take the unsupported position that instances of the same member being injured weeks apart are examples of "duplicates" or "redundancies."  This is based on Plaintiffs' own submission to the Court, on July 1, 2025, an Excel titled "Multiple Entries of Same Injury" which included instances where, for example, a member suffered a muscular strain on May 22, 2023 in one location and another muscle strain on June 13, 2023 in a different location, and Plaintiffs claim this is somehow evidence that the same injury was counted twice and therefore the dataset is not accurate.  The City fundamentally disagrees with the way Plaintiffs define these "duplicates."  EMS and Fire First Responders can sustain injuries multiple times during the same month, the same week, the same day, even the same hour.  This is not evidence that the produced datasets are inaccurate, but in any event, the City has produced its data in the form it is maintained and therefore there is nothing to "resolve."

The City is confused by Plaintiffs' claim as to data reflecting the frequency and severity of injuries.  The parties worked collaboratively to arrive at the best way to produce the data to Plaintiffs, and the City produced the agreed-upon data on May 20, 2025.  *See* LOCAL 2507-DEF-0036127-36131.  The City provided corresponding data dictionaries on June 20, 2025.  As the parties have discussed, to the extent Plaintiffs have any questions about these datasets, the City has agreed to produce a 30(b)(6) witness on those topics.

The City does not know what Plaintiffs mean when they refer to produced SH-900.1 ("Summary of Work Related Injuries and Illnesses") forms as "unusable."  The City produced the SH-900.1 forms in the format the City maintains them in and there is nothing "unusable" about them.  The City attaches just one example of the thousands of SH-900.1 forms produced in this case, which is clearly not "unusable."  *See e.g.*, City Ex. 5, Sample SH-900.1 Form.  The City has not "insisted" on producing the SH-900.1 forms in a format that "do[es] not delineate which injuries

are attributed to EMS or Fire First Responders." That is simply what the SH-900.1 form looks like pursuant to the New York State law that requires the City to maintain these forms. The SH-900.1 form template, which is publicly available and readily searchable online, confirms this fact.

Lastly, the City has not "refused" to produce information responsive to Document Request No. 1(e) from Plaintiffs' December 10, 2024 discovery requests. The City has produced data showing injuries, illnesses, biological and non-biological exposures, and instances of workplace violence. The Injuries with Body Parts dataset has a column for hospitalization, and the City produced a dataset showing which injuries resulted in leave. Plaintiffs provide no explanation as to why these produced documents are deficient, and their assertion that the City has not produced anything responsive is demonstrably false.

Accordingly, the City has produced all responsive documents located following a good-faith reasonable search and is not withholding any documents, and no Court intervention is necessary as to this data.

Plaintiffs' position above concerning depositions related to this topic is inconsistent with the course of events, as on July 14, 2025, Plaintiffs proposed that the parties "reschedule [all noticed depositions], but to hold off until the Court rules on the schedule after which [the parties] can confer and set dates[.]" *See* City Ex. 1. The City accepted Plaintiffs' proposal and will meet and confer with Plaintiffs to schedule both parties' depositions once the Court rules on the broader discovery schedule, as Plaintiffs proposed. *See id*. The City should not be required to undertake this process more than once—particularly where it requires employees with full-time jobs to plan for time away from their work responsibilities—based on Plaintiffs' demand, inconsistent with an email they sent the City only days ago, concerning depositions.

As the City noted in an email to Plaintiffs on July 14 regarding the 30(b)(6) depositions, the City wishes to proceed efficiently. *See* City Ex. 2. Plaintiffs' position concerning depositions is also inefficient and unduly burdensome. First, for the reasons discussed above, there are no deficiencies in the City's production and the Court should therefore not "set an expedited deadline" for additional production—but certainly while Plaintiffs are claiming this, the City should not be required to produce City employees for depositions concerning datasets that Plaintiffs claim should change or be supplemented. Second, Plaintiffs' position ignores completely that document discovery, including ESI, is currently outstanding (including from Plaintiffs, which is an active dispute before the Court). It also makes no sense for Plaintiffs to arbitrarily request that the Court "set expedited dates" for depositions to take place, only for Plaintiffs to likely later claim they want to recall witnesses if additional documents are produced by either side for which Plaintiffs seek to question such witnesses. *See id.* To the extent the Court considers Plaintiffs' position, Plaintiffs should be required to agree that they will not seek subsequent depositions of the individuals the City produces concerning the datasets prior to

resolution of these issues and completion of document discovery. *See id.* If Plaintiffs will not agree to this, the Court should deny the request.

### 7. ESI Search Terms

**Plaintiffs' Position**: Defendant has flatly refused to cooperate with Plaintiffs to determine appropriate search terms for 7 discrete document requests, despite this Court's Order of May 14, 2025 to do so. *See* ECF No. 213 at pp. 79-81. Defendant has refused to accept any modifications to its proposed search terms since the Court's ruling, refused to work cooperatively to properly focus searches to find relevant documents responsive to Plaintiffs requests and has purposefully frustrated Plaintiffs' efforts to secure relevant discovery by insisting on overly general search terms with custodians for the wrong period of time that would result in a 'data dump' of over 140,000 mostly unresponsive documents.

Shockingly for the first time on the afternoon of July 18, 2025 Defendant disclosed that has no run a search and begun reviewing data based on search terms that have not been agreed to by parties.[5] This despite Plaintiffs having made clear in April it did not agree to the search terms and ignoring this Court's Order of May 14, 2025 to meet and confer on this issue to resolve disputes. Defendant is intent on its continued efforts to create unfair surprise by over litigating in a chaotic and bad faith approach to discovery.

Plaintiffs are confounded by Defendant's refusal to work collaboratively with Plaintiffs or accept Plaintiffs' request to narrow its search terms to reduce Defendant's obligations and avoid unnecessary work that will only result in overwhelmingly irrelevant and unresponsive documents. This not only stops Plaintiffs from getting relevant documents, it wastes all parties' resources.

Because Defendant astonishingly represents it has acted in good faith, and further alleges that Plaintiffs have "blatantly misrepresents ESI discussions between the parties" it is necessary to recount the procedural history regarding this issue. This history reveals a very different reality.

On January 15, 2025 in parties' meet and confer Plaintiffs proposed that Defendant perform ESI searches for 7 topics they believed would be most effectively produced by running search terms in relevant datasets and emails of custodians. Defendant agreed and offered to propose search terms and custodians for parties to confer on to that end. On February 25, 2025 Defendant made its first proposal for search terms and custodians. *See* **Exhibit G**. On March 7, 2025 Plaintiffs responding to this proposal with proposed edits and asked Defendant to provide a hit count on this new proposal after which parties would "further discuss the appropriate limitations if necessary." *See* **Exhibit H**. On April 1, 2025 Defendant provided adjusted search terms and

---

[5] Defendant denies it began its review of documents on July 18, 2025 because it advised on June 25, 2025 that it "intended" to start reviewing documents. This makes no sense. Nor does Defendant's claim that "[g[enerally" parties have no obligations to meet and confer to reach agreement on search terms for ESI searches. Plaintiffs disagree and, in any event, in the *instant* matter Your Honor expressly ordered Defendant to do so. It has ignored this order.

custodians.  *See* **Exhibit I**.  On April 14, 2025 Plaintiffs responded explaining why these terms still needed adjusting, provided suggestions and requested that Defendant provide an updated hit count for parties to confer on.  *See* **Exhibit J**.  Instead, Defendant shut down all efforts to confer or agree to ESI production and at parties April 24, 2025 meet and confer, advised parties had met impasse and that parties should hold off on any discussions on ESI until the Court ruled on the upcoming application to the Court on this issue.

On April 29, 2025 parties submitted a joint letter addressing this and other issues.  *See* ECF No. 208.  In this letter, Defendant shockingly represented that Plaintiffs had accepted Defendant's February 25, 2025 ESI proposal and no further discussions or Court intervention was necessary. *Id* at p. 24. Plaintiffs obviously disagreed and the Court rejected Defendant's position, ordering that parties meet and confer to see if they could reach agreement on ESI search terms. *See* ECF No. 213 at pp. 79-81.

On May 14, 2025 the undersigned emailed Defendant's counsel with follow up inquiries regarding its ESI search proposal and asked Defendant to provide a hit count for the proposal provided on April 14, 2025 so that further adjustments could be made.  Defendant ignored this request.  On May 16, 2025 Plaintiffs again followed up with a request for hit counts.  Defendant again ignored this request.  On May 23, 2025 parties met and conferred on this topic and Defendant agreed to provide in writing a hit count by May 30, 2025 for Plaintiffs' April 14, 2025 proposal.  *See* **Exhibit K**.  Defendant failed to provide this information on May 30, 2025 and instead provided an email that gave only summaries of hit counts for an aggregate of search terms.  These aggregates did not allow Plaintiffs to make proposals to adjust the search terms, but showed that the amount of documents responsive to Defendant's intended production would be in the hundreds of thousands.  This is objectively a disproportionate response to 7 topics that are very small in temporal and/or substantive scope.  On June 3, 2025 Plaintiffs responded explaining again that it needed the hit count to be able to properly adjust the search terms and make recommendations on how to better focus the intended search.  *See* **Exhibit L**.  Defendant again ignored this request.  On June 6, 2025 parties met and confer on this topic and Defendant again promised to provide by June 13, 2025 a hit count on the ESI search terms and updated custodians.  *See* **Exhibit M**.  Instead, on June 13, 2025 Defendant responded with a letter again withholding hit counts and stating in essence that it intended to simply produce documents without agreeing to search terms or who the appropriate custodians should be.  *See* **Exhibit N**. On June 17, 2025 Plaintiffs again requested the hit count for the proposed ESI search terms, and explained they could not agree to the production Defendant proposed in its June 13, 2025 letter for several reasons including that the custodians and search terms would not produce relevant information.  Defendant responded that it was reviewing the request and would get back.  It did not.  On June 18, 2025 Plaintiffs again requested this information so that it could make a proposal on how to properly tailor search terms and custodians for a targeted production. Defendant again ignored this request and on June 25, 2025 advised Plaintiffs it did not think it needed to provide a hit count.  Plaintiffs explained the hit count was imperative to try to focus in

to produce a usable document production.  On June 25, 2025, and again on June 26, 2025 Plaintiffs made multiple request again for a hit count for the April 14, 2023 proposal.  Not until June 30, 2025 did Defendant finally produce this hit count which showed that the search as formulated would result in over 140,000 documents.  It also confirmed the search it intended included custodians for the incorrect periods of time.  On July 11, 2025 parties met and conferred on this issue and on the same day Plaintiffs provided an adjusted ESI search proposal with the hopes that it would reduce the volume of documents responsive and focus in on the relevant topics.  *See* **Exhibit O**.  Plaintiffs requested that Defendant provide an updated hit count using this proposal in hopes it would resolve this issue without the need for Court involvement.  On July 14, 2025 Defendant responded that it refused to provide hit counts, claiming that it had spent "exhaustive" efforts to "agree" to search terms for Plaintiffs' 7 discovery requests. Parties have never agreed to search terms or custodians. And, as explained by the procedural background outlined above, while Defendant's efforts have been "exhaustive" this effort has mostly focused on frustrating Plaintiffs efforts.  Plaintiffs simple request for ESI searches for 7 documents have not been "heavily negotiated."  To the contrary, other than a few responses, Defendant has for the most part ignored Plaintiffs requests and refused to provide information necessary to come to agreement on search terms.  In edits to the instant joint letter, Defendant disclosed that as of July 18, 2025, ignoring Plaintiffs having advised them that the search terms were unacceptable and this Court's direction to meet and confer on this topic, and if parties don't reach agreement to come back to the Court, that instead Defendant began running data searches and reviewing data based on search terms that are not agreed to by parties.

Defendant respectfully ask that the Court direct Defendant to produce a hit count for the search terms provided on July 11, 2025 and to provide custodians for the period of time relevant to those search terms.[6]

Plaintiffs further ask that Your Honor direct that Defendant provide the custodians requested in Plaintiffs' April 14, 2025 email so that the search terms can be modified to result in a reasonable document production that does not unnecessarily burden or delay proceedings.

Finally, Plaintiffs ask that Defendant be directed to meet and confer in good faith as necessary to finalize these search terms and custodians.

Undeterred and in an effort to shift blame, Defendant claims Plaintiffs "misunderstand[]" ESI discovery, "blatantly misrepresent[]" ESI discussions and have "abject[ly] refus[ed] to reach reasonable agreements on any aspects of discovery."  It is Defendant who misunderstands or miscasts ESI discovery.  The attached exhibits show that Plaintiffs have never "agreed" and then "back[ed] out" of an agreement on proposed search terms, and instead what this is "illustrative

---

[6] By way of example, Defendant proposes the custodian for information regarding the implementation of Local Law 19 of 2001 is Matthew Campese.  But Mr. Campese was not even employed for the time period relevant, i.e. in and around 2001.  Defendant must identify the appropriate custodians or disclose the datasets that Defendant will be searching in to locate this information.

of" is Defendant's "abject refusal" to meet and confer.  It simply refuses to do so in good faith.
Moreover, while of course Defendant is reviewing these 140,000 plus documents for relevance,
this is an unnecessarily expansive process that is the basis for Defendant's request to delay this
proceeding by seven months.  Moreover, Defendant can continue in bad faith by producing
documents that it claims are relevant but in fact are not.  Properly modifying search terms avoids
the potential of such data dumps and the need to address the issue with the Court at a later time.
Defendant flatly ignores the express direction of this Court to meet and confer properly with
Plaintiffs on this issue, ignoring Plaintiffs multiple requests outlined above.

**Defendant's Position**: Plaintiffs' position is premised on a fundamental misunderstanding of ESI
discovery and blatantly misrepresents ESI discussions between the parties, including in their
characterizations of the exhibits cited by the parties.[7]  It is also illustrative of their abject refusal
to reach reasonable agreements on any aspect of discovery, even where the City has made every
effort to accommodate their increasing and changing demands.

The City is currently conducting an ESI review.[8]  The review set is approximately 140,000
documents.  That review set is based on Plaintiffs' most recently proposed and agreed upon
search terms and temporal scopes, and most of their proposed custodians[9], following months of
exhaustive efforts on the City's part to reach agreement.  In other words, the City has agreed to
an ESI review that includes what Plaintiffs asked the City to review in order to move this
forward.

Plaintiffs have on at least two occasions appeared to agree to the City's search for and review of
ESI only to back out of those agreements and expand their proposed searches.  Even now—
where the City accepted Plaintiffs' most recent requests—Plaintiffs take the paradoxical position
that *the City's review* is somehow overly burdensome because there are too many hits on
Plaintiffs' proposed search terms but continue to also demand vaguely that the City add yet more
custodians (unidentified by Plaintiffs) which will, of course, only increase the number of
documents for review.

The City attempted to negotiate an ESI proposal with Plaintiffs for four months. The City
expended enormous effort identifying ESI custodians (some that Plaintiffs insisted on at various
agencies going back 20-25 years) and expanding their proposed search terms to include
Plaintiffs' proposal.  Each time Plaintiffs altered the requested search terms, custodians, or date
range, the City was compelled to re-collect, re-process, and re-load the new data into the review

---

[7] For example, Plaintiffs assert that the ESI requested is "very small in temporal scope."  Plaintiffs have requested
ESI going back as far as 2000.

[8] Contrary to one of Plaintiffs' numerous misrepresentations in this letter, the City did not "shockingly" disclose this
to Plaintiffs on the afternoon of July 18.  The City informed Plaintiffs on June 25 that it intended to commence its
review.  Plaintiffs did not respond to that disclosure for weeks, and not until after they sent the City a draft of this
joint letter including this "dispute."

[9] The City will not agree to collect ESI from lawyers at the City's Law Department.

platform to then run the new or revised terms—an onerous undertaking that demanded substantial time, effort, and expense.

The City proposed proportional and reasonable search terms at multiple stages and after months of negotiations, accepted Plaintiffs' final responsive ESI proposal as to all of Plaintiffs' additional proposed search terms, which significantly expanded the City's original proposed scope. This is all borne out in the parties' contemporaneous communications memorializing the negotiations. *See* City Ex. 6, the City's February 25, 2025 ESI Proposal; City Ex. 7, Plaintiffs' March 7, 2025 Counter-Proposal; City Ex. 8, the City's April 1, 2025 Counter-Proposal; City Ex. 9, Plaintiffs' April 14, 2025 Counter-Proposal; City Ex. 10, the City's May 30, 2025 Counter-Proposal; City Ex. 11, Plaintiffs' June 3, 2025 Counter-Proposal; City Ex. 12, the City's June 13, 2025 Response to Plaintiffs' Counter-Proposal; City Ex. 13, Plaintiffs' June 17, 2025 Response to the City's June 13, 2025 Counter-Proposal; City Ex. 14, the City's June 25, 2025 Acceptance of Plaintiffs' June 3, 2025 Counter-Proposal; City Ex. 15, Plaintiffs' June 25, 2025 Response to the City's Acceptance of Plaintiffs' June 3, 2025 Counter-Proposal. Plaintiffs' assertion that it was the City—not Plaintiffs—who drove a review population of 140,000 documents—is flatly contradicted on the face of these communications. *See generally,* City Exs. 6 through 15.

Since the City made its first proposal to search for emails on February 25, 2025 in response to certain of Plaintiffs' RFPs, Plaintiffs refused to agree to final search terms and custodians. On several occasions, where it appeared the parties were approaching compromise, Plaintiffs inexplicably revised their proposed search terms, custodians, and subject areas again. Indeed, as recently as June 17, when the City attempted to negotiate a final proposal to accept almost all of Plaintiffs' proposed search terms and custodians, Plaintiffs stated that they could, at any time, enlarge the City's search for ESI to include—not just new custodians and search terms—but even additional subject areas. *See* City Ex. 13. And when the City accepted Plaintiffs' most recent round of search terms on June 25 and stated it would move forward with its review of the hits on these search terms, Plaintiffs insisted on reviewing the hit counts on the search terms "for burden on [Plaintiffs'] end."[10] *See* City Ex. 15. Now they purport to demand that the City re-run new search terms to further prolong an endless cycle of their refusal to reach an agreement.

Because Plaintiffs were unwilling to reach an agreement over many months and the City is cognizant of moving this litigation forward and the need to commence merits depositions with documents, the City provided a final hit report on June 30, 2025 which accepted all of Plaintiffs' final proposed search terms and most of the custodians and notified Plaintiffs that it would move forward with the agreed-upon terms (this is what totaled 140,000 hits). Nearly two and one-half

---

[10] It is unclear how the City's review of documents based on the search terms in Plaintiffs' June 25, 2025 proposal could create any "burden" on *Plaintiffs*. While this has certainly been burdensome for the City—both the exhaustive negotiations with Plaintiffs and the collection and review of ESI, the notion that Plaintiffs have attempted at any point to reduce the City's burden is inaccurate. The City attempted on multiple occasions to raise that certain search terms had unreasonably high hit counts (and disclosed those hit counts). Plaintiffs never agreed to eliminate any such terms. This was yet another example of Plaintiffs' unreasonable approach to these ESI negotiations.

weeks later, Plaintiffs had not responded to the City and thus the City commenced its ESI review as it informed Plaintiffs it would do.[11]  The City anticipates completing its review and making its production by early August.  Contrary to Plaintiffs' suggestion, the City has not "ignore[ed]" any Court order to meet and confer with Plaintiffs' concerning ESI.  The clear record demonstrates that the City attempted to meet and confer with Plaintiffs for months and exhausted those efforts.

Plaintiffs belatedly attempted to re-open ESI negotiations on July 11, 2025, weeks after the City indicated it would proceed with its ESI review.  That should be rejected, and the City should be permitted to finish its review of the hits on the agreed upon terms and custodians, and produce responsive documents, without being forced to renegotiate these already agreed upon conditions. Generally, there is no obligation to wait for agreement on search terms before proceeding with discovery, and much less here where the parties extensively negotiated for four months and came to an agreement and Plaintiffs now want to reopen those negotiations. The City is acting reasonably and in good faith to complete discovery in an efficient and effective manner.

Plaintiffs' refusal to reach a reasonable agreement concerning ESI over the course of months is particularly egregious in light of their current position on the case schedule.  As the City has addressed with Plaintiffs many times, it is important that both parties substantially complete their document productions—including ESI—so that the parties can proceed to depositions and avoid situations in which the parties dispute whether witnesses should be recalled based on documents later produced.

Finally, the City does not understand Plaintiffs' purported concern that Plaintiffs will be forced to review a "data dump" of "mostly unresponsive" documents, but it appears to misapprehend completely the collection, review and production process for ESI.  The City is performing a responsiveness review of the hits on the agreed upon search terms prior to production and will produce only responsive non-privileged documents.  This is standard fare for ESI discovery. *See, e.g., Everythng Ltd. v. Avery Dennison Retail Info. Servs.*, No. 21-cv-4411, 2022 U.S. Dist. LEXIS 41319, at **10-11 (S.D.N.Y. Mar. 7, 2022) ("In accordance with the Federal Rules of Civil Procedure 26 and 34, the parties shall review the documents generated by the agreed-to search terms, and produce any non-objectionable documents (*e.g.*, responsive, relevant, and non-privileged documents.").  A producing party "is entitled to review its documents to ensure that they are responsive to the discovery demands even if they hit on one or more of the parties' agreed-upon search terms." *United States v. Dobco Inc.*, No. 22-cv-9599, 2023 U.S. Dist. LEXIS 145926, at *12 (S.D.N.Y. Aug. 17, 2023).  Plaintiffs' argument is specious in any event; if Plaintiffs were remotely concerned about the volume of this ESI review they would not have spent months insisting on unreasonable custodians, search terms, and time periods for ESI.

---

[11] To be clear, until July 11, 2025, the day after Plaintiffs served their initial draft of this Letter on the City, Plaintiffs made no counter-proposals to the agreed upon search terms.

Plaintiffs have no grounds for relief, and the Court should deny their request.

**8. Benefits Information**

**Plaintiffs' Position**: Plaintiffs have requested information to calculate damages and that is otherwise relevant for Plaintiffs claims regarding the benefits provided to EMS and Fire First Responders.

In specific, Plaintiffs Doc. Request No. 5 and 6 in their 4th RFP requests:

5. Please produce a report showing the pension benefits in NYCERS for all EMS First Responders in the class along with name and Employer ID#.

6. Please produce a report showing the pension benefits in the New York City Fire Pension Fund for all Fire First Responders along with name and Employer ID#.

Defendant claims it does not have this information because NYCERS and the New York City Fire Pension Fund are separate entities from the City of New York. But importantly, Plaintiffs are not asking Defendant to access NYCERS or the New York City Fire Pension. Upon information and belief the City of New York maintains the relevant information sought in NYCERS and New York City Fire Pension regarding the pension benefits for all EMS and Fire First Responders in its normal course of business. In fact, Defendant *provides* these funds to NYCERS and the New York City Fire Pension through deductions to its employee's compensation, including EMS and Fire. So Defendant need not retrieve this information *from* NYCERS, as it already has this information. Defendant simply ignores this in its objection.

Moreover, Defendant misrepresents the Court's position on this issue. First, the appearance Defendant references was prior to the document requests at issue and not responsive to them. Second, Your Honor went on to state "they may have some documents that illuminate the issue you care about…" *See* ECF 62 at p. 49:17-18. Your Honor further goes on to direct parties to meet and confer on the issue in an effort to produce the information requested for that RFP, which again is not the current requests at issue here. As the Court makes clear Defendant "may have" documents that are responsive to this request.

Defendant must make a reasonably diligent search of the requested information. Importantly in the separate joint letter filed simultaneously with the instant one, Defendant asks that Plaintiffs produce information responsive to a document request for damages. The requested information in Document Requests 5 and 6 above are necessary for Plaintiffs to provide those damage calculations to Defendant. Moreover, again illustrating Defendant's unwillingness to work cooperatively, Plaintiffs offered, in the event it does not want to turn this information over, to agree to joint authorizations to NYCERS and the NYC Fire Pension Fund to seek agreed to information to resolve all of parties' disputes globally. Defendant refused.

Without explaining how it came to its conclusion, Defendant's counsel claims Defendant simply does not have information on the pensions of its employees. This is not possible as these deductions are made by Defendant and Defendant is obligated to maintain this information.

**Defendant's Position**: Plaintiffs previously raised this issue with the Court during an April 24, 2023 hearing. At that time, in response to the City's position that NYCERS' records are not in the City's custody or control because NYCERS is a separate entity, the Court stated: "Well, that seems to be their answer, that their documents are not within the City's custody or control. I'm not sure that's an unreasonable answer." (*See* Dkt. No. 62 at 49:10-18.)

As the City has repeatedly explained since the April 24, 2023 hearing (in written responses to Plaintiffs' discovery requests, in email and written correspondence, and on multiple meet and confers), the City's position has not changed. The City has no control over NYCERS' records and does not have records in its possession, custody, or control showing each Plaintiffs' pension benefits. NYCERS and the Fire pension funds are separate legal entities, both distinct from the City, and NYCERS is created by the New York State legislature, under the New York State Retirement and Social Security Law. Under the New York City Administrative Code (the "Admin. Code"), these separate entities are controlled by Boards of Trustees. *See* N.Y.C. Admin Code § 13-103; N.Y.C. Admin. Code § 13-316. NYCERS is not a party to this litigation and the City has no control over it. If Plaintiffs seek information from NYCERS, they will need to subpoena such information.[12]

### 9. Job Evaluations or Other Compensation Analysis.

Plaintiffs' Position: Plaintiffs have called for the name of the individual responsible for setting rates of pay, and the production of all job evaluations or other compensation analyses completed by Defendant determining that pay. *See* Interrogatory No. 3, Plaintiffs' 4.23.23 RFP, Interrogatory No. 3, Plaintiffs 12.10.24 RFP, and Document Request No. 2, Plaintiffs' 12. 10.24 RFP. Defendant has confirmed in writing on May 1, 2023 and again on April 1, 2025 that no individual or documents exist from 2016 to present. *See* **Exhibit P**. ("there were no such evaluations or analyses done during the period from 2016 to present, but has refused to confirm if any were done for the relevant period from 1996 to present. Plaintiffs respectfully ask that "no individual can be identified because no such compensation studies have been performed between 2016 to present."). However, the 12.10.24 RFP expanded the scope of this inquiry from 1996 to present. Defendant has only confirmed this from 2016 to present. Plaintiffs respectfully ask that Your Honor direct Defendant to confirm that the same is true for the period from 1996 to 2015,

---

[12] As Plaintiffs note, the City has requested that Individual Plaintiffs provide authorizations for the City to access their NYCERS records, which Plaintiffs placed at issue by their allegations in this case. That request is consistent with the City's position in this letter. The City does not have access to NYCERS records and requires authorizations from Individual Plaintiffs to access them. As discussed in Dkt. No. 237, Plaintiffs refuse to provide those authorizations.

or in the alternative produce the job evaluations and the name of the person or persons who conducted them.

**<u>Defendant's Position</u>**: To the extent Plaintiffs are asking if the City conducted compensation analyses of the EMS First Responder and/or Firefighter First Responder civil service titles from 1996 to present, the answer is no.

### 10. Depositions

Plaintiffs' Position: As an initial matter Defendant has refused to comply with Plaintiffs' interrogatory requests to identify relevant individuals that they need to depose, such as the person responsible for the training on undergoing workforce analysis for pay equity, or the person responsible for the implementation of Local Law 19 of 2001 that recognizes EMS as uniform for collective bargaining purposes.

Notwithstanding these limitations, Plaintiffs have made a request for the following individuals:

1. Barbara Dannenberg
2. The individual who prepared the CAD Data provided In Defendant's October 30, 2023 Interrogatory Response
3. John Esposito
4. Michael Fields
5. Karey Leung
6. David Zweifler
7. Annabelle Heckler
8. Individual at corporation counsel responsible for investigating and resolving claims of discriminatory pay practices as testified to by Defendant's 30(b)(6) witness
9. Peter Lin
10. Individual responsible for overseeing the implementation of changes to §12-307 of the NYC Administrative Code as amended by Local Law 19 of 2011
11. Individual who conducted the training of the "Overview of Statistical Workforce Reports" prepared by Defendant
12. David Nguyen

Defendant has aggressively resisted deposing most of these individuals and seeks to withhold the names of other individuals necessary for examination.

Of these twelve (12) witnesses Plaintiffs have noticed, only five (5) are for merits discovery.  The remainder of depositions had to be requested so that Plaintiffs can examine these witnesses in an attempt to cure deficiencies in Defendant's document production.

Moreover, of the twelve (12) depositions requested, Defendant has agreed to only *five*; Barbara Dannenberg, John Esposito, Michael Fiends, David Zweifler and Don Nguyen.  Importantly four

of these witnesses are *only* being produced because Your Honor ordered their production. *See* ECF No. 235.

Since the initial draft of this letter, Defendant served objections to several of these depositions. Of note, Defendant is objecting to Plaintiffs' depositions because Plaintiffs are seeking 12 depositions and FRCP 30 only allows for 10 depositions. Your Honor is aware that Defendant has served notices seeking to depose 80 witnesses.

Next, Defendant objects to producing Annabelle Heckler because she is no longer employed by Defendant. But Defendant fails to provide her contact information. Plaintiffs respectfully ask that Your Honor direct Defendant to produce Ms. Heckler's email, mobile phone number and home address so that Plaintiffs can contact her directly.

In addition, Defendant cannot refuse to produce fact witnesses because it claims the testimony will be duplicative of 30(b)(6) witnesses. Plaintiffs intended examinations will not be duplicative, and Plaintiffs have been exceedingly economical of deposition requests, seeking only 5 merits depositions and a total of 11 depositions. For example, Defendant summarily insists that the examination of Karey Leung "The testimony sought from Karey Leung is duplicative of topics for which Plaintiffs have already sought testimony via deposition notices served pursuant to FRCP 30(b)(6)." But Defendant identifies no such duplicative topic, and Ms. Leung has important firsthand knowledge regarding this matter that is not covered in the 30(b)(6) topics covered by Plaintiffs' notice.

Next, testifying "about CAD datasets" is highly distinguishable from the person responsible for preparing the report dated October 10, 2023, which includes more than just data, but opines on Defendant's position and interprets that data. Plaintiffs are entitled to depose the person who prepared that response.

Likewise Defendant states that "Peter Lin helped prepare an earlier version of the Injuries with Body Parts dataset that has since been superseded by an updated version he played no role in preparing." As an initial matter, Peter Lin's name was produced by Defendant in response to Interrogatory No. 7 of Plaintiffs 12.10.24 RFP which asks to identify "the names of the person(s) who prepared the view at BTDS [for injury and illness data]." The data Mr. Lin produced is relevant, as Defendant's expert has relied on this information in preparing not less than two expert reports that have been submitted to the Court and relied on by Defendant in this action. Moreover, to the extent there is a new individual who has prepared a new BTDS view that person's name should also have been produced so that that person can be noticed for examination, as discovery obligations are ongoing. Plaintiffs respectfully ask that Defendant be directed to provide the name of the second individual who prepared the second version of the

Injuries with Body Parts datasets and further directed to produce Peter Lin for examination on the first datasets which were used in at least two of Defendant's expert reports.

Next, Defendant claims that "no one individual is responsible for 'overseeing the implementation of changes to §12-307 of the NYC Administrative Code as amended by Local Law 19 of 2001' and that Plaintiffs should just as questions of the 30(b)(6) witness. However, someone must have been responsible for overseeing the implementation of this change in the law, unless Defendant is prepared to state that it has not implemented the law. Plaintiffs are entitled to examine this person who obviously has important, highly relevant, firsthand knowledge. Moreover, if Defendant is unable to identify anyone with oversight regarding this implementation, than it is safe to assume the 30(b)(6) witness will not be properly prepared to answer related questions. Plaintiffs ask that Your Honor direct Defendant to disclose the steps taken to identify the person or person(s) responsible for overseeing the implementation of the changes to §12-307 of the NYC Administrative Code as amended by Local Law 19 of 2001 and to confer with Plaintiffs to locate this person.

Likewise, Defendant's counsel offers unsworn testimony that the process Defendant's 30(b)(6) witness testified to, Commissioner Renee Campion, does not exist. In answering a highly relevant question, in specific, what responsibilities and what steps the FDNY would be obligated to take if it determined that its pay policies were discriminatory, Commissioner Campion testified that corporation counsel would handle that and conduct its own investigation. *See* **Exhibit Q**, testimony of Renee Campion, pp. 90-98. (Q: I'm saying if there is a concern by the FDNY… I'm not talking about allegations by outside parties. I'm saying if the agency itself determines that there is an issue or a concern with regards to improper pay practices… if the agency finds that it was paying a title in violation of the law, what, if any, steps, is it required to take? A: It's not up to the agency to determine the rate of pay. Q: If there's a concern that there is a discriminatory pay practice and that the pay practice needs to be resolved, does OLR have the authority to address and resolve those concerns? A: Not OLR, no. Q: What agency does? A: The law department. Q: Okay. Other than the law department, anyone else? A: No. Q: do you know how corporation counsel would resolve those concerns? A: They would do their own investigation. Q: Okay. So corporation counsel is tasked with investigating claims of discriminatory pay practices for the City of New York? A: I believe so, yes."). Defendant must explain on what authority it disputes this testimony and what it believes this process is, if not as described by Commissioner Campion.

Finally, while Defendant claims it cannot locate the "Individual who conducted the training of the 'Overview of Statistical Workforce Reports, Civil Service Law, Uniform Guidelines, on Employee Selection Procedures, and Reasonable Accommodations EEO' PowerPoint" there are numerous individuals on the powerpoint document who created the program. Certainly one of them can be produced to testify.

Plaintiffs respectfully request that Defendant be ordered to produce the above witnesses.

**Defendant's Position**: The City has agreed to produce Barbara Dannenberg, John Esposito, Michael Fields, David Zweifler, Don Nguyen, and witness(es) to testify as to the datasets produced in this matter. Plaintiffs incorrectly claim that the City is only producing these witnesses because of the Court's July 8, 2025 Order. *See* Dkt. No. 235. That Order, which denied Plaintiffs' Motion to Compel the testimony of Fire Commissioner Robert Tucker, only confirmed that it "appears from the letters that the City is prepared to provide witnesses as to this topic and has already identified them." *Id*. The City thereafter confirmed that to Plaintiffs and offered to produce Chief Esposito and Chief Fields for depositions. Furthermore, the Order has nothing to do with Ms. Dannenberg, Mr. Zweifler, Mr. Nguyen, or the witness(es) testifying as to produced datasets in this matter. The City voluntarily agreed to make all of the above witnesses available for deposition.

The City will not agree to produce the remaining witnesses for reasons that the City has articulated to Plaintiffs. The grounds for the City's objections to these depositions are as follows:

Ms. Heckler is not a current employee of the City and, therefore, the City has no control over her and her presence cannot be compelled through a notice of deposition served on the City. The City will provide Plaintiffs with Ms. Heckler's last known contact information.

Multiple notices are duplicative of the 30(b)(6) depositions that the City has already agreed to provide, and Plaintiffs should not be permitted multiple, duplicative depositions that are taking full-time employees away from their work responsibilities when the City is willing to provide the appropriate witness for the applicable topics. Specifically, Peter Lin helped prepare an earlier version of the Injuries with Body Parts dataset that has since been superseded by an updated version he played no role in preparing. The City has agreed to provide a witness to testify about the updated dataset, so Mr. Lin's testimony is not necessary. The individual who prepared October 30, 2023 interrogatory responses about CAD Data does not need to testify because the City agreed to provide a witness to testify about the CAD datasets.[13] The testimony sought from Karey Leung is duplicative of topics for which Plaintiffs have already sought testimony via deposition notices served pursuant to FRCP 30(b)(6): the City's collective bargaining negotiations with the District Council 37 ("DC 37"); Local 2507, Uniformed EMTs, Paramedics & Fire Inspectors ("Local 2507"); Local 3621, EMS Officers Union ("Local 3621"); and NYC EMS Superior Officers Association ("SOA") regarding wages, hours, and working conditions for

---

[13] Plaintiffs misstate this deposition notice. They did not notice a deposition for "The individual who prepared the CAD Data provided In Defendant's October 30, 2023 Interrogatory Response." The deposition notice is for "The Individual Who Prepared the Interrogatory Response Attached As Exhibit A." The referenced interrogatory responses related to the CAD datasets.

EMS First Responders for the applicable collective bargaining agreements in effect between September 2016 and the present.

As has been discussed many times, both between the parties and before the Court, there is no one individual responsible for "overseeing the implementation of changes to §12-307 of the NYC Administrative Code as amended by Local Law 19 of 2001." Furthermore, this notice is duplicative of Plaintiffs' noticed 30(b)(6) topic ("The implementation of NYC Administrative Code 12-307 as it relates to EMS and Fire First Responders"). The City repeats its position from its July 1, 2025 letter to the Court that it will produce a witness to provide non-privileged fact testimony regarding the City's collective bargaining negotiations with DC 37, Local 2507, Local 3621, and SOA regarding wages, hours, and working conditions for EMS First Responders for the applicable collective bargaining agreements in effect between September 2016 and the present.

There is no "individual at corporation counsel responsible for investigating and resolving claims of discriminatory pay practices." The City has specifically denied in its responses to Request for Admission Nos. 17-21 that individuals in the office of the Corporation Counsel are tasked with or have investigated claims of discriminatory pay practices as they relate to the subject matter of this lawsuit. (*See* Defendant's March 31, 2025 Responses and Objections to Plaintiffs' First Requests for Admissions.) Because there is no individual in the Corporation Counsel tasked with such investigatory responsibilities, the City cannot identify or produce a deponent on this topic.

The City conducted a reasonable, good-faith search for the "Individual who conducted the training of the 'Overview of Statistical Workforce Reports, Civil Service Law, Uniform Guidelines, on Employee Selection Procedures, and Reasonable Accommodations EEO' PowerPoint." As the City explained in the July 1, 2025 letter to the Court (Dkt. No. 228), the City has conducted a diligent search but to date has not located this or any similar document in the possession, custody, or control of the City, and which has been used to train FDNY. The PowerPoint was presumably produced to counsel for the Plaintiffs in another matter, although the City is not aware of who produced the document or how Plaintiffs came into possession of it, and there is nothing within the contents of the PowerPoint indicating that it was shared with FDNY. The City asked Plaintiffs to provide it with information concerning how it obtained the PowerPoint to aid in the City's search, but Plaintiff did not respond to that request. Moreover, the PowerPoint presentation is undated, but based on the contents of the document, the City believes it is at least ten years old.

### 11. New Training Requirements

**Plaintiffs' Position**: Defendant has refused to produce all documents that identify new training and eligibility requirements for EMS regarding physical strength requirements recently instituted. Plaintiffs even provided Defendant with a document for easy reference. Defendant has provided no reason why they will not produce this information.

Defendant claims it is unaware of its own training requirements.  Moreover, Plaintiffs have provided this information to Defendant, and include a copy here.  *See* **Exhibit R**.

**Defendant's Position**: This letter was the third time that Plaintiffs inaccurately claimed that they previously presented the City with a document showing that there are "new training and eligibility requirements for EMS regarding physical strength requirements recently instituted"— Plaintiffs had not previously provided the City with any such document.[14]  When the City pointed this out during the drafting of this letter, Plaintiffs sent the City the purported document for the first time at 7:37PM on Friday, July 18.   The City previously conducted a reasonable good-faith search for any such document based on Plaintiffs' descriptions and has previously informed Plaintiffs that it has not located any additional responsive documents based on Plaintiffs' description.  Now that Plaintiffs provided the City with this document, as the City has offered several times over the course of months, the City will conduct an additional search and agrees to provide an update within 14 days.

## 12. Costing Materials

**Plaintiffs' Position**: Defendant's 30(b)(6) witness testified to a process whereby Defendant prepares costing for the titles it negotiates.  Plaintiffs made a request for this information on June 1, 2023 (Doc. Req. No. 10).  Plaintiffs also made a request on December 10, 2024 for "all reports, analyses, studies or other documents related to efforts undertaken to monitor, evaluate or analyze the FDNY's workforce for purposes of ensuring non-discriminatory pay practices towards its workforce." (Doc. Req. No. 2 of Plaintiffs' 12.10.24 RFP).

Defendant attempts to play a word game between "Costing Sheets" and "Costing Materials" to avoid production of information that it has withheld.  Plaintiffs numerous requests are clear.  Defendant must produce "all reports, analyses, studies or other documents related to efforts undertaken to monitor, evaluate or analyze the FDNY's workforce."

Plaintiffs have produced only some of these documents.  It has failed to produce all documents in its possession concerning this information. In specific, OLR maintains costing information in which it monetizes the costs of overall compensation for both EMS and Fire First Responders which must be produced.  In addition, Defendant maintains information regarding analyses such as the excel spreadsheet prepared by Annabelle Heckler that Dr. Campion relied on in his expert reports.  All of this information must be produced.

Stunningly, Defendant accuses Plaintiffs of making an "end run" on discovery when in fact, it is Defendant who is avoiding its discovery obligations.  In specific on July 6, 2025 Plaintiffs learned for the first time that Defendant has conducted a "total compensation survey" of local hospital EMTs and Paramedics "to compare with our NYC EMTs and Paramedics."  As an initial matter this information should have been produced in response to Plaintiffs' Document Request

---

[14] In addition to this letter, Plaintiffs' February 11, 2025 letter to the City and Plaintiffs' March 5, 2025 letter to the City likewise made this inaccurate claim.

No. 2 of their 12.10.24 RFP.  To the extent somehow Defendant can claim this information is not responsive to that request, the "deadline to propound" such a request has not "long passed."  To the contrary, Your Honor's deadline for document requests expressly provides that information such as this which Plaintiffs were unaware of are excluded from the February 28, 2025 deadline.  *See* ECF No. 203.

**Defendant's Position**: The City does not know what "Costing **Materials**" are but that is not the document request that Plaintiffs propounded.  Plaintiffs' June 1, 2023 Document Request No. 10, which they cite, is very specific: "Please produce all Costing **Sheets** Commissioner Campion testified to for all titles from 2005 to present for FDNY First Responders."  *See* City Ex. 16, Plaintiffs' Second Supplemental Combined Set of Interrogatories and Request for Production of Documents at 13.  In earlier versions of this joint letter, Plaintiffs titled this section "Costing **Sheets**," consistent with the Document Request No. 10.  Plaintiffs then changed the title to "Costing **Materials**" and separately refer to "costing **information**" in this same section.

The City is not playing a "word game."  Plaintiffs requested "costing sheets," which are a specific type of document exchanged during collective bargaining, and the City has made extensive productions of costing sheets in this litigation.[15]  The deadline for propounding new document requests has long passed and there is no good cause for Plaintiffs to suddenly now try to make an end run around a very specific document request they made and to which the City responded in full.  Accordingly, the City has produced all responsive documents located following a good-faith reasonable search and is not withholding any documents.


Respectfully Submitted,


        //s//                                           //s//

Yetta G. Kurland                        Lora Minicucci
The Kurland Group                     New York City Law Department
Attorneys for Plaintiffs               Attorneys for Defendant

---

[15] Plaintiffs' December 10, 2024 Document Request No. 2 is an entirely different request, which has nothing to do with costing sheets, and seeks "reports, analyses, studies or other documents related to efforts undertaken to monitor, evaluate, or analyze the FDNY's workforce for purposes of ensuring non-discriminatory pay practices towards its workforce."  The City produced over 1,600 pages of materials responsive to this Request on June 25, 2025.  *See* LOCAL 2507-DEF-0039628-41280.  Plaintiffs' counsel's non-sequitur about a "survey" that she purportedly learned about on the Sunday of the July 6 holiday weekend, which has no record citation, is another attempt to distract from the fact that Plaintiffs' propounded discovery request was for "costing sheets," and Plaintiffs have not identified how the City's 1,600 page production in response to Document Request No. 2 is deficient.