**THE KURLAND GROUP**

ATTORNEYS AT LAW

July 23, 2025

**VIA ECF**

The Honorable Gabriel W. Gorenstein, U.S.M.J.
United States District Court Southern District of New York
40 Foley Square, Room 519
New York, New York 10007

**Re:    Local 2507 et al v. City of New York 22cv10336 [rel20cv3389]**

Dear Your Honor:

Plaintiffs submit this individual letter in response to Defendant's July 16, 2025 individual letter [ECF No. 237] having been given leave of the Court to do so pursuant to its July 17, 2025 Order. [ECF No. 241].

In accordance with Your Honor's July 9, 2025 Order, having first complied with Paragraph 2A of Your Honor's Individual Rules[1], Plaintiffs ask for a protective order quashing Defendant's duplicative and excessive Deposition Notices [ECF No. 233-2] seeking what would amount to almost 80 depositions of Plaintiffs. This request is overly burdensome, is not proportional to the needs of the case and impermissible under FRCP 30 and 26(b)(1).

Plaintiffs also ask that Your Honor deny Defendant's request to compel Plaintiffs to conduct an additional "forensic" ESI search using overly broad, general search terms untied to any specific discovery deficiency. This too is improper, Plaintiffs have produced all information in their custody and control responsive to Defendant's requests whether ESI or non-ESI, other than a handful of topics they have objected to, and Defendant's discovery requests seek information that is largely irrelevant and/or does not exist.

Defendant's claim that Plaintiffs have refused to conduct "basic" searches for ESI is incorrect, as is its claim that there exists outstanding discovery Plaintiffs have not provided. Instead, Defendant's instant discovery requests are "speculative" and "[un]targeted" and make "unfocused" and "roving" requests that should not be permitted.  See *Walsh v. Top Notch Home Designs Corp*., No. CV 20-05087 (GRB) (JMW), 2022 U.S. Dist. LEXIS 143801 (E.D.N.Y. Aug. 11, 2022).

The basis for this request is that Plaintiffs have not produced more discovery. But, as explained below, this is not a defect in Plaintiffs' responses, but in Defendant's discovery requests.

---

[1] In furtherance of Your Honor's July 9, 2025 Order the undersigned along with Jacqueline BeVier for Plaintiffs met and conferred Rachel Philion, Lora Minicucci and Jacob Tucker for Defendant, on July 11, 2025 from 1:00pm to 2:00pm to see if parties could narrow the scope of their disputes raised in the July 3, 2025 letter.

85 BROAD STREET
28TH FLOOR
NEW YORK, NY 10004

P: 212 253 6911
F: 212 614 2532
kurland@kurlandgroup.com
KURLANDGROUP.COM

New York | Washington, D.C.

## I.    History of Defendant's Delays and Other Bad Faith Discovery Efforts

Before addressing the specific claims in Defendant's most recent letter of July 16, 2025, it is necessary to address its broader discovery strategy which is relevant to the instant request.

There exists a stark double standard in Defendant's approach to its affirmative and responsive discovery efforts.  Defendant has delayed production of discovery for eight months, yet demands its joint letter be submitted in days to address disputes it first raised in June.[2]  It expects Plaintiffs to accept Defendant's counsel's written representation that discovery is complete, but rejects Plaintiffs' counsel's representations in kind.  It withholds portions of documents, while insisting Plaintiffs make repeated searches and produce documents not in their possession.  It refuses to meet and confer in good faith, even when ordered to do so.  It insists on determining the manner and means of ESI searches for *both* itself and Plaintiffs.  It refuses to disclose details of its discovery process or even what database it is searching yet demands "forensic" accountings by Plaintiffs of their search process.  It objects to Plaintiffs deposing twelve of Defendant's witnesses because of the limit set by FRCP 30(a)(2)(A)(i) but demands to depose approximately *eighty* of Plaintiffs' witnesses.  And even the joint letter process has been misused through over-litigating issues in an uncooperative and unproductive manner.

By way of example, last night Plaintiffs had to spend an additional 3 hours due to technical challenges to file *thirty-four* exhibits for *one* joint letter, which addressed only *twelve* discrete discovery items and was *thirty-one* pages long because Defendant refused to "share" exhibits, insisting Plaintiffs instead file duplicate exhibits.  This letter was seven pages when Plaintiffs provided it to Defendant for edits. Most of the additional pages were spent making and correcting false claims, also requiring Plaintiffs attach additional exhibits to disprove.

Defendant's instant application is likewise premised on inaccurate factual assertions that require Plaintiffs to spend significant time correcting.  It is also an attempt to "re-do" discovery and cause additional delay.  To put in perspective the unreasonableness of its requests, one need only imagine what Defendant's response would be to these same requests.

## II.    Relevant Background

Plaintiffs initiated this action in December of 2022 alleging disparate impact and treatment claims against Defendant in violation of federal, state and local civil rights laws.  The pattern-or-

---

[2] Defendant claims Plaintiffs insisted on waiting to file joint letters on discover disputes together.  In reality, Defendant refused to address Plaintiffs' requests insisting instead that parties focus on Defendant's.  To address this Plaintiffs requested that disputes be addressed in the order they were raised.  Defendant surprisingly refused.  Parties ultimately agreed that the disputes would be submitted to the Court at the same date to avoid Defendant ignoring Plaintiffs requests.  This provided Defendant with almost 3 times the amount of time to produce discovery that Plaintiffs sought and 3 times faster resolution of its discovery disputes. Notwithstanding this Defendant simply filed its letter on July 16, 2025.

practice claims Plaintiffs allege in this action will in large part be determined through statistical data and employment records maintained by the employer, the City of New York.

On March 9, 2023 Defendant served its First Set of Interrogatories and Document Requests ("2023 RFP") propounding 14 interrogatories and 52 document requests.  On April 21, 2023 Defendant served notices to depose 26 Plaintiffs.  *See* ECF No. 233-4.  These depositions were completed on August 4, 2023.[3]  Defendant also took four depositions of Plaintiffs' experts which were completed on November 9, 2023.  Plaintiffs responded to Defendant's 2023 RFP on April 10, 2023 and made a production of responsive documents and information.  <u>Defendant raised no objection to the sufficiency of Plaintiffs' 2023 RFP response until approximately two years later in February of 2025 after retaining new counsel</u>.  It also now seeks to re-depose Plaintiffs which prior counsel has already examined and additionally seeks to depose 22 absent class members.

Defendant's stated purpose for these recent discovery efforts is that Defendant disagrees with the Court's decision to certify the class and subclasses, and intends to move for decertification. *See* ECF No. 202, p. 7 ("The City is entitled to discovery for a reasonable sampling of the class for purposes of its anticipated motions for decertification…").  *See also* Declaration of Lora Minicucci at ECF No. 220, ¶ 6 ("… following the close of discovery, the City anticipates filing a motion to decertify all or certain portions of the class and/or subclasses…"  Respectfully, Plaintiffs submit it is also to cause delay, to shift the focus from Plaintiffs discovery efforts and to harass.

To that end, on February 12, 2025, Defendant served 87 additional document requests and 18 additional interrogatories, and on February 28, 2025 served 28 additional document requests (together "2025 RFPs").  Other than a few requests which are duplicative of Defendant's 2023 RFP, Defendant's 2025 RFPs seek almost exclusively information regarding the collective bargaining process that Defendant engages in with District Council 37 ("DC 37"), a municipal labor union of which Local 2507 and Local 3621 are members.[4]  On February 15, 2025 Defendant also served a subpoena on DC 37 seeking similar information. DC 37 responded to and produced information.

Plaintiffs responded to Defendant's 2025 RFPs on March 29, 2025.  *See* **Exhibit A**.  They supplemented that response on July 14, 2025. *See* **Exhibit B**. In their responses, Plaintiffs raised several objections, not the least being that the requests are overly broad, they assume facts not in

---

[3] Three of the twenty-six Plaintiffs are unable to proceed as named Plaintiffs. Parties have stipulated to remove them as such, and Defendant does not seek discovery from them.

[4] Defendant and DC 37 negotiate the application of pattern increases that are set every few years and apply to the compensation for municipal employees including EMS First Responders.  Union Plaintiffs sit in on those negotiations and often sign the final Collective Bargaining Agreements, but have no authority to enter into agreements or bind parties.

evidence and as such seek information that does not exist, and as to the information that does exist, because Plaintiffs do not maintain and/or are not the custodian of that information they have little to no documents to produce, and that the information sought is largely irrelevant to Plaintiffs claims and Defendant's defenses in this action. Notwithstanding this, and with full reservation of its rights, remedies and objections, on March 29, 2025 Plaintiffs made a production of all information responsive to Defendant's 2025 RFPs. In that same production they supplemented their 2023 response to Defendant's 2023 RFP for the period from April 10, 2023 to present, and advised that production was complete.[5]

On May 16, 2025 Defendant served notices to re-depose 26 named Plaintiffs. *See* ECF No. 233-2. On June 3, 2025 Defendant served notices to depose the presidents of Union Plaintiffs Oren Barzilay, Vincent Variale and Kathleen Knuth.[6] *See Id*. On June 27, 2025 Defendant served notices to take the depositions of 22 absent class members. *See Id*. On July 1, 2025 Defendant serviced notices for two additional absent class members. *See Id*. Despite many requests to do so, Defendant has been unable to identify what information could not be sought from the almost thirty deponents it has already examined, including all named Plaintiffs.

### III. Relevant Legal Standard

Importantly missing from Defendant's portion of the instant letter is any explanation of how or why Defendant meets its legal burden to be entitled to the exhaustive discovery it now seeks. Plaintiffs submit it does not.

#### A. Defendant's Request for Duplicate ESI Searches Is Improper

1. Defendant Seeks Unspecified and Speculative Information

Discovery requests cannot be speculative in nature and "a clear distinction should be made between legitimate targeted demands and an unfocused 'roving inspection or fishing *excursion*' (*Welty v. Clute, 29 F. Supp. 2, 2 (W.D.N.Y. 1939)* (emphasis added)), designed to seek unspecified information. That is, the propounder of the demand seeking disclosure must have some articulable idea of what it is the demand seeks to reveal in support of a claim or defense… Thus, what can be distilled from the myriad of cases considering fishing expeditions is that at bottom, fishing expeditions are *not* allowed when premised on mere speculation of what may come up in the production… That is, when the proponent of the discovery demand is *not* entirely sure of what they are seeking or what will be produced, it's merely casting the net for a "gotcha." *Walsh v. Top Notch*

---

[5] In its July 14, 2025 letter Plaintiffs further offered to conduct an ESI search with search terms only slightly modified with the understanding they would be self-collected and began undertaking that effort, but Defendant rejected the offer.

[6] Chief Knuth is no longer the President of SOA.

*Home Designs Corp.*, No. CV 20-05087 (GRB) (JMW), 2022 U.S. Dist. LEXIS 143801 (E.D.N.Y. Aug. 11, 2022).

This is precisely what Defendant is attempting to do here. Defendant has refused to identify *any* documents it seeks in its requested ESI search, or even what topic it seeks to bolster in its RFPs. In fact, Defendant does not even tie its ESI search terms to *any* document request. It simply asks for *all* documents in the possession of 39 "custodians" that contain any of the 143 over-generalized search terms such as "EMS" and "pay." Nor can Defendant identify what information the requested discovery is intended to produce. Further illustrating the unfocused nature of this request, Defendant does not even identify a topic in its July 16, 2025 letter that it believes Plaintiffs response to is deficient. Instead, it lists 5 bullet points that it claims are generalized summaries of multiple topics. The bullet points do not properly summarize the discovery topics in Defendant's RFPs, and more importantly Defendant does not identify what it thinks additional searches will produce.

2. <u>Defendant Is Unable to Establish Its Burden of Relevance</u>

Defendant repeats a general claim that the documents it requests are "highly relevant" but fails to establish how. Its few arguments are also largely based on incorrect assumptions of fact that do not justify the request for additional searches and explain in part why Plaintiffs did not have more documents in their possession responsive to Defendant's RFPs.

For example, Defendant misstates that the Union Plaintiffs are the parties responsible for negotiating and entering into the Collective Bargaining Agreements between Defendant and DC 37 to apply pattern increases. They are not. Likewise, who determined how the set pattern increase would be applied is not relevant to Plaintiffs' claims. Defendant redefines the term 'Collective Bargaining Agreement' to "Class Agreement" in an effort to make it seem like Plaintiffs are responsible for the terms of those agreements and then claims that this is relevant because it will allow Defendant to "mitigate" liability by showing Plaintiffs agreed to the terms. But even if true, which it is not, this would not establish relevance as Defendant cannot "mitigate" liability in an employment discrimination claim. Finally, Defendant already has the information it purports to seek, i.e. the terms and conditions of employment in the collective bargaining agreements, and as such additional searches would not provide any additional relevant evidence.

Information "is relevant if: '(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and [*7] (b) the fact is of consequence in determining the action.'" *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088, 2016 U.S. Dist. LEXIS 18460, 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016) (quoting *Fed. R. Evid. 401*). Moreover, "[t]he party seeking the discovery must make a *prima facie* showing that the discovery sought is more than merely a fishing

expedition." *Evans v. Calise*, No. 92 Civ. 8430, 1994 U.S. Dist. LEXIS 6187, 1994 WL 185696, at *1 (S.D.N.Y. May 12, 1994).

Setting aside Defendant's confusion over who is responsible for negotiating and accepting terms of collective bargaining, it does not meet the requirements in *Vaigasi* to establish a basis for the information sought.

First, as to whether it would have a tendency to make a fact more or less probable, any information sought regarding whether Union Plaintiffs purportedly accepted the terms and conditions of the agreement or what those terms and conditions are, has already been produced, and the best evidence is the document itself. Defendant is unable to explain how communications about this document, assuming they exist, would tend to make the fact more or less probable that the collective bargaining agreement has the terms and conditions of employment that it has. It will not. Nor is it relevant to Plaintiffs' claims, as explained *infra*.

Second, whatever Defendant intends to prove with the documents it seeks has no "consequence in determining the action." Defendant's requests are far removed from any inquiry relevant in this action and the claims or defenses of whether the identified policy of excluding EMS First Responders from the higher increase provided under the uniform pattern adversely impacts or treats women or non-white employees in the FDNY.

i.   DC 37 Not Union Plaintiffs Is The Bargaining Unit for EMS First Responders Not Union Plaintiffs

Defendant conflates DC 37 with Union Plaintiffs and attempts to hold Union Plaintiffs responsible for the purported negotiation positions and acceptance of terms and conditions of employment for EMS First Responders. But only the bargaining unit, which is the exclusive representative for EMS First Responders has the authority to so act. Pursuant to Defendant's own Office of Collective Bargaining's Board of Certification, DC 37 retains the bargaining certificate and is the exclusive bargaining unit for EMS First Responders. As such DC 37 is the only entity that can negotiate terms and conditions of employment on behalf of these employees.[7] *See* **Exhibit C**. Accepting Defendant's argument for the moment that it matters whether the entity that negotiated and agreed to the terms and conditions of employment is responsible for the discrimination alleged, which as explained below it does not, that entity is not Union Plaintiffs, nor the Plaintiffs. Defendant counters that because the Union Plaintiffs sit in on the negotiations and sign some of the

---

[7] Defendant unpersuasively argues that SOA holds its own collective bargaining certificate. But out of the 4,500 EMS First Responders, SOA represents about 20 members who are the chiefs in EMS. This *de minimis* portion of EMS First Responders which is less than half of one percent, coupled with the lack of probative value, does not establish Defendant's burden for relevance.

agreements, they have relevant information.  But this misapprehends the issue.  Defendant requests information that does not exist, i.e. "All documents… proposed or agreed upon by any of the Union Plaintiffs as set forth in each of the [Collective Bargaining] Agreements."  *See* Doc. Req. No. 2 **Exhibit D**.  Defendant's argument that members must ratify the Collective Bargaining Agreements and therefore have relevant information about the collective bargaining process doesn't change this. Likewise, speculation that Union Plaintiffs "are responsible for encouraging their members to either ratify, or not ratify, each agreement" and that therefore they too may have relevant information does not mean they are withholding information.  While that is not actually the Union Plaintiffs' responsibility, even if it were, Plaintiffs have no documents responsive to the majority of Defendant's requests that seek information about terms of agreements purported to be made by the Union Plaintiffs.  This is not for lack of effort in Plaintiffs searches, the defect lies in Defendant's requests.  Importantly, Defendant's position also cuts directly against its argument that it must depose Union Plaintiff presidents as opposed to a 30(b)(6) witness because these presidents have unique information.  Defendant now claims that all 6,500 class members who vote to ratify or not ratify a Collective Bargaining Agreement have relevant knowledge regarding the Collective Bargaining Process.

ii.    How Bargaining Units Apply the Set Pattern Increases is not Relevant to Plaintiffs' Claim That They Are Not Given the Higher Set Uniform Pattern

Second, the topic itself of how DC 37 negotiates collective bargaining agreements is not relevant and many generations removed from the issues relevant to this action. Plaintiffs are alleging that Defendant's stated policies, i.e. not to give EMS First Responders the uniform pattern increase, and segregating its workforce results in disparate impact and/or treatment to women and non-white employees of the FDNY. Defendant conflates Plaintiffs claim that Defendant does not *allow* Plaintiffs to collectively bargain as uniform, which *is* relevant, with how the set percentage increases are applied, i.e. whether a portion is applied to longevity increases, salary increases, etc. which is *not* relevant to Plaintiffs' claims.

Defendant argues that "the Union Plaintiffs have taken the position publicly that they are advocating in collective bargaining negotiations for the Individual Plaintiffs and Class to receive the uniform pattern, and this information is therefore discoverable."  Again, Defendant's fail to explain why Plaintiffs advocacy is relevant to whether or not Defendant's policy of treating EMS as civilian or segregating its workforce adversely treats or impacts women and non-white members of the FDNY. This is especially true because, as explained below, Defendant cannot mitigate its liability by blaming a third party, i.e. Plaintiffs' Union, DC 37, etc.  But the bigger problem is once more, Defendant's requests assume facts not in evidence and request documents that don't exist.  For example, there are no documents responsive to Defendant's request for "All documents… concerning any discussions of a Union Plaintiff's decision whether or not to file a Declaration of Impasse with the New York City Office of Collective Bargaining, pursuant to New York City Collective Bargaining Law, N.Y.C. Admin. Code §§ 12-311, with regards to the allegation that EMS

First Responders are entitled to 'uniform pattern percentage compensation increases in collective bargaining cycles…" As explained above, Union Plaintiffs do not make the decision to file a Declaration of Impasse. Typifying Defendant's discovery strategy, it makes a number of outlandish claims, accusing Plaintiffs of failing to properly search for this information, when in fact the blame is on Defendant for drafting requests that in large part seek non-existent documents.

iii.    <u>Defendant Cannot "Mitigate" Its Liability Under Title VII and State and Local Analogues</u>

Defendant's argument, that it should be entitled to "mitigate" its liability by showing Union Plaintiffs contributed to the employment practices Plaintiffs assert cause discrimination has been summarily rejected by the courts. In fact, Defendant raised this argument in their FRCP 12(b)(6) motion to dismiss and in opposition to Plaintiffs FRCP 23 motion. Both times the Court rejected it. As Judge Torres ruled, Defendant cannot hide behind these negotiations as a defense against the claims brought by Plaintiffs here for discrimination because "The City ignores the crux of the issue: Plaintiffs allege that [Plaintiffs] are unable to negotiate substantial pay increases due to the City's discriminatory treatment of [Plaintiffs] during collective bargaining, such as by refusing to apply uniformed pattern increases to [Plaintiffs] . . . and that the FDNY, with its history of racial discrimination, . . . refuses to advocate for higher pay for [Plaintiffs] during negotiations." Chalmers, 2022 WL 4330119,at *20. *Local 2507 et al v. City of New York, 22cv10336 [rel20cv3389]*, ECF No. 139, at p. 16.[8] As such, Defendant's request for information about how the pattern is utilized is not relevant. *Id*., at p. 15.

In the related matter *Chalmers et al v. City of New York*, 20cv3389, Judge Torres reiterated "The City argues that the fairer and more efficient way for class members to remedy unequal pay is through collective bargaining… The City ignores the crux of the issue… Under these circumstances, continuing to pursue wage increases through collective bargaining would not be a superior method of adjudication because it would not provide greater "fair[ness] and efficien[cy]."… [Defendant] testified that the [Plaintiff Union] would not be able to negotiate a pay increase without accepting decreases in other forms of compensation such that the economic value of total compensation would not exceed the civilian pattern increase…" *See Chalmers v. City of New York*, 20cv3389 at ECF No. 98, at p. 42, f. 8. This position has been consistently upheld by the Courts with regards to the City of New York's collective bargaining practices. *See UPOA et al v. City of New York, 21cv218*, ECF No. 33, at p. 16, f. 8. ("The Court rejects the City's argument that no discriminatory pay claim can lie because DOP salaries were negotiated by the City and the UPOA via a collective bargaining agreement… More broadly, the fact that the UPOA had some

---

[8] Defendant argues that Judge Torres has not ruled on this issue but merely accepted Plaintiffs claims as true because the Court was considering a 12(b)(6) motion. But this misstates the fact that Judge Torres was citing a decision made in the related matter, not simply accepting Plaintiffs' position.

influence in determining salaries and pay increases for Probation Officers does not mean that the City had no such influence."

Likewise, the Second Circuit has made clear an employer "may [not] absolve itself from liability for its own act of racial discrimination by shifting the blame to an outside party who instigated the practice that the employer implemented." *Smith v. CH2M Hill, Inc.,* 521 Fed.Appx. 773, 775 (11th Cir.2013) (per curiam) (unpublished).

Nor can Defendant as employer establish its lack of discriminatory intent by showing a third party participated in discriminatory pay practices. In fact, an employer is affirmatively responsible for ensuring a non-discriminatory workplace and can even be held accountable for other parties' discriminatory actions. *Brooks v. D.C. 9 Painters Union,* No. 10 Civ. 7800(JPO), 2013 WL 3328044, at *4 n. 2 (S.D.N.Y. July 2, 2013) (noting that discriminatory conduct by someone other than employer may be attributable to the employer if the employer "actively facilitated such discrimination or in some other manner participated in it").

For all these reasons the information Defendant seeks is largely irrelevant to the claims and defenses in this action and as such are not discoverable. To the extent Defendant can argue some minimal relevance, for the reasons stated above and under FRCP 26(b)(1) as explained below, the probative value is far outweighed by the burden and cost of producing this information, which if needed, can be secured much more easily and affordably through other means.

## B. Defendant's Discovery Requests Do Not Satisfy FRCP 26(b)(1)

Defendant's request to conduct duplicative far-reaching ESI searches and its request to depose and re-depose almost 80 Plaintiffs is also not permissible under FRCP 26(b)(1). As such, Plaintiffs respectfully ask that Your Honor deny these unreasonable requests.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* FRCP 26(b)(1).

Again, assuming Defendant could argue some minimal relevance to the information it seeks, and setting aside the speculative nature of these requests, the additional considerations under FRCP 26(b)(1) further require that Defendant's request be denied. This is especially true given the substantial cost and burden in producing the requested information which outweighs what minimal probative value the information might have.

1. <u>Defendant's Requests Are Unduly Burdensome and Any Potential Probative Value is Far Outweighed by the Cost</u>

Plaintiffs estimate that running the ESI search Defendant's request would require a minimum of 300 to 500 hours and cost hundreds of thousands of dollars.  This is based on a conservative assumption that there would be under 500 documents per custodian.  Based on this conservative assumption, Plaintiffs estimate it would take 3 hours to retrieve the data from each custodian, prepare the data and run searches and quality control, and approximately 4 to 10 hours to review those documents per custodian, and prepare and produce them.  The time and cost could be substantially greater.  This also does not include the cost to Defendant, the City of New York, who would likely incur similar costs in this undertaking.  The burden and expense of this is far outweighed by the extremely unlikely chance, for the reasons explained above, that this would result in the discovery of any relevant information.

Defendant's request to re-depose Plaintiffs and depose 22 absent class members is even more costly and even more unreasonable. First, Defendant has already had the opportunity to examine each of the Plaintiffs on the issue it claims it intends to cover, and doing so again, as explained below, would be prejudicial and duplicative. *United States v. Prevezon Holdings*, Ltd., 320 F.R.D. 112, 114 (S.D.N.Y. 2017).  Second, as further explained below, Defendant is not entitled to depose absent class members unless it can show that the Representative Plaintiffs are unable to provide the requested information, which Defendant does not even attempt.  Plaintiffs conservatively estimate, based on the time required to defend Plaintiffs' the first time, that it would take 800 to 1,200 hours of time, and would cost Plaintiffs in the high six figures to low seven figures to complete.  This assumes that each deposition would only last for 2 to 3 hours. This estimate also does not include the tax dollars it will cost the City of New York which Plaintiffs estimates will be even more for many reasons including it is both conducting the depositions and paying for the transcription costs which alone are estimated at tens of thousands of dollars.  These depositions would also totally derail this proceeding for upwards of a year and parties would incur collateral costs related to managing the deposition transcripts and testimony from those depositions.  Defendant has offered no basis for why they are entitled to incur this substantial cost to depose Plaintiffs twice or absent class members at all.[9]

2. <u>Defendant Are Best Suited to Produce This Information and Have Far Greater Resources</u>

Even if this information was relevant, which it is not, and even if Plaintiffs had not already searched and produced responsive information, which they have, and even if there were documents

_____

[9] In one of twenty-three depositions, Defendant's counsel states on the record that he is reserving his right to reproduce Plaintiff for another deposition during merits discovery.  But Defendant is not entitled to re-depose this witness again simply because it stated this on the record.  Absent a stipulation with parties, which does not exist, Defendant would have had to have gotten leave from the Court.  It did neither.

responsive to Defendant's requests, which in large part there are not, and even if Defendant identified specific topics that it felt were deficient, which it has not, even if Defendant had requested ESI in its discovery requests which it did not, Defendant would be the custodian of that information in large part, and has more resources and easier access to get this information.  As such a costly request for Plaintiffs to run expensive and time consuming forensic ESI searches is unreasonable. Also, as explained, the information requested has little to no importance in resolving the issues in this action.

Defendant misconstrues Plaintiffs position to make it seem like Plaintiffs are refusing to produce information or that there is outstanding information that has not been produced.  Neither is true, as explained in further detail below.

3.  The Discovery Requested is Not Important to This Action

As explained above, the information requested from Defendant's requested ESI search will not produce information important to this action.  Even accepting as true every claim Defendant has made, and even assuming there are documents that are responsive, which for many there cannot be, nothing Defendant is seeking will bear on the relevant question - Does the stated policy, i.e. that Defendant does not allow EMS First Responders to apply the uniform pattern to their compensation increases, result in adverse impact or adverse treatment to women and non-white employees of the FDNY.

For all these reasons, Defendant does not meet its burden under 26(b)(1) to be entitled to the discovery it requests, and Plaintiffs respectfully ask that Your Honor deny Defendant's motion to compel a forensic ESI search not included in Defendant's RFPs, and issue a protective order quashing Defendant's 53 additional and redundant Deposition Notices.

**Issue 1:  Plaintiffs Have Conducted a Reasonably Diligent Search for ESI and Defendant Fails to Establish a Need for Its Proposed ESI Search**

Defendant has again misrepresented the facts and procedural history to Your Honor in an effort to portray Plaintiffs as having failed to perform a search of electronically stored information and/or not complied with Defendant's RFPs and/or that there remains outstanding discovery Plaintiffs have promised but not produced, all of which is inaccurate.

As an initial matter, Defendant claims "The City's First and Second Sets of RFPs included requests for the production of relevant ESI" and then lists 4 bullet points purporting to summarize discovery requests it claims have ESI requests in them.  Importantly, Defendant does not provide any citation to this claim, because no such requirement for ESI or ESI searches exists in any of Defendant's RFPs.

11

Despite this, Plaintiffs *did* search for electronically stored information. In fact, Defendant admits that it *received* ESI documents, such as emails, in Plaintiffs' production.

It is also simply untrue that Plaintiffs "ignored their ESI obligations." It is Defendant who fails to offer any proof or basis to justify its time consuming and labor intensive demand that Plaintiffs conduct additional searches for unspecified discovery topics, when it cannot even identify what information it believes is missing or what would be produced from the search terms it proposes. To that end, Defendant's "proposed ESI search terms" are wholly unreasonable and would be cost prohibitive and unduly burdensome. They propose general terms like "EMS" and "pay" without any type of focus and Defendant does not even identify what document request number the searches are purported to be tied to. This exposes again the true intent of these searches, which are not for any specific document request, but rather serve as a wide-sweeping dragnet seeking something to base its intended motion to reconsider the Court's certification of the class and subclasses in this action. This is an improper use of merits discovery. *Walsh v. Top Notch Home Designs Corp*., No. CV 20-05087 (GRB) (JMW), 2022 U.S. Dist. LEXIS 143801 (E.D.N.Y. Aug. 11, 2022).

Defendant also fails to mention that Plaintiffs responded to Defendant's April 22, 2025 letter on April 28, 2025. *See* **Exhibit E**. Importantly, in their April 28, 2025 letter Plaintiffs explain that 1) Defendant has waived its right to assert deficiencies in Plaintiffs responses to its 2023 RFP because it has taken no action to raise objections for two years, 2) Defendant has failed to meet its obligations under FRCP 26(b)(1) to establish the requested information is relevant, 3) notwithstanding this and will full reservation of rights, ***Plaintiffs have produced all information in its possession responsive to Defendant's requests***, and 4) to the extent Defendant seeks additional information on any topics they establish are relevant under FRCP 26(b)(1), Defendant and not Plaintiffs is the custodian of those records, and it is Defendant's and not Plaintiffs' obligation to produce them to all parties.

Plaintiffs further advised Defendant in their April 28, 2025 letter that "It seems Defendant's instant efforts to demand additional discovery from Plaintiffs are meant to distract from the relevant discovery Defendant has failed to produce for close to half a year" and that "For the above reasons, and because there are no deficiencies in Plaintiffs' production, Defendant has no basis to compel further production… any such further efforts to do so would be frivolous and only serve to harass Plaintiffs while misdirecting from the important focus of completing production by the custodian, Defendant… *Trilegiant Corp. v. Sitel Corp.,* 272 F.R.D. 360, 364 (S.D.N.Y. 2010)."

On July 14, 2025 Plaintiffs provided an additional supplement to their March 29, 2025 response, in which they offered to resolve certain disputes presented in the instant letter and otherwise confirmed that production was complete which Plaintiffs began undertaking. Defendant rejected this offer. *See* **Exhibit B**.

Plaintiffs have responded to all of Defendant's interrogatories and document requests. This includes searches for electronically stored information and information that is not electronically stored, and have produced all information in their possession.

a. <u>Defendant's Discovery Requests Are Not "Highly Relevant" and Plaintiffs Have Not Waived Their Objections Based on Relevance</u>

Defendant repeats the claim that its requests are "highly relevant but fails to explain how. Instead, Defendant claims that Plaintiffs have waived their objections based on relevance. They have not. But this shows Defendant has no legitimate basis to establish relevance. In every discussion Plaintiffs have had both verbal and written, they have expressed a willingness to accommodate Defendant but an insistence that they reserved all rights, remedies and objections.

Moreover, contrary to Defendant's claims, Plaintiffs have not changed their position, or the bases for their objections to Defendant's discovery requests, nor have they waived any of those objections because they object to some requests on the basis of relevance but not others. Moreover, the case law Defendant cites for this proposition is vastly distinguishable and inapplicable. *See Cambridge Capital LLC v. Ruby Has LLC*, No. 20-cv-11118 (LJL), 2022 U.S. Dist. LEXIS 53814, *15 (S.D.N.Y. Mar. 24, 2022). In *Cambridge* the attorneys for *Ruby* had agreed to produce non-privileged documents, even those that were not relevant. Thereafter, they sought to withhold those documents which they asserted were not relevant. The Court found that they could not later assert relevance having already agreed to produce the documents. Here, Plaintiffs did not represent that they would produce documents, have throughout this process preserved their objections, have not withheld non-relevant documents and have *already* produced everything in their custody and control.

All of this is an attempt to shift the burden. But the burden is Defendant's to show that the information it seeks is relevant. It fails to meet that burden.

While it summarily insists that the documents it seeks are "highly relevant to the claims and defenses in this litigation" Defendant fails to explain why. Defendant's only explanation is because "Plaintiffs allege that the City discriminated against them in the form of disparate pay and benefits policies, which are purportedly carried out at least in part via 'the FDNY's policy and/or practice of refusing to recognize EMS as a uniform service *in collective bargaining, or to participate in uniform pattern bargaining . . .*" (emphasis included) Defendant then reverts to the same debunked argument that because Defendant has a policy of denying the uniform pattern increase for EMS First Responders, somehow this means everything related to collective bargaining negotiations is relevant.

As an initial matter, information regarding the compensation, benefits and/or other terms and conditions of employment with the City is squarely in Defendant's possession, who is the custodian of these records and best suited to produce them.

As to the information requested and produced in 2023, Defendant has waived any disputes it might have had two and a half years ago to Plaintiffs' production.

b. <u>Defendant is Not Entitled to Compel a Forensic ESI Search</u>

Defendant's main grievance is that Plaintiffs have not produced more discovery. But this is not a defect in Plaintiffs' responses, but in Defendant's discovery requests. Defendant's initial complaint was that "Plaintiffs failed to produce documents in response to most of these RFPs" and that "the production included pictures of certain degrees and certificates, online articles, and a handful of email blasts" and "aside from this handful of email blasts… Plaintiffs produced no emails in response to the RFPs." In its July 16, 2025 letter Defendant claims "Plaintiffs largely ignored [Defendant]'s ESI requests" because their "initial" production was "paltry." Defendant argues that because it included a "handful of emails" this made clear "Plaintiffs had not made a reasonable effort to conduct an ESI search." But Plaintiffs cannot produce what they do not have. As described above, they are not the custodian of these records, and many of the records requested don't exist. Notwithstanding this, Plaintiffs have spent hundreds of hours searching for the information requested by Defendant, despite the fact that this information has little to no probative value. Importantly, the fact that Plaintiffs have produced so little is an indication that Defendant's aggressive efforts to make them conduct more searches would end with similar results.

Defendant's cite to *Komatsu v. City of New York*, 2020 U.S. Dist. LEXIS 238711, at *5 (S.D.N.Y. Dec. 18, 2020) and a string of related cases are likewise unpersuasive. Again, Plaintiffs are not saying they are refusing to conduct a search or produce information. They have *already* conducted a reasonably diligent search and produced what is in their possession, other than a handful of specific objections. These cases are also distinguishable and actually support Plaintiffs' request that the Court deny Defendant's instant request. This is because, in the cases Defendant cites, the Court found that the producing party could not object when the requesting and producing parties had "equal access" to the information. *Id*. Here, Defendant has significantly more access to documents requested assuming they exist, and as such, under FRCP 26(b)(1) Plaintiffs should not be forced to conduct unreasonable searches.

In an illustration of the discovery strategy Defendant engages in as outlined above that requires Plaintiffs to spend exhaustive time correcting the record, Defendant makes the following representation to Your Honor:

> "One of the most concerning claims is the Union Plaintiffs admission they do not maintain a centralized, organization-managed email systems in which they can apply search terms to locate and produce documents responsive to the City's request and relevant to this lawsuit. As a result, the Union Plaintiffs are taking the position that, despite their filing of this lawsuit they cannot search for, locate, or produce documents and communications relevant to this lawsuit… The Union Plaintiffs' position is effectively that they will not search for, collect and produce ESI because they do not use centralized email, and the City is not entitled to any information." ECF No. 237, at p. 4.

14

It should go without saying that Plaintiffs have never made such "claims" or "admissions" and the only part of the above paragraph that is true is that Plaintiffs do not have a centralized email system. But they are fully capable of, and *have* searched for and *produced* records responsive to Defendant's requests, including both ESI and non-ESI documents.

So that there could be no doubt, on July 14, 2025 Plaintiffs provided Defendant with a letter expressly confirming:

1. Defendant has already conducted a search of electronically stored information as part of its response to Defendant's RFPs, and Defendant offers no basis to justify requiring an additional search. Plaintiffs asked Defendant to identify a document or documents it believed Plaintiffs were in possession of that they had not turned over that might justify the need for additional searches. Defendant was unable to identify any such document.

2. The search criteria Defendant proposes is excessive and untethered to any document request. They include exceedingly general search terms such as "agreement" OR "EMS" OR "pay" that are overreaching and unreasonable along with 39 "custodians" that are equally unreasonable. None of these custodians have information in a centralized location and almost all of them, other than named Plaintiffs, are not in the custody or control of Plaintiffs.

3. As such, we estimate that this search would take approximately 300 to 500 hours to complete. This is unduly burdensome and not proportional to the needs of this action, especially because the topics sought have little to no probative value or relevance.

   However, for settlement purposes only, with reservation of all rights, remedies and objections, and with the express agreement that Defendant will accept it as a resolution to all outstanding disputes Defendant has with Plaintiffs' responses to its 2025 RFPs, Plaintiffs have offered to have the named Plaintiffs run searches of the attached search terms and produce any documents responsive to Defendant's 2025 RFPs. *See* **Schedule A**.

Defendant should explain to Plaintiffs and the Court why, given the details of Plaintiffs' July 14, 2025 letter why it made the above representations to Your Honor on July 16, 2025

Setting aside the misstatements, it seems Defendant is suggesting that Union Plaintiffs are somehow at fault or not permitted to seek legal redress if they don't have the resources to maintain a "centralized" email system like Defendant, the City of New York.[10]  That is certainly not the case. Defendant then claims "[i]n addition to their refusal to conduct a satisfactory ESI search discussed above, Plaintiffs' production raises significant concerns about their compliance with their obligation

---

[10] Of note, Defendant's extreme double standard regarding the scrutiny and transparency regarding ESI searches is startling.  By way of example, Defendant will not even disclose what database it pulls information from let alone the operating systems it uses, for ESI *and* non-ESI discovery.  Unlike Defendant, Plaintiffs have represented that they did a complete search of electronically stored information as well as non-electronically stored information and, with full reservation of their rights, remedies and objections, have produced everything in their possession.

to perform a reasonable and diligent search for responsive documents.  But in fact FRCP 34 makes clear, it is Defendant's request that is improper.  FRCP 34(b)(2)(E)(i) states that when producing electronically stored information a party may "produce documents as they are kept in the usual course of business…" and per FRCP 34(b)(2)(E)(i) "If a request does not specify a form for production electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms."

Moreover, Defendant offers no caselaw for its intimation that forensic searches are required, because no such requirement exists.  To the contrary, Rule 34 does not require forensic searches. While the 2006 amendment to FRCP 34 *allows* forensic searches, it does not create a routine right of access to forensic searches. In fact, the advisory note to Rule 34 advises courts to "guard against undue intrusiveness resulting from inspecting or testing" electronic systems:

"Inspection or testing of certain types of electronically stored information or of a responding party's electronic information system may raise issues of confidentiality or privacy. The addition of testing and sampling to Rule 34(a) with regard to documents and electronically stored information is not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances. Courts should guard against undue intrusiveness resulting from inspecting or testing such systems." (Rule 34(a) Advisory Committee Note to 2006 Amendment).

When it comes to ESI, "[f]orensic examinations of computers and cell phones are generally considered a drastic discovery measure because of their intrusive nature." *Stewart v. First Transit, Inc.*, No. Civ. No. 18-3768, 2019 WL 13027112, at *1 (E.D. Pa. Sept. 3, 2019); *Aminov v. Berkshire Hathaway Guard Ins. Co.*, No. 21-CV-479-DG-SJB, 2022 818944, at *1 (E.D.N.Y. Mar. 3, 2022) (citing same); *Raleigh v. Baribault*, No. 3:22-CV-01069 (VDO), 2024 WL 4524101, at *17 (D. Conn. Oct. 18, 2024) (citing same). *See also Raleigh v. Baribault,* No. 3:22-CV-01069 (VDO), 2024 WL 4524101, at *16 (D. Conn. Oct. 18, 2024). (The court rejected party's motion to compel a second forensic search, citing the advisory note to FRCP 34 2006 amendment, and states that the advisory note's urging of courts to "guard against undue intrusiveness resulting from inspecting or testing such systems" is "particularly true where the plaintiff's main arguments for requesting a second forensic examination are that (1) he does not believe the defendants' representations (*i.e.*, that they do not possess relevant documents) and (2) some of Baribault's discovery responses are inconsistent." *Raleigh v. Baribault,* No. 3:22-CV-01069 (VDO), 2024 WL 4524101, at *16 (D. Conn. Oct. 18, 2024). *See also Stewart v. First Transit, Inc.*, No. Civ. No. 18-3768, 2019 WL 13027112, at *2 (E.D. Pa. Sept. 3, 2019).("[g]enerally, mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant a forensic examination." (internal quotations omitted)).

Here, Defendant's only basis for demanding a second search of ESI is its complaint that not more documents were produced and its claim it "knows" documents were withheld.  Defendant has refused to produce or even identify what documents it is referring to when it claims "The City knows that these emails exist and were not produced because two of the Individual Plaintiffs *did* produce email communications between Local 2507 and its members, yet Local 2507 and the other Individual Plaintiffs did not produce these (or any other) emails from the Union Plaintiffs."  But

16

there are many explanations for why one party produced a document and others did not.  This generalized claim is wholly insufficient for the "drastic" relief Defendant seeks.

Likewise the case Defendant cites from a Connecticut District Court, *Othon v. Wesleyan University*, 2019 WL 13291270 (D. Conn. Nov. 18, 2019) to support its claim that Plaintiffs should produce information regarding the manner in which they conducted searches is non-precedential and wholly distinguishable.  As an initial matter, in *Othon* Defendant had actually made a request for ESI discovery including "Any and all documents concerning… online, e-mail, or internet communications…" and, the topic was relevant to the action.  Moreover, *Othon* did not require a forensic ESI search, the search was self-collected.  Further, to put in context again the hugely different expectations Defendant has regarding this information, even when ordered to produce a description of the searches undertaken by Defendant to locate ESI its explanation consisted only of "[the witness] searched his email box, local electronic files, and shared electronic files where Mr. Alexander reasonably believed responsive documents might be located."  *See* **Exhibit F**.  Yet Defendant is demanding that Plaintiffs provide granular details far in excess to what Defendant provides.

Plaintiffs should not be subjected to the cost, invasion of privacy or delay in performing an unnecessary forensic ESI search of all of their electronically stored information.  Far from identifying a topic or document that Defendant is seeking but cannot locate, Defendant simply demands what amounts to all of Plaintiffs records that are in any way related to EMS.  It has also demanded that Plaintiffs somehow produce this information for an additional 13 individuals who Plaintiffs have no control over, at least one of whom is deceased.  Plaintiffs properly produced documents in the manner they are maintained.  Defendant's complaint that this has not produced more documents is a reflection of Defendant's discovery requests, not Plaintiffs' efforts.

c.  Defendant Offers No Basis to Overrule Plaintiffs' Burdensomeness Objection

Defendant in essence claims that because Plaintiffs do not have hit counts in their self-collection, they are not entitled to argue production would be burdensome.  It has no argument rebuttal to Plaintiffs burdensome and proportionality arguments for the additional 53 depositions Defendant seeks.

Moreover, Plaintiffs provide detailed calculations for both cost and time that Defendant does not dispute, which are reasonably calculated and based on conservative estimates.  There is no question, both the ESI searches and the request for 53 additional depositions would be unduly burdensome and are not proportional to the needs of the case as they would not provide any additional information.

For all these reasons Defendant's request to compel Plaintiffs to perform the widescale searches it requests is unreasonable and Plaintiffs respectfully ask that this request be denied.

**Issue 2: Defendant's Request to Depose and Re-Depose an Additional 53 Plaintiffs Including Absent Class Members is Unreasonable and the Court Should Not Permit**

In addition to all the reasons stated above, Defendant's Notices of Deposition for 53 *additional* depositions, including re-deposing Plaintiffs who have *already* been deposed violates several provisions of FRCP 30. This request is also not proportional to the needs of the case, would be prejudicial to Plaintiffs and overly burdensome.

Defendant seeks to re-depose Plaintiffs who prior counsel has already examined and additionally seeks to depose 22 absent class members. Defendant's stated purpose for these efforts is that Defendant disagrees with the Court's decision to certify the class and subclasses, and intends to move for decertification. *See* ECF No. 202, p. 7 ("The City is entitled to discovery for a reasonable sampling of the class for purposes of its anticipated motions for decertification…"). *See also* Declaration of Lora Minicucci at ECF No. 220, ¶ 6 ("… following the close of discovery, the City anticipates filing a motion to decertify all or certain portions of the class and/or subclasses…" This reason is wholly improper and this request demonstrates a grotesque waste of resources. Plaintiffs estimate that it would take upwards of 1,200 hours of time, and cost Plaintiffs in the high six figures or more to complete. This does not include the tax dollars it will cost the City of New York for its fees for outside counsel or the out of pocket costs of 53 depositions. These depositions would also totally derail this proceeding for upwards of a year and cause exponential collateral costs related to managing the deposition transcripts and testimony from these depositions. Moreover, Defendant seeks to duplicate topics which would be highly prejudicial to Plaintiffs.

Regrettably, only for the *first* time in its July 16, 2025 letter does Defendant identify four topics it seeks to re-depose Plaintiffs on; 1) their theory or theories of discrimination, 2) how each Plaintiff was recruited to join the FDNY, 3) whether or not each Plaintiff has attempted to become a firefighter, and 4) knowledge of the alleged disparate treatment in the Complaint." Plaintiffs also claim that it wants to depose Plaintiffs on their job duties, and those of their "alleged comparators."

Plaintiffs have *repeatedly* asked Defendant to explain 1) why it believes Plaintiffs need to be reproduced to give testimony, 2) what topics it has not had a chance to depose Plaintiffs on, and 3) what topics the Court appointed Representative Plaintiffs could not address that warranted the need to depose absent class-members. Defendant has flatly refused to provide *any* responses to these questions.

At the last meet and confer on July 11, 2025 when asked these questions again, Defendant stated only it "d[id] not need to disclose [its] legal strategy." When the undersigned explained that Your Honor had directed parties to meet and confer to see if they could resolve this dispute Defendant's counsel stated "you can write anything you want to write in your letter and we will respond." When pressed, Defendant stated that there might be some unidentified "information" produced as a result of its hoped for ESI searches that it may wish to depose Plaintiffs on. This is patently speculative and as such an impermissible basis for these depositions. *Walsh v. Top Notch*

18

*Home Designs Corp.*, No. CV 20-05087 (GRB) (JMW), 2022 U.S. Dist. LEXIS 143801 (E.D.N.Y. Aug. 11, 2022).

Defendant also explained that it believed the Court appointed Representative Plaintiffs were "handpicked" and therefore were not truly "representative" and Defendant felt it was entitled to select and depose its own representatives.  Setting aside Defendant's flagrant disregard for Judge Torres' ruling on class certification and the appointment of class representatives in accordance with FRCP 23, this is *exactly* what the Courts in *Walsh* were referring to as an "unfocused and 'roving inspection or fishing excursion" which is "designed to seek unspecified information."  Defendant cannot identify any topic it was unable to question Plaintiffs on in their last deposition. It simply wants to re-depose Plaintiffs in hopes of being able to find something to impeach them on in hopes it can decertify the class.  As the Courts have made clear, this is not an appropriate use of discovery.

Defendant has the audacity to claim that Plaintiffs request to quash Defendant's Notices of Deposition is "egregious" because Plaintiffs have themselves served 13 notices for depositions. What is egregious is that Defendant up until July 16, 2025 has utterly refused to provide a single legitimate reason for any of these depositions and has not met and conferred with Plaintiffs to see if parties can come to agreement on a reasonable resolution of this dispute.

**A.  Defendant Has Already Questioned Plaintiffs on Most of the Topics Identified for Depositions and The Remaining Information Can Be Provided In a Less Costly Way**

As to the topics that Defendant raised in its July 16, 2025 letter for the first time. First, "Plaintiffs theory or theories of discrimination" calls for a legal conclusion and is not a reasonable basis to produce Plaintiffs to testify.  To the extent Defendant seeks testimony on the basis for Plaintiffs claims, similar to its fourth stated topic seeking "knowledge of the alleged disparate treatment in the Complaint Defendant" this is a relevant topic, but Defendant has already deposed Plaintiffs on this topic.  In specific, Defendant asked the following questions to Plaintiffs:

1. What is your understanding of the claims asserted in this lawsuit?

2. Which is brought based on claims that you're asserting against the City?

3. What is your understanding of those claims?

4. What harm has been suffered by the members of the prospective class?

5. What is your understanding of the relief that you're seeking in this action?

6. What relief are you seeking?

7. Are you seeking money damages?

8. Have you suffered any emotional distress as a result of the claims in this action?

9. Do you know if you're seeking punitive damages in this lawsuit?

19

10. Do you recall ever reading the Complaint in this action?

11. Do you know if you read the Complaint in this action before it was filed?

12. In the Complaint… Paragraph 64 reads: "The field work performed by EMS First Responders is similarly situated in all respects to the field work by Fire First Responders." Do you agree with that statement? What is your basis for that belief?

13. I'm going to direct your attention to the bottom of page 50. It says: "And as for the Fifth Cause of Action Suppressed Wage of a Segregated Workforce In Violation of the New York State Human Rights Law." Do you know what a "segregated workforce" is?

14. You testified earlier that you believe that EMS workers and firefighters do similar work under similar conditions and receive different pay. Do you believe that that difference in pay is based on race or gender discrimination?

15. The complaint makes the claims that "EMTs and paramedics perform the same work as firefighters and the discrepancy in pay is based on gender or race discrimination. Do you agree with that statement?

16. And how you are discriminated against?

17. When you say we, who are you referring to?

18. Do you have any personal experience with gender discrimination in your role with the fire department?

19. Can you give me an example of how you have been treated unfairly?

20. Have you ever had a gender based comment directed at you in your employment at the fire department?

21. Have you ever had a race-based comment directed at you in your employment with the fire deparmtent?

22. What kind of relief is the class seeking in this lawsuit?

23. What kind of harm has been suffered by the members of this lawsuit?

Defendant also asked several follow up questions to the above questions on this topic. *See* **Exhibit G** Sample deposition transcripts of Richard Guzman and Alicia Elkadi.

The next topic "whether or not each Plaintiff has attempted to become a firefighter" is not an appropriate basis to expend the overwhelming resources to reproduce Plaintiffs for depositions. Defendant does not need to expend the exorbitant costs of 53 depositions, especially because it already has this information. Indeed, Defendant has *produced* this information in the promotional

and open examination data.  Moreover it also already asked this question, in specific "Have you ever applied to be a firefighter?" *See* **Exhibit G**, p. 70:17-18, p. 150:14.

As to the topic of job duties and Plaintiffs comparators, Defendant has already examined all Plaintiffs on this topic as well.  *See* **Exhibit G**.  In specific, these are just some of the questions Defendant asked Plaintiffs:

1. What were the qualifications necessary for EMT?

2. Did you have to get a license to be an EMT at that time?

3. Did you get it during your training with Health and Hospitals?

4. What license did you receive during your training?

5. Do you know what organization issues that license?

6. Did you have to get any other licenses as an EMT?

7. How long were you an EMT for?

8. What were your job duties as an EMT?

9. Were you also able to drive an ambulance?

10. When did you receive the certification?

11. Who gave you that certification?

12. Can you tell me the different ways in which EMTs provide patient care?

13. When EMTs perform patient care, they're obviously treating patients. Can you give me some examples of ways in which EMTs treat patients?

14. Do you administer medication?

15. Do EMTs intubate?

16. Do they use a defibrillator?

17. Do they carry patients either with a stretcher or with a chair to an ambulance?

18. Can EMTs perform stitches?

19. Can EMTs evaluate a patient?

20. Can they perform the Heimlich Maneuver?

21. Is there anything other than what we just talked about that you could think of that are included in the job duties of an EMT?

22. How long was your training when you started as an EMT?

23. Can you tell me what topics you were trained on?

24. Where was your training held?

25. Do you recall what agency provided the instructors for this training?

26. Did you receive any training from the Fire Department at that time?

27. During your training, did you do any training with respect to building structures?

28. Tell me about the trainings you've received with respect to building structures.

29. You went into the smoke room, what is the smoke room?

30. Were you trained on fire extinguishment?

31. When were you trained on fire extinguishment?

32. Other than training with a fire extinguisher during your time at FDNY or with Health and Hospitals, were you trained on fire extinguishment?

33. And your training in 1994, was that just how to use a fire extinguisher?

34. Were you trained on fire control?

35. Were you trained on pulling a fire hose?

36. Were you trained on the use of power tools?

37. Were you trained on how to work on a fire floor?

38. Were you trained on how to operate an engine truck?

39. Were you trained on how to operate a ladder truck?

40. Were you trained on how to conduct field inspections of buildings?

41. Were you trained on enforcement of fire prevention laws?

42. Were you trained on how to teach fire safety?

43. Were you trained on issuing Criminal Court summonses or vacate orders?

44. Were you trained on the fire safety code?

45. Were you trained on the building code?

46. Were you trained on the multiple dwelling code?

47. Were you trained on the housing maintenance code?

48. Were you trained on New York State Labor Law?

49. Did you ever work in dispatch?

50. When you work in dispatch, are you stationed centrally?

51. And by that I mean are all the dispatchers in one place?

52. Where did you work as a dispatcher?

53. Can you tell me about your job duties as a dispatcher?

54. Just to understand what the structure is, somebody calls 911 centrally, they tell them their emergency, if it's medical, it comes to you?

55. And then you then become the point person for that medical emergency; is that correct?

56. When you worked in dispatch, how many dispatchers worked in your unit?

57. Do you know what the staffing levels went up to?

58. Is that the staff for the whole unit or just people who are on-call at any one time?

59. Is emergency medical dispatch just for EMS?

60. Are there dispatchers for the fire operations side?

61. Do you know how many dispatchers there are on the fire operations side?

62. Do you know if the fire operations dispatchers work in 11 Metrotech?

63. Do  you know where they work in 11 Metrotech?

64. So, is it accurate to say that the dispatchers for Fire, EMS, and PD are all working in the same room?

65. As part of your job duties as a dispatcher, do you decide how many units are dispatched to any emergency?

66. How do you decide that?

67. What is the dispatch system?

68. How does the dispatch system assist you in deciding how many units to dispatch to any given emergency?

69. And this would be only for medical calls, correct?

70. What other types of calls do you receive?

71. So, the EMS unit could be assigned a call for a gas leak?

72. If you're assigned a call for a gas leak as an EMS dispatcher, what would you do?

73. Would you do that for any other kind of non-medical emergency, send a unit?

74. Do you know how the calls get assigned to EMS dispatch?

75. Do you use your EMT training to effectively form the duties of a dispatcher?

76. During your time with the FDNY, did you attend any joint trainings with firefighters?

77. Do you recall which trainings those were?

78. Can you tell me what MCI is?

79. Can you tell me what the format is for that training?

80. So, for example, does this training run as a drill, is it sitting down in a classroom, or something else?

81. Did you ever have any joint trainings with the police department?

82. Is that a similar format where you would have some lecture and then do a drill?

83. During the drill, what duties would EMS employees perform? Starting with firefighters

84. What about with the police department?

85. Do you remember the frequency with which these trainings were held?

86. Have you ever responded to the scene of a fire?

87. In the Complaint… Paragraph 64 reads: "The field work performed by EMS First Responders is similarly situated in all respects to the field work by Fire First Responders." What is your basis for that belief?

88. Exhibit F is the report of Dr. McGuire. Have you read the report of Dr. McGuire?

89. In the Complaint… Paragraph 64 reads: "The field work performed by EMS First Responders is similarly situated in all respects to the field work by Fire First Responders." Do you agree with that statement?

90. Can you tell me why?

91. And you said EMS workers carry heavy equipment. What equipment is that?

92. So, your basis for the belief that the jobs are similarly situated in all material respects is when it comes to medical, responding to medical emergencies is where you have the same training?

93. Can you tell me a little bit about the dangers EMS workers face?

94. Do EMS workers respond to motor vehicle accidents?

95. What duties do they perform at motor vehicle accidents?

96. Do they transport to the hospital?

97. What do EMS, EMTs or paramedics do with respect to scene safety at the scene of a car accident?

98. Do EMTs or paramedics who work in an ambulance have access to flares?

99. Do you know what firefighters do when they respond to scenes of car accidents?

100. Do you know if EMS workers use hydraulic rescue tools, which are colloquially called the Jaws of Life at car accidents?

101. Do EMTs and paramedics respond to gas leaks?

102. What do they do at the scene of gas leaks?

103. Do you know where EMTs and paramedics would be in standby with respect to the leak?

104. Can you tell me the general rules of standing by?

105. Can you tell me if firefighters respond to gas leaks?

106. Do you know what tasks firefighters perform when responding to gas leaks?

107. Do you know if firefighters investigate gas leaks?

108. Do you know if firefighters shut off the gas in a gas leak?

109. Are EMTs and paramedics able to take a door?

110. Did you receive special training to be a dispatcher?

111. What did that training consist of?

112. Do you recall how long the training was?

113. When you started as an EMT, did you work in the field at all?

114. Did you start as a call taker?

25

115.    How long were you a call taker for?

116.    As an EMT, have you ever conducted a building inspection?

117.    Have you ever issued a summons?

118.    Have you ever applied to be a rescue paramedic or EMT?

119.    Do you know what a rescue paramedic is?

Defendant also asked several follow up questions to the above questions on this topic. *See* **Exhibit G** Sample deposition transcripts of Richard Guzman and Alicia Elkadi.

Likewise, Defendant offers no legitimate basis for why it needs to depose absent class members on this topic when Plaintiffs have already answered 119 questions on this topic along with additional follow up questions specific to each Plaintiffs' responses.

The only topic that could reasonably be construed as a topic Defendant did not already question Plaintiffs on is "how each Plaintiff was recruited to join the FDNY." Plaintiffs argue that Defendant is not entitled to re-depose witnesses, regardless of it having put on the record in one of these depositions that it reserved its right to do so. That is not sufficient to entitle Defendant to depose that witness or the 22 other Plaintiffs for a second day absent a stipulation between parties or a Court order, neither of which Defendant secured.

. Notwithstanding this, and in the interest of cooperation, Plaintiffs are willing to provide a response to the question of how they were recruited to the FDNY. But in the interest of avoiding unnecessary and substantial cost and delay, Plaintiffs respectfully ask that they be allowed to do so via interrogatory response.

## B. <u>Defendant's Deposition Notices Violate FRCP 30</u>

Defendant's Deposition Notices violate FRCP 30 and this Court should not allow Defendant to misuse the discovery process in this way.

First, depositions are limited to one day. *See* FRCP 30(d)(1). Defendant may not depose Plaintiffs for a second day as it now seeks. Defendant ignores this fact in its portion of the instant letter.

Second, Defendant has already conducted twenty-three (23) depositions including all representative Plaintiffs in this matter and as such has far exceeded its ten (10) deposition limit pursuant to Rule 30. To conduct additional depositions Defendant would have needed to get leave from the Court. *See* FRCP 30(a)(2)(A)(i). Defendant has neither sought this leave, nor should the Court grant such leave as Defendant has offered no reasonable basis for this last-minute barrage of depositions. Defendant again ignores this fact in its instant letter.

26

Third, Defendant is also barred under Rule 30 from re-deposing witnesses that have already been deposed absent Court leave. *See* FRCP 30(a)(2)(A)(ii).  In fact, Defendant has failed to even seek such leave, nor should the Court entertain such a request as Defendant offers no justification for such drastic relief.  Defendant likewise ignores this fact in its instant July 16, 2025 letter.

Further, the substantial time, cost and burden required to depose this large number of witnesses, especially when Defendant has already had the opportunity to examine all the Plaintiffs already and doing so as explained above again would be duplicative is unduly burdensome. *United States v. Prevezon Holdings*, Ltd., 320 F.R.D. 112, 114 (S.D.N.Y. 2017) (Courts must consider whether the second deposition "would be unnecessarily cumulative," whether the party requesting the deposition "has had other opportunities to obtain the same information," and whether "the burden of a second deposition outweighs its potential benefits.").  The preparation and attendance of the twenty-three (23) depositions Defendant already conducted required several hundreds of hours of time. In addition, hundreds of hours were spent meeting and conferring, reviewing deposition transcripts, and preparing, locating and producing documents related to these depositions. Defendant's request to duplicate these efforts is unwarranted and untenable   Moreover, Defendant has waived its right to do so.

Fourth, Defendant ignores the Court's recent ruling on the requirements under the apex doctrine [ECF No. 221] and seeks to depose the Presidents of the Union Plaintiffs without any basis or even an allegation that there exist the extraordinary circumstances, which Defendant strongly argued are required, to entitle them to do so.  *See* ECF No. 220.  Defendant should instead, while it still has time, serve 30(b)(6) Notices if it believes there is testimony needed from the Union Plaintiffs.  Defendant argues in its July 16, 2025 letter that Union Plaintiffs presidents have information on these topics.  But that is not disputed.  Nor is it the standard under the apex doctrine. Again, Defendant demonstrates a double standard is it seeks to depose these presidents while objecting to producing high ranking officials of Defendant.  Plaintiffs' high ranking officials are entitled to the same protections as Defendant's.

Defendant claims that it is excused from the apex doctrine here because Union Plaintiffs' presidents "sat at the table" along with dozens of other individuals, during negotiations and were signatories on documents.  This hardly meets the extraordinary circumstances required to depose high-ranking officials.  Less than a month ago Defendant was clear on this burden and argued that standing on the stage *and* making public statements did not meet this requirement.  Defendant is not allowed a double standard with regards to the application of the apex doctrine and Defendant has not even attempted to explain here what unique information Union Plaintiff presidents have or how it is otherwise entitled to this extraordinary relief.

Defendant is also incorrect that Union Plaintiffs are the appointed entities to engage in bargaining.  The bargaining certificates are held by District Council 37, who likewise sign the agreements.  Moreover, these negotiations are to apply pattern increases that are not set by

27

Plaintiffs. As Judge Torres has already held "… [Defendant] testified that the [Plaintiff Union] would not be able to negotiate a pay increase without accepting decreases in other forms of compensation such that the economic value of total compensation would not exceed the civilian pattern increase…" *See Chalmers v. City of New York*, 20cv3389 at ECF No. 98, at p. 42, f. 8.

Additionally, Defendant has utterly failed to demonstrate or even address what basis it has to depose non-representative class members. As a preliminary matter, Defendant may only seek discovery on common questions. *Redmond v. Moody's Inv. Serv.*, No. 92 CIV. 9161 (WK), 1995 WL 276150, at *1 (S.D.N.Y. May 10, 1995). To depose non-representative class members, Defendant must demonstrate that the information it seeks from non-representative class members on common questions is unavailable from representative class members. *Id.* Given this prerequisite, it is "rare" for such depositions to be permitted. *Clark v. City of New York,* No. 18CV2334ATKHP, 2022 WL 17496225, at *3 (S.D.N.Y. Dec. 8, 2022).[11] Defendant has made no effort to even allege what the common questions are it seeks to examine that Plaintiffs have not already testified to.

Defendant's stated purpose is to examine these absent class members on job duties of EMS and their comparators.  But as demonstrated above Plaintiffs have already testified to this and there is no basis by which Defendant can assert Plaintiffs were unable to answer a question.  Defendant fails to identify what common question about job duties representative Plaintiffs are unable to answer.  Instead, Defendant, unhappy with the answers provided by twenty-three Plaintiffs it has already deposed, seeks a fishing expedition to find additional testimony.  This is impermissible under FRCP 26 but also because "Generally, absent class members are not considered 'parties' for purposes of discovery." Guenther v. Sedco, Inc., No. 93-cv-4143, 1998 WL 898349, *6 (S.D.N.Y. Dec. 22, (1988)).

Defendant has failed to meet its burden to establish this discovery 1) is needed, 2) won't impose an undue burden on the absent class members and 3) is not available from the representative Plaintiff. *See In re Warner Chilcott Ltd. Sec. Litig*., 06 Civ. 11515 (WHP), 2008 WL 344715 at *2 (S.D.N.Y. Feb. 4, 2008) (Pauley, D.J.), citing *Krueger v. New York Tele. Co*., 163 F.R.D. 446, 450 (S.D.N.Y. 1995) (Koeltl, D.J.).

Moreover, the caselaw Defendant cites is not only distinguishable but illustrates why Defendant is not entitled to depose absent class members here.

In *City of Clark*, No. 18CV2334ATKHP, 2022 WL 17496225 (S.D.N.Y. Dec. 8, 2022)*,* Defendant sought to depose non-representative class members because the two named

---

[11] In *Redwood v. Moody*, an employment discrimination class action, the court denied the Defendant's request to depose non-representative class members, stating that the defendant had "not identified any such class member whose knowledge about class wide issues is superior to that of the named plaintiffs." No. 92 CIV. 9161 (WK), 1995 WL 276150, at *2  (S.D.N.Y. May 10, 1995). The court also noted that the depositions would be unduly burdensome both for the non-representative class members and class counsel. *Id.*

plaintiffs did not have knowledge of the various faiths present in the class and could not speak to the differences among religions. *Id.* The Court in *Clark* also limited the total deposition time to 70 hours, i.e. the length of time permitted under FRCP 30.  Here, Defendant has deposed twenty-three Plaintiffs for whom Defendant has not even alleged a common question they did not have knowledge on, for more than 70 hours.

In *LoCurto v. AT&T Mobility Services, LLC*, No. 13 Civ. 4303 (AT)(GWG) (S.D.N.Y. Feb. 13, 2019) (Gorenstein, J.) the information sought from absent class members again could not be obtained from the representative plaintiffs. In particular, there were no facts on the record necessary to determine if class members were eligible or exempt.  The court ruled that a sampling of absent class members would be necessary in order to determine whether everyone in the class was exempt or eligible.  Here there is no common question Defendant cannot get answered from Plaintiffs and parties have already agreed to and identified who the eligible class members are, even sending notice to the same.

In summary, Defendant has failed to secure leave from the Court for the Notices it served, has failed to explain why it is entitled to such extraordinary relief, has already deposed Plaintiffs on all but one of the topics it has identiied, has the option of serving a 30(b)(6) notice on Union Plaintiffs, and identifies no common questions that Representative Plaintiffs have been unable to testify to.  Moreover, conducting fifty-three (53) additional depositions is unnecessary, would offer little probative value and would be extremely unduly burdensome and prejudicial to Plaintiffs.

As such, respectfully, we ask that Your Honor issue a protective order quashing Defendants' Notices.

The Individual Plaintiffs have already been deposed, but Plaintiffs would consent to produce a 30(b)(6) witness so that Defendant can depose them on behalf of Union Plaintiffs and answer Plaintiffs question of how Plaintiffs were recruited to the FDNY through and interrogatory response.

Defendant again misrepresents the factual history, claiming that Plaintiffs had limited the initial deposition to topics related to class certification.  In reality, *parties* first agreed to limit initial depositions of Plaintiffs to just topics related to certification and allow a continuance of those depositions during merits discovery.  *See* **Exhibit C** of parties' July 3, 2025 joint letter at ECF No. 233-3. (May 12, 2023 email from Defendant's counsel confirming "[w]e are deposing Plaintiffs as to their adequacy as class representatives").  But Defendant changed its mind and instead served deposition notices on Plaintiffs insisting it conduct examinations with any limitations on those depositions.  *See* **Exhibit D** of parties' July 3, 2025 joint letter at ECF No. 233-4.  In response, Plaintiffs put Defendant on notice through formal objections, in advance of these depositions that if Defendant chose to examine Plaintiffs on all topics and for more than two (2)  hours it would waive its right to re-produce them at a later time.  *See* **Exhibit E** of parties' July 3, 2025 joint letter at ECF No. 233-5. (June 2, 2025 Objections advising "Plaintiffs also reserve their right not to re-produce

these witnesses during merits discovery in the event the Court grants class certification if, despite the instant notice of Plaintiffs objections, Defendant insists on examining these witnesses on issues outside the scope of class certification."). Defendant made the informed and express decision to proceed without any limitations on the scope of topics in Plaintiffs' examinations and further made clear, absent a protective order, it would not limit depositions as to time. *See* **Exhibit F** of parties' July 3, 2025 joint letter. (June 13, 2023 Email from Defendant's counsel "We are not agreeing to limit [depositions] to two hours… if you want to limit the time, then you can make a motion for a protective order."). Defendant had the opportunity and declined to limit Plaintiffs' deposition to two hours. It benefited from having examined Plaintiff on all topics, not just those related to class certification, but on the merit topics it outlined above, early on in the litigation. It is not entitled to now "re-do" Plaintiffs depositions.

Defendant also misstates that "Plaintiffs' position is also contradictory to the distinction they have long drawn when it suited them between class discovery and merits discovery. Just two months ago, for example, Plaintiffs argued to the Court that, while they had previously sought discovery back to only 2016, they had done so because it was 'the minimum discovery necessary for class certification' and that they were now entitled to 'seek a wider scope [of discovery] during merits discovery." *See* Dkt. No. 208 at 5. The City is also entitled to obtain appropriate merits discovery." First, Defendant is referring to a document request not production of a witness which FRCP 30 allows a production of only once. Second, Plaintiffs did narrowly construe its requests during class certification with regards to depositions as well. Defendant did not. Plaintiffs noticed depositions for and conducted depositions for 2 fact witnesses. Defendant noticed 26 and conducted 23. Defendant is allowed to and has conducted depositions on substantive topics. It can only identify one topic it did not depose Plaintiffs on.

For all these reasons, Plaintiffs respectfully ask that Your Honor quash Defendant's duplicative and overreaching Deposition Notices and allow Plaintiffs to respond to Defendant's question regarding how Plaintiffs were recruited to the FDNY through an interrogatory response. Plaintiffs also do not object to producing a 30(b)(6) witness for Union Plaintiffs.

## Issue 3: Defendant Has Failed to Meet its Burden to Justify its Request to Compel a Second ESI Search Especially The Overreaching Search Defendant Requests

### A. Plaintiffs Have Made A Complete Production of Information Responsive to Defendant's Requests, And Defendant's Instant Requests are Improper

Plaintiffs have produced all ESI and non-ESI information responsive to Defendant's discovery requests that are in Plaintiffs' possession. Defendant is unable to identify any deficiencies in Plaintiffs' production that would justify its request to now perform additional ESI searches. Nor can it justify its demand that Plaintiffs supplement their ESI search. Respectfully, Defendant is merely attempting to gain unfettered access to broad swaths of Plaintiffs' records through its self-described "myriad" of discovery demands such as duplicative and speculative ESI

searches untethered to any discrete discovery request, of which the burden to produce far outweighs any probative value. These requests are unreasonable and would only delay and prejudice these proceedings.

Defendant, citing *Komatsu v. City of New York*, 2020 U.S. Dist. LEXIS 238711, at *5 (S.D.N.Y. Dec. 18, 2020) claims that Plaintiffs position is that they need not produce information in their possession because it is in Defendant's possession. As Defendant is aware, that is *not* Plaintiffs' position. Plaintiffs position as made abundantly clear to Defendant is that they have produced all information having made a reasonably diligent search, with the exception of a handful of topics Plaintiffs object to, while reserving all rights, remedies and objections.

Defendant cannot name any document it is searching for. It is simply searching to find whatever it can to support its upcoming motion for decertification. Defendant cannot identify a topic it has not had the opportunity to depose Plaintiffs on, other than how Plaintiffs were recruited to the FDNY, it simply wants to re-depose Plaintiffs in hopes of being able to find something to impeach them on in hopes it can decertify the class. As the Courts have made clear, this is not an appropriate use of discovery. Moreover the extreme volume of discovery Defendant seeks underscores the unreasonableness of these requests. While the ESI searches would be hundreds of hours, re-deposing Plaintiffs would be thousands of hours. This would also derail this action for close to a year and cause extreme prejudice to Plaintiffs.

### Issue 4: Defendant Has Failed to Establish a Basis for NYCERS Authorizations And Refuses to Cooperate with Plaintiffs Efforts to Secure NYCERS Information

Defendant's First Set of Interrogatories and Document Requests were served on March 9, 2023 ("2023 RFP") and responded to on April 10, 2023. Defendant for the first time on April 22, 2025 claimed that Defendant took issue with portions of Plaintiffs production and responses to those requests. In specific, Defendant now demands that Plaintiffs produce NYCER release forms in response to document request number 48, two and a half years later. This request is untimely.

As Plaintiffs have advised in its April 28, 2025 letter, Defendant has waived any objections it may have with Plaintiffs production having failed to raise any issues with that production for two and a half years. In addition, Defendant fails to properly explain why it needs this information and almost more importantly what information in NYCERS it needs. Defendant never provided an Authorization Form and its time to do so has long passed. Moreover, to the extent Defendant cites *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 2022 WL 17740157, at *10 (S.D.N.Y.) Dec. 16, 2022) for the proposition that Plaintiffs cannot allege harm unless they actually apply for disability benefits from NYCERS, this is incorrect. To the extent Defendant is trying to find out the difference in benefits between NYCERS and NYC Fire Pension, that information is not in Plaintiffs' personal NYCERS files.

Defendant had explained that it seeks "authorizations to obtain plaintiffs' NYCERS pension records for any plaintiff who claim they were discriminated against when seeking disability retirement." Plaintiffs are not alleging plaintiffs are discriminated "when seeking disability retirement." They allege Defendant subjugates uniform EMS to the civilian NYCERS system which results in disparate treatment and impact in terms of lesser benefits. Again, this information is not available in Plaintiffs personal NYCERS files. To the extent Defendant wants to confirm the allegations in the Complaint regarding Plaintiffs efforts to get disability benefits, upon information Defendant, the City of New York is already in possession of that information. Finally, upon information, Defendant is in possession of all relevant NYCERS information both because NYCERS provides information regarding employees' benefits to Plaintiffs on a regular basis, and because Defendant's FISA and OPA are responsible for processing and forwarding to NYCERS the deductions from its employees paychecks that make up the benefits, a copy of which is also maintained by Defendant.

Plaintiffs offered to settle this dispute by coming to an agreed to request for information to jointly submit to NYCERS. Defendant refused.

Plaintiffs respectfully ask that Your Honor deny Defendant's late request having waited two and a half years. Alternatively Plaintiffs ask that Your Honor direct parties to meet and confer on this issue so that it can agree to a joint request to NYCERS.

### *Issue 5: Plaintiffs Have Identified The Responding Plaintiff For Each Set Of Responses To The City's Second Sets Of Interrogatories And Requests For Production Of Documents.*

Defendant claims it can only tell which Plaintiff produced the discovery by the name of the PDF that is produced. This is sufficient pursuant to FRCP 34. *See* FRCP 34(b)(2)(E)(i), (ii). Furthermore, upon information Defendant has already identified the Plaintiffs and information produced. Moreover, Plaintiffs provided documents in one response because Defendant served all Plaintiffs in one request. Notwithstanding this, if Defendant has any genuine questions regarding this production or seek good faith clarification, if Defendant can identify what it still needs Plaintiffs can provide that information. However, again, upon information, Defendant is able to and has already identified the documents with the Plaintiffs who have produced them.

We again thank the Court for its time and attention.


Respectfully Submitted,
_____//s//_____
Yetta G. Kurland